LEXSEE 2006 US DIST LEXIS 58033

**ROBERT L. PUGH, et al., Plaintiffs, v. SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, et al., Defendants.**

Civil Action 02-02026 (HHK)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2006 U.S. Dist. LEXIS 58033

May 11, 2006, Filed

**PRIOR HISTORY:** Pugh v. Socialist People's Libyan Arab Jamahiriya, 2006 U.S. App. LEXIS 5612 (D.C. Cir., Mar. 2, 2006)

**COUNSEL:** [*1] For ROBERT L. PUGH, Individually on his own behalf and asExecutor of the Estates of Bonnie Barnes Pugh and Malcolm R. Pugh, Individually on her own behalf and as Executrix of the Estate of Harvey Mills Coverley, DEBORAH VAUGHN SCHOOLING, Individually on her own behalf and as Executrix of the Estate of James E Turlington, Sr., JANA ELIZABETH TURLINGTON, JIMMY BRUCE TURLINGTON, CHRISTOPHER DARWYN TURLINGTON, DAVID ONLEY TURLINGTON, JAMES ELDEE TURLINGTON, JR., EDDIE DON TURLINGTON, JOYCE WRIGHT, Individually on her own behalf and as Executrix of the Estate of Elvee Turlington, RUSSELL TURLINGTON, MARY KATHRYN HASSETT, Individually on her own behalf and as Executrix of the Estate of Margaret Elizabeth Schutzius, WILLIAM CARL SCHUTZIUS, CATHERINE ALEXANDRIA SCHUTZIUS, CHRISTOPHER MATTHEW SCHUTZIUS, JOHN BENEDICT SCHUTZIUS, ERMINE HAILEY, Individually on her own behalf and as Executrix of the Estate of Patrick Wayne Huff, JAN PATILLO, Individually on her own behalf and as Executrix of the Estates of James E. Huff and Janice Huff, MICHAEL HUFF, AMANDA HILL, JARED HILL, SUSAN WARNER, SHERRY WARNER, IOANA ALIMANESTIANU, Individually on her own behalf and as Executrix of the Estate of Mihai [*2] Alimanestianu, IRINA ALIMANESTIANU, JOANNA ALIMANESTIANU, NICHOLAS ALIMANESTIANU, ALEXANDER ALIMANESTIANU, SERBAN ALIMANESTIANU, CALIN ALIMANESTIANU, PAULINE ALIMANESTIANO, As Executrix of the Estate of Constantin Alimanestiano, CARLA J. MALKIEWICZ, Individually on her own behalf and as Executrix of the Estate of Mark E. Corder, THERESE CODDINGTON, Individually on her own behalf and as executrix of the Estate of Edward A. Corder, MICHAEL J. CORDER, INTERLEASE, INC., SALLY CHISHOLM JOHNSON, Individually on her own behalf and as Executrix of the Estate of Georgia Mae Chisholm, ALL PLAINTIFFS, Plaintiffs: Michael Lee Martinez, Stuart H. Newberger, Shari Ross Lahlou, CROWELL & MORING, L.L.P., Washington, DC.

For JANET WARNER,Individually on her own behalf and as Executrix of the Estates of Donald J. Warner and Alvin Warner, Plaintiff: Michael Lee Martinez, Stuart H. Newberger, CROWELL & MORING, L.L.P., Washington, DC.

For THE SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRYA, LIBYAN EXTERNAL SECURITY ORGANIZATION, also known as JAMAHIRIYA SECURITY ORGANIZATION, MUAMMAR QADHAFI, ABDALLAH SENOUSSI, AHMED ABD ALLAH ELAZRAGH, IBRAHIM NAELI, ARBAS MUSBAH, ISSA ABDELSALAM SHIBANI, ABDELSALAM [*3] HAMMOUDA EL AGELI, Defendants: Arman Dabiri, LAW OFFICES OF ARMAN DABIRI & ASSOCIATES, P.L.L.C., Washington, DC.

For UNITED STATES OF AMERICA, Interested Party: Daniel Riess, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

For LA REUNION AERIENNE, Movant: Christopher Burgess Kende, COZEN O'CONNOR, New York, NY; Peter John McHugh, John F. Keating, Jr., KEATING & MCHUGH, New York, NY.

**JUDGES:** Henry H. Kennedy, Jr., United States District Judge.

**OPINION BY:** Henry H. Kennedy, Jr.



Case 1:06-cv-00727-GK   Document 17-4   Filed 12/05/2006   Page 2 of 15

Page 2
2006 U.S. Dist. LEXIS 58033, *

OPINION:

### MEMORANDUM OPINION AND ORDER

On September 19, 1989, Union des Transports Aeriens ("UTA") Flight 772 exploded in mid-air over Niger, Africa, killing all 170 people on board. The personal representatives and family members of the seven American victims and the corporate owner-lessor of the exploded airplane bring this action against the Socialist People's Libyan Arab Jamahiriya ("Libya"), the Libyan External Security Organization ("LESO"), Muammar Qadhafi in his official capacity as Libya's Head of State, and six other high-ranking Libyan government officials in their personal capacities. n1 Plaintiffs seek to hold defendants liable, pursuant to the state-sponsored terrorism exception of the Foreign Sovereign [*4] Immunities Act, 28 U.S.C. § 1605(a)(7), for violating, inter alia, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, the so-called Flatow Amendment, 28 U.S.C. § 1605 note, and 18 U.S.C. § 2333(a). Plaintiffs also assert various state and federal common law causes of action.

> n1 The individual defendants are Abdallah Senoussi, Ahmed Abdallah Elazragh, Ibrahim Naeli, Abras Musbah, Issa Abdelsalam Shibani, and Abdelsalam Hammouda El Ageli. Plaintiffs' complaint sues these individuals in both their personal and official capacities. During a hearing on the parties' cross motions for summary judgment, plaintiffs' counsel indicated that plaintiffs now wish to proceed against these six defendants in their personal capacities only.

Before the court are the parties' cross motions for summary judgment. Upon consideration of the motions, the oppositions thereto, the record of the case, and the argument of counsel [*5] at a hearing, the court concludes that both motions should be granted in part and denied in part.

### I. BACKGROUND

#### A. Factual Background

The claims in this case arise out of the September 19, 1989, bombing of UTA Flight 772. The flight originated in Brazzaville, Congo, and was en route to Paris following a layover in N'Djamena, Chad, when it exploded. The explosion killed all 170 people aboard the DC-10 airplane, including seven Americans.

Soon after the bombing, the French Government initiated an investigation into the cause of the explosion. The investigation was headed by Magistrate Judge Jean-Louis Bruguiere, a counterterrorism expert in France, who was aided in his investigation efforts by, among others, France's intelligence and investigative services, the U.S. Federal Bureau of Investigation, the U.S. National Transportation Safety Board, as well as other international intelligence officials. The investigation recovered and analyzed over fifteen tons of wreckage, obtained confessions from some of the people involved in planning the bombing, and interviewed numerous other individuals. Magistrate Judge Bruguiere ultimately concluded, in January 1998, that Libya [*6] was responsible for the bombing of UTA Flight 772 and that it had used senior intelligence agents -- the individual defendants in this case -- to plan and coordinate the explosion.

As a result of this investigation, the six Libyan intelligence officers sued in this case were criminally tried, in absentia, in a special Court of Assize in March 1999. Following a three-day hearing, the six officers were convicted of deliberately destroying, or deliberately being involved in the destruction of, the UTA airliner by means of an explosive device and intentionally taking the lives of the passengers and crew on board. Each was sentenced to life in prison. n2 Following the criminal trial, the Court of Assize also heard civil charges against defendants brought by family members of some of the victims of the bombing and issued a civil judgment in July 1999 totaling approximately $ 33 million. The Libyan government, despite having not accepted responsibility for the UTA Flight 772 bombing, paid the civil judgment.

> n2 Libya never honored French arrest warrants for the individual defendants and refused to extradite them to France.

[*7]

The U.S. Department of State has also concluded that Libya was responsible for the bombing of UTA Flight 772, as well as for the bombing of Pan Am Flight 103 over Lockerbie, Scotland. See Pls.' Mot. for Partial Summ. J. ("Pls.' Mot."), Ex. 6-B, at 32 ("We [the Department of State] believe that these two incidents, resulting in the murder of 441 people, were executed with the knowledge and approval of officials at the highest level of the Libyan Government."). Additionally, the UN Security Council imposed international sanctions against Libya as a result of these bombings.

#### B. Procedural History

Plaintiffs in this case are thirty-six individuals, who sue on their own behalf and on behalf of the estates of the American victims of the UTA Flight 772 bombing, and one corporation, Interlease, Inc. ("Interlease"). Interlease is a Georgia corporation that owned and leased to

UTA the DC-10 airplane that was destroyed in the bombing. Plaintiffs filed their 180-paragraph complaint in 2002, which sets forth six counts on behalf of the individual plaintiffs n3 and three counts on behalf of Interlease. n4 In addition to compensatory damages, plaintiffs seek punitive damages against [*8] the individual defendants and LESO under 29 U.S.C. § 1605 note. This case was originally assigned to Judge Thomas Penfield Jackson.

n3 The counts set forth on behalf of the individual plaintiffs are (1) wrongful death, (2) survival damages, (3) economic damages, (4) intentional infliction of emotional distress, (5) loss of solatium and (6) loss of consortium.

n4 The counts set forth on behalf of Interlease are (1) conversion, (2) tortious interference, and (3) violation of 18 U.S.C. § 2333(a).

In response to the complaint, defendants filed a motion to dismiss that asserted a host of defenses. Based on the consistent holdings of cases that had been decided in this jurisdiction by district judges and the D.C. Circuit at the time, Judge Jackson quickly rejected a number of defendants' arguments, including: (1) defendants' suggestion that this court cannot constitutionally exercise personal jurisdiction over the Libyan state; (2) defendants' argument that the Flatow [*9] Amendment does not create a private cause of action against Libya; n5 and (3) defendants' assertion that the case should be dismissed on *forum non conveniens* grounds.

n5 Since Judge Jackson made this ruling, the D.C. Circuit has addressed the issue and adopted a contrary holding. In *Ciccipio-Puleo v. Islamic Republic of Iran*, the D.C. Circuit held:

[N]either 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government. Section 1605(a)(7) merely waives the immunity of a foreign state without creating a cause of action against it, and the Flatow Amendment only provides a private right of action against officials, employees, and agents of a foreign state, not against the foreign state itself.

359 U.S. App. D.C. 299, 353 F.3d 1024, 1033 (D.C. Cir. 2004). The D.C. Circuit later clarified that any suit against an official of a foreign state under the Flatow Amendment must be "a suit in that official's *personal* capacity." *Acree v. Republic of Iraq*, 361 U.S. App. D.C. 410, 370 F.3d 41, 59 (D.C. Cir. 2004) (emphasis in original). Based on these holdings, defendants move for summary judgment on plaintiffs' claims against Libya and LESO under the Flatow Amendment. This argument is addressed in detail below.

[*10]

Judge Jackson discussed in more detail the remaining two arguments presented by defendants' motion. With respect to defendants' argument that this court is unable to exercise personal jurisdiction over the individual defendants consistent with due process principles, Judge Jackson held that "it is altogether foreseeable that some Americans would be aboard [Flight 772], whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003). As such, defendants should have anticipated the possibility of being "haled into court" in the United States in some capacity. *Id.* at 60. Accordingly, Judge Jackson concluded that the exercise of personal jurisdiction over the individual defendants in their personal capacities did not offend any "'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)). Defendants neither asserted any argument that the exercise of personal jurisdiction over the individual defendants in their personal capacities [*11] violated any statutory provision nor objected to either the sufficiency of process or the service thereof. n6

n6 In their motion for summary judgment, defendants reiterate their argument that the court lacks personal jurisdiction over the individual defendants in their personal capacities. Defendants acknowledge that Judge Jackson already rejected this argument, but nonetheless contend that Judge Jackson's "reasoning is not supported by case law." Defs.' Opp'n at 12.

The court sees no need to reconsider Judge Jackson's holding that the court may exercise personal jurisdiction over the individual defendants

and finds that such holding is perfectly consistent with this Circuit's precedents. *See, e.g., Mwani v. Bin Laden*, 368 U.S. App. D.C. 1, 417 F.3d 1, 12-13 (D.C. Cir. 2005) ("[S]o long as [an] actor's efforts are purposefully directed toward residents of another [forum], the Supreme Court has consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.") (internal quotations omitted) (alterations in original).

[*12]

As for defendants' contention that Interlease's claims should be dismissed for lack of subject matter jurisdiction, Judge Jackson agreed that the claims against the Libyan state, LESO, and against the individual defendants in their official capacities were barred, but held that, to the extent that Interlease's claims "are limited to the individual defendants *in their personal capacities*," they may go forward. *Pugh*, 290 F. Supp. 2d at 61 (emphasis added). n7

n7 Defendants had argued that Interlease's claims were barred by sovereign immunity and by 18 U.S.C. § 2337, which precludes actions under 18 U.S.C. § 2333 against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof within his or her official capacity or under color of legal authority."

Defendants sought an interlocutory appeal of Judge Jackson's rulings, which the D.C. Circuit dismissed for lack of jurisdiction. In the meantime, [*13] the case was reassigned to this judicial officer.

## II. ANALYSIS

Plaintiffs move for partial summary judgment, seeking a judgment of liability against all defendants. Once the court rules on the question of liability, assuming a finding that defendants are liable for the destruction of UTA Flight 772, plaintiffs suggest that they would then seek an evidentiary hearing to determine the scope of damages. Defendants oppose plaintiffs' motion on several grounds and also move for summary judgment, arguing that plaintiffs' complaint should be dismissed for legal reasons.

### A. Factual Issues

In support of their motion for summary judgment, plaintiffs filed a proper, and very detailed, statement of material facts as to which there is no genuine dispute. The statement itself is over 80 pages and consists of over 300 paragraphs. Plaintiffs also filed voluminous exhibits, including, *inter alia*, the investigation report of Magistrate Judge Bruguiere, various French reports and decisions involving the bombing of UTA Flight 772, a very detailed affidavit by terrorism expert and former member of the U.S. National Security Council, Ambassador Thomas E. McNamara (retired), and numerous [*14] other reports, declarations, and press releases.

In opposition, defendants not only fail to submit any contrary evidence, but fail, as well, even to suggest that contrary evidence might exist. Moreover, defendants have not complied with Local Rule 56.1, which requires an opposition to a motion for summary judgment be "accompanied by a separate and concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated. . . ." LcvR 56.1. Rather, defendants raise four vague and unsupported challenges to the evidence submitted by plaintiffs, none of which is sufficient to preclude the court from concluding that no genuine dispute of material fact exists.

First, defendants argue that, because Libya itself was not a party to the French criminal proceeding and the individual defendants were tried *in abstentia*, the proceeding "cannot be relied upon." Defs.' Opp'n to Pls.' Mot. for Summ. J and Cross Mot. for Summ. J ("Defs.' Opp'n") at 2. Furthermore, defendants state that the "French standards of criminal law are not adequate and do not provide the same standards as the American legal system." *Id.* These [*15] unsupported arguments are insufficient to preclude the court from considering the French proceeding for its evidentiary value. *See Donnelly v. FAA*, 366 U.S. App. D.C. 291, 411 F.3d 267, 270-71 (D.C. Cir. 2005) ("[P]rinciples of comity suggest that the [foreign] judgment should be given weight as *prima facie* evidence of the facts underlying it and the burden was on [the party challenging the reliability of the foreign judgment] to impeach the judgment."). Moreover, the French judgment is not the sole evidence of liability provided by plaintiffs, but is rather one piece of plaintiffs' submission. Plaintiffs also introduce, *inter alia*, numerous affidavits, declarations, and reports.

Second, defendants object to plaintiffs' use of newspaper articles, arguing that "they are inadmissible under Federal Rule of Evidence 703." Defs.' Opp'n at 2-3. Whether or not these newspaper articles are admissible is ultimately not material, for they are not used to establish any specific facts. Even were the newspaper articles completely disregarded, there still would be ample evidence upon which to determine that defendants should be held liable for the UTA Flight 772 bombing.

Third, defendants [*16] argue that, because they have "not yet had the opportunity to depose, test the ex-

pertise, and to check the veracity of" the authors of the various declarations and affidavits submitted by plaintiffs, this court cannot "simply accept [them] as true . . . and accept opinions of various individual [sic]." *Id.* at 3. As plaintiffs correctly note, defendants fail to understand their burden at this stage of the litigation, for it is well settled that an unsupported argument that further discovery is needed is insufficient to defeat summary judgment. Rather, the Federal Rules of Civil Procedure require that a non-movant who wishes to postpone summary judgment to obtain further discovery must file an affidavit explaining the reasons why he cannot "present by affidavit facts essential to justify the party's opposition." FED. R. CIV. P. 56(f); *see also Byrd v. EPA*, 335 U.S. App. D.C. 403, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999); *Strang v. U.S. Arms Control & Disarmament Agency*, 275 U.S. App. D.C. 37, 864 F.2d 859, 861 (D.C. Cir. 1989) ("Without some reason to question the veracity of affiants . . ., Strang's desire to 'test and elaborate' affiants' testimony falls short; her plea is too vague to [*17] *require* the district court to defer or deny dispositive action.") (emphasis in original). Defendants have failed to meet the burden imposed upon them by Rule 56(f) to justify further delay in these proceedings.

Finally, defendants claim that plaintiffs "falsely assert that the United States victims of the UTA incident were not offered compensation by the Qadhafi Foundation," which is assertedly "unquestionably false as the compensation offered was to all families of victims." Defs.' Opp'n at 3. Beyond lacking legal relevance, this assertion is factually incorrect as well. Plaintiffs never assert that they were not offered compensation, but rather state that the American

victims of the explosion were never actually compensated by the Foundation. Pls.' Mot. at 6.

\*\*\*

Having rejected defendants' arguments that "genuine issues remain regarding the material facts of the case," Defs.' Opp'n at 1, plaintiffs' evidence stands undisputed and overwhelmingly establishes defendants' culpability and involvement in the bombing of UTA Flight 772. To merit summary judgment, however, plaintiffs must also establish that these facts entitle them to judgment as a matter of law. Defendants present [*18] a host of legal challenges to plaintiffs' numerous claims, each of which is addressed below. Before addressing these arguments, however, a concise discussion of the relevant legal framework is necessary.

### B. Statutory Framework

As a general rule, the Foreign Sovereign Immunities Act ("FSIA"), enacted in 1976, establishes that foreign states (including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a)), are immune from suit in courts in the United States. 28 U.S.C. § 1604. n8 A limited number of exceptions to this general rule of immunity are enumerated. *Id.* § 1605. The most recent of the exceptions, and the one implicated in this case, provides that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case" where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." *Id.* § 1605(a)(7).

---

n8 Section 1604 of FSIA, 28 U.S.C. § 1604, states:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605-1607 of this chapter.

---

[*19]

In order for this so-called "state-sponsored terrorism exception" to apply, three criteria must be satisfied: (1) the foreign state must be designated as a state sponsor of terrorism at the time of the terrorist act or as a result of the terrorist act, (2) the foreign state must be afforded a reasonable opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim has been brought; and (3) either the claimant or the victim must have been a national of the United States at the time of the terrorist act. *Id.* § 1605(a)(7)(A),(B); *see also Cicippio-Puleo v. Islamic Republic of Iran*, 359 U.S. App. D.C. 299, 353 F.3d 1024, 1028-29 (D.C. Cir. 2004). There is no dispute in this case that the state-sponsored terrorism exception waives Libya's sovereign immunity and that the court has jurisdiction to hear plaintiffs' claims against Libya and LESO.

Section 1605(a)(7) of FSIA is "merely a jurisdiction-conferring provision that does not otherwise provide a cause of action against either a foreign state or its agents." *Cicippio-Puleo*, 353 F.3d at 1032. To determine what causes of action, if any, may be pressed against a non-immune foreign [*20] state, FSIA directs courts to

Case 1:06-cv-00727-GK    Document 17-4    Filed 12/05/2006    Page 6 of 15

Page 6
2006 U.S. Dist. LEXIS 58033, *

pre-existing causes of action. Specifically, section 1606 of FSIA states, in relevant part:

> As to any claim for relief with respect to which a foreign state is not entitled to immunity. . ., the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.

28 U.S.C. § 1606. Based on this language, "a plaintiff should be able to bring a cause of action under state or common law, federal statutes (where Congress has not indicated otherwise), and even possibly the law of a foreign country in a Section 1605(a)(7) case, as long as the plaintiff would be able to bring such a claim against an individual in similar circumstances." *Holland v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 40254, at *35-36 (D.D.C. Oct. 31, 2005).

**C. Claims Against Individual Defendants in their Personal Capacities**

Plaintiffs' complaint asserts causes of action against the individual defendants in both their official and personal capacities (with the exception of Qadhafi, who is sued in his official capacity only) based on the same factual allegations. [*21] Noting that plaintiffs have never asserted that the individual defendants "acted out of personal gain or private motivation," Defs.' Opp'n at 4, defendants maintain that the court should dismiss the claims against the individual defendants in their personal capacities because "[i]t is clear that the suit against the individual defendants in their personal capacities is nothing more than a 'redundant' suit against Libya." *Id.* at 4-5. Defendants insist that if the individual defendants:

> took any of the alleged actions asserted by the plaintiffs in their personal capacity, then the suit against Libya as well as its departments should be dismissed immediately. If the actions of the individual defendants were for the furtherance of the Libyan state, then the suit against the individual defendants in their personal capacity must be dismissed. Plaintiffs may not have it both ways.

*Id.* at 5.

Defendants' assertions are *ipsit dixit* and their position cannot be sustained. While it is true that "it is duplicative to name both a government entity and the entity's employees in their official capacity [and that] courts have routinely dismissed corresponding claims [*22] against individuals named in their official capacity as redundant and an inefficient use of judicial resources," *Robinson v. Dist. of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005) (internal quotation omitted), this court rejects defendants' suggestion that the court must dismiss the suit against Libya in order to hold the individual defendants liable in their personal capacities. n9

> n9 As noted *supra*, plaintiffs' counsel concedes that plaintiffs seek to hold the individual defendants liable in their personal capacities only.

In *Kentucky v. Graham*, the Supreme Court sought to "unravel . . . the distinctions between personal-and official-capacity suits." 473 U.S. 159, 163, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). The court wrote that:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer [*23] is an agent."

*Id.* at 165-66 (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)); *see also Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990) ("It is generally recognized that a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly."). The Supreme Court recognized that whether an individual is sued in his personal capacity or in his official capacity has very real consequences, noting that the standards for liability and the available defenses can be different. *Kentucky*, 473 U.S. at 166-67. For example, the defense of sovereign immunity is available only to an individual sued in his official capacity, while a qualified immunity defense can only be asserted by an officer sued in his personal capacity. *Id.*

Importantly, and contrary to defendants' argument, the difference between official-capacity and personal-capacity suits turns on "the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Hafer v. Melo*, 502 U.S. 21, 26, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). [*24] n10 The Supreme Court also has recognized that government of-

Case 1:06-cv-00727-GK    Document 17-4    Filed 12/05/2006    Page 7 of 15

Page 7
2006 U.S. Dist. LEXIS 58033, *

ficials may liable "for damages in their personal capacities, however, even when the conduct in question relates to their official duties." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997).

> n10 At issue in *Hafer* was the extent to which suits for monetary damages could proceed against state officers in Section 1983 claims. Under prior Supreme Court precedent, it was established that suits for monetary damages against state officials in their *official capacities* were precluded by the Eleventh Amendment. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). In *Hafer*, the Court took the opportunity to clarify the holding in *Will* and rejected the argument that, because § 1983 liability is limited to actions taken under color of state law, state officers could not be sued *in their personal capacities* for money damages. The Court wrote: "The requirement of action under color of state law means that Hafer may be liable for discharging respondents precisely because of her authority as Auditor General. We cannot accept the novel proposition that this same official authority insulates Hafer from suit." 502 U.S. at 27-28. By analogy, the individual defendants in this action should not be insulated from suit simply because their conduct was endorsed by the Libyan state.

[*25]

Finally, the two relevant statutes at issue -- the Flatow Amendment and the TVPA -- would be rendered a nullity by adopting defendants' view that the individual defendants cannot be held personally liable for actions taken "for the furtherance of the Libyan state." Defs.' Opp'n at 5. As plaintiffs note, "both federal statutes *impose* liability on government agents and officials *because* they have committed their terrorist acts 'under actual or apparent authority, or color of law, of any foreign nation.'" Pls.' Opp'n at 3. Specifically, actions under the Flatow Amendment, which provides for liability against individuals "acting within the scope of his or her office, 28 U.S.C. § 1605 note, *must* be brought against individual officers in their personal capacity, *Acree*, 370 F.3d at 59 ("[A]ny suit against an official of a foreign state must be a suit in that official's *personal* capacity") (emphasis in original). Accepting defendants' argument that actions against foreign government officials undertaken pursuant to the directive of the foreign state must proceed as official-capacity suits only would preclude liability from ever being [*26] imposed under this statute. The same is true for the TVPA as well, which likewise limits liability to actions taken by foreign officials "under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 note.

For these reasons, the court rejects defendants' argument that the individual defendants cannot be held liable in their personal capacities for actions taken pursuant to their official duties. n11

> n11 Defendants attempt to support their argument by relying on a number of distinguishable cases. *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir. 2002) (noting that it is appropriate to consider whether an action against individual foreign officials is "a disguised action against the nation that he or she represents."); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 104-05 (D.D.C. 2005) (reviewing record and holding that the plaintiffs "do not present legitimate claims against the individual Israeli defendants in their personal capacities."); see also *El-Fadl v. Central Bank*, 316 U.S. App. D.C. 86, 75 F.3d 668, 671 (D.C. Cir. 1996) (rejecting argument that defendant was acting in personal capacity because, "the only evidence in the record shows that [the defendant's actions] were neither personal nor private.").
>
> As plaintiffs correctly argue, these cases all involve situations wherein the plaintiffs attempted to bypass the bar of sovereign immunity by suing the individual officers of the immune foreign state in their personal capacities. Pls.' Opp'n at 7-8. While these cases may include broad language, they should be limited to their holdings; that a plaintiff cannot circumvent the sovereign immunity of a foreign state by targeting the individual foreign government officials who carried out the action when the types of actions they are accused of doing are those sorts of ordinary government activities for which the foreign state enjoys sovereign immunity.
>
> Given this distinction, the courts in the above cases necessarily were required to determine whether the acts were official or personal. However, once the sovereign immunity of the foreign state is waived, "whether or not [defendants'] acts exceeded the scope of their . . . authority is ultimately beside the point." *Meredith v. Fed. Mine Safety & Health Review Comm'n*, 336 U.S. App. D.C. 209, 177 F.3d 1042, 1052 n.8 (D.C. Cir. 1999).

[*27]

### D. Head-of-State Immunity

Defendants argue that Muammar Qadhafi, who is sued in his official capacity only, enjoys head-of-state immunity, thereby requiring the court to dismiss plaintiffs' claim against him.

Prior to the enactment of FSIA, courts "consistently . . . deferred to the decisions of the political branches -- in particular, those of the Executive Branch -- on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B. V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983). During this pre-FSIA era, the Supreme Court held that "the Executive Branch's suggestion of immunity is conclusive and not subject to judicial inquiry." *Ye v. Zemin*, 383 F.3d 620, 625 (7th Cir. 2004) (citing *Ex parte Republic of Peru*, 318 U.S. 578, 589, 63 S. Ct. 793, 87 L. Ed. 1014 (1943)).

FSIA, passed in 1976, confers immunity on foreign states and its political subdivisions. In so doing, the FSIA "transferred the responsibility for case-by-case application of [immunity] principles from the Executive Branch to the Judicial Branch." *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997). Importantly, [*28] however, FSIA is silent with regards to whether heads of state are immune from suit, dealing instead only with the immunity of foreign states themselves. This silence has led to the conclusion by at least two courts of appeals that immunity for foreign heads of state continues to be governed by the pre-FSIA framework. *See, e.g., Ye*, 383 F.3d at 625 ("Because the FSIA does not apply to heads of states, the decision concerning the immunity of foreign heads of states remains vested where it was prior to 1976 -- with the Executive Branch."); *Noriega*, 117 F.3d at 1212 ("Because the FSIA addresses neither head-of-state immunity, nor foreign sovereign immunity in the criminal context, head-of-state immunity could attach in cases, such as this one, only pursuant to the principles and procedures" that existed prior to the enactment of the FSIA"). n12

---

n12 Applying these principles, Judge Urbina requested the position of the Executive Branch regarding whether Qadhafi is entitled to head-of-state immunity in another case in which Qadhafi is a defendant. *Collett v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 237 (D.D.C. 2005). Over a year ago, Judge Urbina held that the "Attorney General may advise the court . . . regarding the application of the head-of-state immunity doctrine." *Id.*, 362 F. Supp. 2d 230 (D.D.C. March 1, 2005). However, to date, the Executive Branch has not yet submitted its views regarding Qadhafi's immunity to Judge Urbina, citing the "host of serious issues with respect to American foreign policy interests." *Id.*, Status Report at 1 (D.D.C. Feb. 1, 2006). In its most recent filing, the Executive Branch indicated that the issue "continues to remain under active consideration" and that a further update will be submitted to Judge Urbina on or before June 1, 2006. *Id.*

---

[*29]

Given the important foreign policy considerations at play and because a federal court must satisfy itself that it has subject matter jurisdiction over a defendant before it proceeds, *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 284 U.S. App. D.C. 333, 905 F.2d 438, 449 (D.C. Cir. 1990) ("Where, as with foreign sovereigns, immunity involves protection from suit, not merely a defense to liability, more than the usual is required of trial courts in making pretrial factual and legal determinations. In such circumstances, it is particularly important that the court satisfy itself of its authority to hear the case, before trial") (internal quotations omitted), the court concludes that it must offer the Attorney General the opportunity to submit his views regarding the possibility of Qadhafi being granted head-of-state immunity in this case. Pending this submission, plaintiffs claims with regards to Qadhafi are stayed.

### E. Available Causes of Action

Having resolved these threshold matters, the court must next address which causes of action are available against which defendants. Plaintiffs seek to hold defendants liable for violating federal statutes, federal common law, as well [*30] as state statutory and common law. The court will address the viability of each available cause of action separately.

#### 1. Liability Under Federal Statutes

Aside from Qadhafi, the defendants here are the Libyan state, LESO, and six Libyan officials who are sued in their personal capacities. Given the text of the federal statutes at issue, it is necessary to analyze the potential liability of the individual defendants and the government defendants separately.

##### a. Individual Defendants

Plaintiffs seek to impose liability against the individual defendants in their personal capacities under three federal statutes: the Flatow Amendment, the TVPA, and 18 U.S.C. § 2333(a). Because the undisputed material facts establish the individual defendants' liaiblity under these statutes, the court grants plaintiffs' motion for partial summary judgment in this regard.

First, plaintiffs look to the Flatow Amendment. The Flatow Amendment, in relevant part, provides:

> [a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency, shall be liable [*31] to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee or agent for which the courts of the United States may maintain jurisdiction under 1605(a)(7).

28 U.S.C. § 1605 note; *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 12-13 (D.D.C. 1998).

Each of the prerequisites to imposing liability under the Flatow Amendment has been satisfied in this case. First, Libya is, and was at the time of the bombing, designated a state sponsor of terrorism. 31 C.F.R. § 596.201. Second, the evidence provided by plaintiffs makes clear that the bombing of UTA Flight 772 was carried out by the individual defendants while acting within the scope of their office and employment. *See, e.g.*, Pls.' Statement of Material Facts PP 8, 40, 50-56, 114-34. Third, the victims at issue in this case were all U.S. nationals at the time of the bombing. Finally, the acts that underlie this case are acts for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of FSIA; namely, extrajudicial killing and aircraft sabotage.

Next, plaintiffs [*32] also seek to impose liability on the individual defendants for violating the TVPA. The TVPA provides, in part, that:

> an individual who, under actual or apparent authority, or color of law, of any foreign nation. . . (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note. Congress defined "extrajudicial killing" to mean any "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people." *Id.* § 1350 note sec. 3(a).

Here, there is no dispute that the individual defendants acted under the authority of the Libyan state when they assisted with the bombing of UTA Flight 772. The undisputed evidence establishes that these actions were deliberately planned with knowledge that the death of those aboard Flight 772, including the seven Americans whose estates and families are plaintiffs here, would result. Moreover, the victims were not [*33] convicted of any crime such that the killings were authorized or lawful. Consequently, the killings were extrajudicial and give rise to liability pursuant to the TVPA.

Finally, plaintiffs seek to hold the individual defendants liable under 18 U.S.C. § 2333(a). n13 18 U.S.C. § 2333(a), which was enacted in 1992, provides that:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). "International terrorism," in turn, is defined to mean activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended --
>
>> (i) to intimidate or coerce a [*34] civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>>
>> (iii) to affect the conduct of a government by assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1).

n13 As noted above, Judge Jackson previously determined that Interlease, the owner-lessor of the DC-10 aircraft that was destroyed, cannot pursue claims directly against Libya, LESO, or the individual defendants in their official capacities. Judge Jackson did, however, expressly hold that Interlease could pursue claims against the individual defendants in their personal capacities. *Pugh*, 290 F. Supp. 2d at 61.

Plaintiffs' motion indicates that all of the individual plaintiffs now also seek to rely on 18 U.S.C. § 2333(a), despite the fact that the complaint only sought to impose liability under this statute on behalf of Interlease. Defendants never objected to plaintiffs' broadening of this claim in their submissions to this court or during the hearing on plaintiffs' motion. Therefore, the court concludes that defendants have waived any objection they might have to all thirty-seven plaintiffs seeking relief under this statute and plaintiffs' complaint is deemed amended to claim such relief.

[*35]

The bombing of UTA Flight 772 satisfies the statutory definition of "international terrorism"; it was a violent act that would be a violation of the U.S. criminal code if committed within the United States, it appears to have been intended to affect the conduct of the French government, Pls.' Statement of Material Facts PP 107-13, and it occurred outside the territorial jurisdiction of the United States. Moreover, by bombing UTA Flight 772, Interlease was deprived of its property -- the DC-10 aircraft -- and the income associated with the long-term lease agreement with UTA, and the victims were deprived of their lives. Finally, the undisputed evidence establishes that the six individual defendants were involved in the bombing. Therefore, the court finds the individual defendants liable under 18 U.S.C. § 2333(a).

b. Government defendants

Plaintiffs also seek to impose liability against Libya and LESO under the Flatow Amendment and the TVPA. n14 These statutes are "not statutes of general application" and instead, by "their very terms, confine their scope to officials or agents of foreign states." *Dammarell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343, [*36] *93 (D.D.C. Mar. 29, 2005). Defendants, therefore, move for summary judgment in their favor on plaintiffs' claims against Libya and LESO under both the Flatow Amendment and the TVPA.

n14 As stated above, Judge Jackson previously ruled in this case that the Flatow Amendment provides a cause of action against the government defendants. *Pugh*, 290 F. Supp. 2d at 57. That holding was overruled by the D.C. Circuit in *Cicippio-Puleo*, 353 F.3d at 1033, which held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." The D.C. Circuit later clarified that any suit against an official of a foreign state under the Flatow Amendment must be "a suit in that official's personal capacity." *Acree*, 370 F.3d at 59.

Also, Judge Jackson previously held that plaintiffs' claims under 18 U.S.C. § 2333(a) could only be pressed against the individual defendants in their personal capacities. *Pugh*, 290 F. Supp. 2d at 61. That holding remains intact and unchallenged.

[*37]

Despite the fact that the texts of these two statutes do not directly create causes of action against the government defendants, plaintiffs nonetheless argue that they can be held liable indirectly, by way of section 1606 of FSIA. As noted above, section 1606 states that, as to any claim for relief with respect to which a foreign state is not entitled to immunity, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Plaintiffs' theory of liability is that Libya and LESO should be held liable under the Flatow Amendment and the TVPA because both statutes "set forth a cause of action and specific damage remedies against private individuals." Pls.' Mot. at 22-23. Therefore, plaintiffs argue, " § 1606 instructs, and indeed requires, that such rights of action and remedies likewise be available against the non-immune foreign state." *Id.* n15 This court disagrees.

n15 The effect of section 1606 on the liability of foreign states under either the Flatow Amendment or the TVPA was not explicitly addressed in neither *Cicippeo-Puleo nor Acree*.

[*38]

To reiterate, the Flatow Amendment creates a specific cause of action against an "official, employee, or agent of a foreign state" for acts over which the court may maintain jurisdiction under the state-sponsored terrorism exception to sovereign immunity. 28 U.S.C. § 1605 note. Two judges in this jurisdiction have explicitly held that the Flatow Amendment should not be expanded to apply to foreign states through application of section 1606. The first, and most extensive, discussion of this issue was provided by Judge Bates in *Dammarell v. Islamic Republic of Iran*. Judge Bates presented four reasons why "the cause of action in the Flatow Amendment cannot be read to apply to foreign states through section 1606": (1) the text of the Flatow Amendment applies only to officials, employees, or agents of a foreign state, not a foreign state itself; (2) the legislative history does not contain any indication that Congress nonetheless intended to create a private cause of action against a foreign state; (3) the statute does not "obviously extend to *private individuals* within the meaning of section 1606," 2005 U.S. Dist. LEXIS 5343, at *97-98 (emphasis [*39] added); and (4) such a holding would be "in at least some tension with *Cicippio-Puleo*," *id*. 2005 U.S. Dist. LEXIS 5343, at 97. Last October, Judge Kollar-Kotelly adopted the rationale laid out by Judge Bates in *Dammarell* and similarly rejected the argument that the Flatow Amendment can be read to apply to foreign states through section 1606. *Holland*, 2005 U.S. Dist. LEXIS 40254, at *41-44. n16

n16 Judge Jackson, in *Dodge v. Islamic Republic of Iran*, reached a contrary conclusion and held without elaboration that a plaintiff, pursuant to section 1606, may sue a foreign state "under *any* cause of action arising from common law, foreign law, or federal statute which might ordinarily give rise only to individual liability," including the TVPA and the Flatow Amendment. 2004 U.S. Dist. LEXIS 29045, at *12 (D.D.C. Aug. 25, 2004) (emphasis added).

The court agrees with the reasoned decisions of Judge Bates and Judge Kollar-Kotelly and likewise concludes that Congress did not intend to create a cause [*40] of action under the Flatow Amendment against foreign states (or its instrumentalities or agents acting in their official capacities) through section 1606 of FSIA.

As the D.C. Circuit has stated, "it is for Congress, not the courts, to decide whether a cause of action should lie against foreign states." *Cicippio-Puleo*, 353 F.3d at 1036. In situations where "Congress has not expressly recognized" a cause of action against foreign states, courts should "decline to imply" one. *Id*. Accordingly, the court dismisses plaintiffs' claims against the government defendants under the Flatow Amendment.

The court also rejects plaintiffs' assertion that section 1606 of FSIA may also be used to expand the terms of the TVPA. As with the Flatow Amendment, the terms of the TVPA make clear that its applicability is limited to suits against individuals, not foreign states. *See* 28 U.S.C. § 1350 note. Moreover, the legislative history of the TVPA demonstrates that Congress did not intend for it to be used to hold foreign states and their instrumentalities liable. First, the Senate Report states unequivocally that the legislation's use of the term "individual" [*41] was intentional and was meant "to make crystal clear that foreign states or their entities cannot be sued under this bill *under any circumstances;* only individuals may be sued." S. Rep. No. 102-249, at 7 (1991) (emphasis added). The House Report contains language of similar effect. H.R. Rep. No. 102-367, at 87 (1992) ("Only 'individuals,' not foreign states, can be sued under the [TVPA].").

Plaintiffs attempt to circumvent the text of the TVPA and its strong legislative history by arguing that, by virtue of the "plain words" of section 1606, "the cause of action reflected statutorily in the TVPA . . . must be available against Libya here." Pls.' Mot. at 19-20. Judge Bates, in *Dammarell*, rejected a similar argument, stating that:

> Congress's plain intent in enacting the TVPA -- as reflected in the text (which specifies only individuals) and the legislative history (which could not be clearer) -- was to confine liability for acts of torture and extrajudicial killing to private individuals. To overcome this strong evidence of intent, the Court would require something more than the textual gymnastics of reading a 1996 statute (section 1605(a)(7)) as operating through [*42] a 1976 statute (section 1606) to expand a 1992 cause of action (the TVPA) to the states. Therefore, the Court concludes in this instance that Congress's clearly expressed intent in 1992 should prevail over any speculative intent to the contrary in 1996.

Case 1:06-cv-00727-GK    Document 17-4    Filed 12/05/2006    Page 12 of 15

Page 12
2006 U.S. Dist. LEXIS 58033, *

*Dammarell*, 2005 U.S. Dist. LEXIS 5343, at *100-01. Judge Kollar-Kotelly adopted this holding as well in *Holland*. 2005 U.S. Dist. LEXIS 40254, at *35-47.

Again, the court agrees with Judge Bates's and Judge Kollar-Kotelly's rationale and holds that the TVPA cannot be used to hold the government defendants liable for the torture or extrajudicial killings of individuals under its authority. Any contrary holding would "produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling." *Griffin v. Oceanic Contractors*, 458 U.S. 564, 571, 102 S. Ct. 3245, 73 L. Ed. 2d 973 (1982). Accordingly, the court dismisses plaintiffs' claims against Libya and LESO under the TVPA.

### 2. Liability Under Federal Common Law

Plaintiffs also argue that federal common law, "to the extent that it incorporates international law principles," provides a viable cause of action against [*43] defendants. Pls.' Mot. at 25. Plaintiffs concede that "courts have been reluctant to recognize federal common law as a general, undefined matter," *id.*, but nonetheless insist that the acts alleged in their complaint "fall squarely within the narrow category of cases that the Supreme Court has recently pronounced to be actionable." *Id.* (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)).

For a period of time, the courts in this jurisdiction looked to federal common law, rather than state common law or federal statutes, for the substantive rule of decision in cases brought under the state-sponsored terrorism exception to FSIA. *See, e.g., Stethem v. Islamic Republic of Islam*, 201 F. Supp. 2d 78, 87 (D.D.C. 2002); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 134-35 (D.D.C. 2001); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 33 (D.D.C. 2001). That changed, however, in 2003, when the D.C. Circuit decided *Bettis v. Islamic Republic of Iran*, 354 U.S. App. D.C. 244, 315 F.3d 325 (D.C. Cir. 2003). *Bettis* strongly signaled that a federal common law of tort is incompatible with section 1606 of FSIA. [*44] At issue in *Bettis* was whether the plaintiffs could obtain recovery, under the Flatow Amendment, for intentional infliction of emotional distress. Amicus curiae in that case suggested that the court look to federal common law to determine the scope of any such claim. The D.C. Circuit first noted that it was a "mistake" to "label actions under the FSIA and Flatow Amendment . . . as 'federal common law' cases, for these actions are based on *statutory* rights." *Id.* at 333 (emphasis in original). "Without the statute, the claims could not arise." *Id.*

Rather than limiting its analysis to use of "federal common law" to interpret a federal statute, the D.C. Circuit continued on and, in the process, raised serious doubts as to the use of federal common law at all. Specifically, the court wrote:

> Of course, because these claims are based on a federal statute, their "extent and nature" are "federal questions." *Burks v. Lasker*, 441 U.S. 471, 476, 99 S. Ct. 1831, 60 L. Ed. 2d 404 (1979). But that does not, in this case, "authorize the federal courts to fashion a complete body of federal law." *Id.* at 477. Rather, . . . because the FSIA instructs that "the foreign [*45] state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it.

*Id.* Later in its opinion, the D.C. Circuit reiterated this point, writing that courts "have no free-wheeling commission to construct common law as we see fit," because section 1606 "instructs us to find the law, not to make it." *Id.* at 338. As such, this holding "reflects the modern rule that the federal common law should only be employed in the rarest of circumstances." *Dammarell*, 2005 U.S. Dist. LEXIS 5343, at *78; *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 6.1, at 354 (4th ed. 2003) ("There long has been a strong presumption against the federal courts fashioning common law to decide cases.").

After the *Bettis* decision was issued, the Supreme Court further explicated when federal common law can provide a cause of action. *Sosa*, 542 U.S. at 712-39. In *Sosa*, the Court drastically limited the use of federal common law, writing that it was "persuaded that federal courts should not [*46] recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350] was enacted" in 1789. 542 U.S. at 732. Plaintiffs place heavy emphasis on this opinion, arguing that "the acts at issue here -- specifically the blowing up of an airliner, killing all aboard -- are now, and were at the time of the events, both sufficiently well-defined and universally condemned to fall within the *Sosa* paradigm." Pls.' Mot. at 27. Therefore, plaintiffs urge this court to recognize that federal common law provides a "viable cause of action" against defendants. *Id.* at 29.

As a preliminary matter, *Sosa* arose in the context of the ATCA, a federal statute that grants jurisdiction to federal courts over "any civil action by an alien for a tort

Case 1:06-cv-00727-GK    Document 17-4    Filed 12/05/2006    Page 13 of 15

Page 13
2006 U.S. Dist. LEXIS 58033, *

only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Key to the Court's recognition in *Sosa* that certain, very narrow, federal common law causes of [*47] action could be recognized under ATCA was the Court's belief that the Congress that enacted ATCA intended for it "to have practical effect the moment it became law." 542 U.S. at 724. Therefore, although the ATCA was primarily a jurisdictional statute creating no new causes of action, it was enacted "on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for liability at the time" it was passed. *Id.*

Jurisdiction in this case does not arise under the ATCA. Rather, plaintiffs rely on FSIA to establish jurisdiction. This difference is fatal to plaintiffs' argument. FSIA, unlike the ATCA, details "precisely the sort of claims that a plaintiff may bring when suing under a waiver of immunity provided by the FSIA." *Dammarell*, 2005 U.S. Dist. LEXIS 5343, at *90. It is a well-recognized principle that, "[i]nsofar as one important justification for the exercise of federal common law is that Congress has not spoken on the matter before the court, that justification is removed once Congress has spoken on a particular matter." 19 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD [*48] H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4514, at 480-81 (2d ed. 1996); *see also City of Milwaukee v. Illinois*, 451 U.S. 304, 312, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981) (stating that the Supreme Court has "always recognized that federal common law is subject to the paramount authority of Congress" and may be resorted to only "[in] absence of an applicable Act of Congress.") (internal quotations and citations omitted). Here, Congress has spoken on this particular matter, in section 1606 of FSIA, and directed that courts must "find the law, not make it." *Bettis*, 315 F.3d at 338; *see also Dammarell*, 2005 U.S. Dist. LEXIS 5343, at *90-91. Therefore, the court denies plaintiffs' request to fashion a cause of action against defendants under federal common law and grants summary judgment in favor of defendants in that regard. n17

n17 Other courts have looked to *Acree* when rejecting federal common law as a viable cause of action. In *Acree*, the district court had predicated its finding of liability on the Flatow Amendment. After that finding, but before oral argument on appeal, the D.C. Circuit held in *Ciccipio-Puleo* that the Flatow Amendment was not a viable cause of action against a foreign state. 370 F.3d at 58-59. Accordingly, the D.C. Circuit ordered plaintiffs to consider, in preparation for oral argument, whether any other cause of action could sustain the district court judgment. The plaintiffs cited only "generic common law torts" and "traditional torts . . . in their generic form." *Id.* at 59. The D.C. Circuit rejected the possibility of relying on generic common law torts, holding that "the shared common law of the states" cannot be a "*source* of a federal cause of action." *Id.* (emphasis in original). Rather than remand to the district court, the D.C. Circuit dismissed the plaintiffs' complaint for failure to state a cause of action because the plaintiffs had failed to "identify a particular cause of action arising out of a specific source of law." *Id.* at 59-60.

Relying on this holding, some district courts in this jurisdiction have held that *Acree* forecloses the possibility of a plaintiff ever relying on federal common law in claims under FSIA. *See Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 137 n.3 (D.D.C. 2005); *Collett*, 362 F. Supp. 2d at 238 n.5. The court disagrees that *Acree* should be read so broadly. All *Acree* held was that the plaintiffs were required to offer an "alternative cause of action" in order for remand to the district court to be appropriate and that reference to "general common law torts" under the "common law of the states" was insufficient to meet this burden. Under this court's reading of *Acree*, had the plaintiffs specifically cited federal common law incorporating international law (as the plaintiffs do in this case) the D.C. Circuit would likely not have dismissed the case, but rather would have remanded.

[*49]

### 3. Liability Under State Law

Finally, plaintiffs seek to hold defendants liable under state statutory and common law causes of action, including wrongful death and intentional infliction of emotional distress. In the wake of the D.C. Circuit's opinion in *Cicippio-Puleo*, district courts in this jurisdiction have uniformly held that state law may be used to hold foreign states liable for acts of terrorism. *Holland*, 2005 U.S. Dist. LEXIS 40254, at *63-65; *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 132 (D.D.C. 2005); *Dammarell*, 2005 U.S. Dist. LEXIS 5343, at *55-56; *see also Virtual Dev. & Def. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 14 (D.D.C. 2001) ("As a general matter, state substantive law is controlling in FSIA cases."). It is likewise unquestioned that the individual defendants may also be held liable under state law.

While plaintiffs may properly state a claim against defendants under state law, the court nonetheless denies

Case 1:06-cv-00727-GK    Document 17-4    Filed 12/05/2006    Page 14 of 15

Page 14
2006 U.S. Dist. LEXIS 58033, *

plaintiffs' motion for partial summary judgment. Plaintiffs' motion seeks partial summary judgment as to liability alone. As plaintiffs [*50] note, "the starting point for such an analysis is the District of Columbia's choice of law principles." Pls.' Mot. at 30. However, plaintiffs argue that the court "need not, in the first instance, engage in a state-by-state analysis of the various causes of action, as asserted by each plaintiff" because the claims asserted -- wrongful death and intentional infliction of emotional distress -- are "fairly uniform in every state." Id. at 30-31. Rather, plaintiffs argue that "[i]t is enough at this stage for the Court to conclude -- as it must -- that the undisputed material facts establish the Defendants' liability." Id. at 31.

Essentially, plaintiffs ask the court to ignore the choice-of-law analysis necessary to determine which state's law applies and hold that defendants would be liable under *every* state's law. n18 The court declines this invitation, as it was foreclosed by the D.C. Circuit's opinion in *Acree*. In *Acree*, the D.C. Circuit rejected the plaintiffs' claims that the "traditional torts of assault, battery and intentional infliction of emotional distress in their generic form" were sufficient to impose liability on defendants. [*51] 370 F.3d at 59. Rather, the court required plaintiffs to "identify a particular cause of action arising under a specific source of law." Id. Plaintiffs failed to do so in their submissions to the court. n19

---

n18 Plaintiffs state that, in *Dammarell*, Judge Bates used such an approach, "first [finding] paradigmatic liability under the basic causes of action; . . . then reserv[ing] certain specific issues as to the recovery for specific plaintiffs, including the choice of applicable state law for that particular plaintiff, to the damages portion of the proceedings." Pls.' Opp'n at 19. Plaintiffs do not provide any citation to support this statement, and a review of the docket suggests that plaintiffs may have misstated the procedural history of *Dammarell*. The bifurcation that occurred in that case was that the court first held the defendants in default prior to considering the issue of damages. It does not appear that the court ever held defendants liable, as plaintiffs here suggest, for committing generic common law torts in the abstract.

n19 In their original motion, plaintiffs address only the law of Virginia, solely "[a]s an example." Pls.' Mot. at 32. In their opposition to defendants' motion for summary judgment, plaintiffs suggest that defendants' liability under state law can be resolved by reference to the law of Virginia, Texas, Montana, and New York but conceded that they failed "to tie the claims of each and every one of the Plaintiffs to a particular applicable state law." Pls.' Opp'n at 19.

---

[*52]

Moreover, the D.C. Circuit, in *Cicippio-Puleo* and *Acree*, suggested that a plaintiff cannot rely on their submissions to identify that "particular cause of action," but rather must do so *in their complaint*. In *Cicippio-Puleo*, the D.C. Circuit, after rejecting the plaintiffs' use of the Flatow Amendment as a cause of action against the foreign state, remanded the case "to allow plaintiffs an opportunity to *amend their complaint* to state a cause of action under some other source of law," including state law. 353 F.3d at 1027 (emphasis added). Several months later, the D.C. Circuit reviewed a complaint in a similar case that, like plaintiffs here, asserted tort claims "in their generic form." *Acree*, 370 F.3d at 59. At oral argument, the court pressed the plaintiffs to identify the source of law upon which their claims were based. Counsel reiterated their reliance on "generic common law torts." Id. Having failed to identify a particular cause of action, the D.C. Circuit dismissed the case, stating that it found "no cause to remand this case to the District Court in order to allow appellees to *amend their complaint* to state a cause [*53] of action under some other source of law." Id. at 59-60 (emphasis added).

Based on these cases, some district courts in this jurisdiction have held that a plaintiff in a FSIA case is required to identify, in their complaint, their state law claims with particularity. See *Dammarell*, 2005 U.S. Dist. LEXIS 5343, at *4-5; *Welch v. Islamic Republic of Iran*, 2004 U.S. Dist. LEXIS 19512, at *13-16 (D.D.C. Sept. 27, 2004). These cases have allowed the plaintiffs to amend their complaint to accomplish such a result. Here, plaintiffs' complaint alleges nothing more than the "generic common law torts" of wrongful death and intentional infliction of emotional distress. Based on the language in *Acree* and *Cicippio-Puleo* that suggests that a FSIA complaint must allege more in order to survive a motion to dismiss, the court concludes that plaintiffs must amend their complaint if they wish to proceed. n20

---

n20 Disregarding the language in the D.C. Circuit opinions, Judge Urbina recently rejected this view and held that there is no heightened pleading requirement in FSIA cases. See *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 182-83 (D.D.C. 2005) (holding that adopting the argument that pleading with specificity is required would place "a greater burden on the plaintiffs than notice pleading requires") (citing *Swierkiewicz v. Sonoma N.A.*, 534

U.S. 506, 511-14, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)). This court believes that the D.C. Circuit's language in *Cicippio-Puleo* and *Acree* forecloses such a conclusion.

Interestingly, despite having rejected the requirement that the plaintiffs' complaint allege the state law causes of action with particularity, Judge Urbina nonetheless ordered the plaintiffs to amend their complaint "with a more specific cause of action" so that the litigation could "proceed most efficaciously." *Simpson*, 362 F. Supp. 2d at 183.

[*54]

### III. CONCLUSION

For the aforementioned reasons, it is this 11th day of May, 2006, hereby

**ORDERED** that plaintiffs' motion for partial summary judgment [#39] is granted in part and denied in part as set forth in this Memorandum Opinion; and it is further

**ORDERED** that defendants' motion for summary judgment [#49] is granted in part and denied in part as set forth in this Memorandum Opinion; and it is further

**ORDERED** that the Clerk of the Court shall inform the Attorney General that he may advise the court of his views regarding the application of the head-of-state immunity doctrine to this case on or before June 1, 2006; and it is further

**ORDERED** that plaintiffs shall amend their complaint, in a manner consistent with this Memorandum Opinion, on or before June 1, 2006; and it is further

**ORDERED** that not later than 45 days after filing of the amended complaint, plaintiffs shall submit briefing on the proper choice of law determination and causes of action under state law for each plaintiff.

Henry H. Kennedy, Jr.

United States District Judge