# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
Estate of John Buonocore III, *et al.*,        )
)
     Plaintiffs,        )
)
  v.        )  Civil Action No. 06-00727 (GK)
)
Great Socialist People's Libyan        )
Arab Jamahiriya, *et al.*,        )
)
     Defendants.        )
_____)


## PLAINTIFFS' MEMORANDUM OF LAW WITH POINTS AND AUTHORITIES IN OPPOSITION TO LIBYAN DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**BACKGROUND AND STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . .5

**PROCEDURAL POSTURE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.     STATUTORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

II.    THIS COURT POSSESSES SUBJECT MATTER
       JURISDICTION OVER THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

       A.     The Defendants Misconstrue The Plaintiffs' Complaint
              In That The Plaintiffs Have Not Pled Substantive Causes
              of Action Under The TVPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

       B.     The Court Possesses Subject Matter Jurisdiction of the
              Plaintiffs' Claims Under the FSIA, as the Plaintiffs'
              Allegations Demonstrate that the Rome Airport Attack
              Did Constitute Acts of "Extrajudicial Killing" and
              "Torture" As Defined By the TVPA. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

              1.     The Rome Airport Attack Was An "Extrajudicial
                     Killing" As Defined By The TVPA. . . . . . . . . . . . . . . . . . . . . . .20

              2.     The Rome Airport Attack Was An Act Of
                     "Torture" As Defined By The TVPA. . . . . . . . . . . . . . . . . . . . . 22

       C.     The Defendants Have Not Demonstrated That This Court
              Lacks Jurisdiction Over The Plaintiffs' Claims Against
              Defendant Al-Sanusi and Defendant Al-Bishari. . . . . . . . . . . . . . . . . . . 28

       D.     The Plaintiffs Need Not Set Forth The Specific Acts Of
              Material Support By Al-Sanusi and Al-Bishari Individually For
              The State-Sponsored Terrorism Exception To Apply To Them. . . . . . . . 31

              1.     Al-Sanusi and Al-Bishari Constitute the
                     "Foreign State" for the Purposes of the
                     FSIA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

2.  Plaintiffs Need Not Plead "But For" Causation To Satisfy The Requirements of the State-Sponsored Terrorism Exception. . . . . . . . . . .32

III.  THE PLAINTIFFS FILED THEIR COMPLAINT WITHIN THE APPLICABLE STATUTE OF LIMITATIONS BECAUSE THE FSIA EXPLICITLY EXTENDS THE TIME FOR FILING CASES BROUGHT UNDER THE STATE-SPONSORED TERRORISM EXCEPTION TO SOVEREIGN IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . .35

A.  The Relevant Decisions In This Circuit Overwhelmingly Support Plaintiffs' Interpretation of 28 U.S.C. § 1605(f). . . . . . . . . . . . 36

B.  The Legislative Purpose and Structure of the State-Sponsored Terrorism Exception and its Equitable Tolling Provision Should Be Read to Effectuate the Legislative Scheme. . . . . . . . . . . . . . . . . . . . . . 39

IV.  THE PLAINTIFFS HAVE SET FORTH CLAIMS FOR WHICH RELIEF MAY BE GRANTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.  Plaintiffs' Complaint States Sufficient Claims Under State Common Law and Statutory Law Because Neither the Federal Rules of Civil Procedure Nor Case Law Requires That Plaintiffs Identify In Their Complaint the Specific States' Common Law Upon Which They Intend To Rely. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

C.  The Plaintiffs State Sufficient Claims Against the Individual Defendants Under the Flatow Amendment. . . . . . . . . . . . . . . . . . . . . . . . 49

V.  PLAINTIFFS PROPERLY SERVED THE INDIVIDUAL DEFENDANTS AL-QADHAFI, AL-SANUSI AND AL-BISHARI. . . . . . . . . .51

VI.  THE HEAD-OF-STATE DOCTRINE DOES NOT APPLY IN THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

APPENDIX

Exhibit 1: Declassified CIA Report, *NID-Libya: Arms Support for Abu Nidal* ("CIA Grenade Report").

Exhibit 2: U.S. Dep't of State, Office of the Sec'y of State, Ambassador-at-Large for Counter-Terrorism, *Fact*

*Sheet: Abu Nidal Organization* (February 1989) ("State Department Fact Sheet On The ANO").

Exhibit 3: U.S. Dep't of State, Bureau of Public Affairs, *Libya Under Qadhafi: A Pattern of Aggression* (January 1986).

Exhibit 4: Affidavit of Khaled Ibrahim ("Ibrahim Affidavit").

Exhibit 5: Affidavit of Mustafa Badra, a/k/a Mongi Ben Abdalla Saadaoui ("Badra Affidavit").

Exhibit 6: *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, No. 03-749 (GK) (June 30, 2005 Opinion) ("*Baker I* Opinion").

Exhibit 7: Plaintiffs' Notice of Proof of Service, filed August 17, 2006.

## TABLE OF AUTHORITIES

**Case**                                                                                    **Page(s)**

*Abur v. Rep. Of Sudan,*
    437 F.Supp.2d 166 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Acree v. Republic of Iraq,*
    370 F.3d 41 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46-48

*Ali v. Mid-Atlantic Settlement Services, Inc.,*
    233 F.R.D. 32 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Arakelian v. National Western Life Ins.,*
    755 F. Supp. 1080 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

*Argentine Republic v. Amerada Hess Shipping Corp.,*
    488 U.S. 420 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Arce v. Garcia.*
    434 F.3d 1254 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39-42

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Baker v. Great Socialist People's Libyan Arab Jamahiriya,*
    No. 03-cv-749 (GK) (June 30, 2005 Opinion) ("*Baker I*") . . . . . . . . . . . . . . . .*passim*

*Baker v. Great Socialist People's Libyan Arab Jamahiriya,*
    2006 WL 3208662 (D.D.C. 2006) ("*Baker II*") . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bettis v. Islamic Republic of Iran,*
    315 F.3d 325 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bennett v. Schmidt,*
    153 F.3d 516 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45-46

*Boim v. Quranic Literacy Ins. And Holy Land Found. For Relief and Dev.,*
    291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Burnett v. New York Central Railroad Co.,*
    380 U.S. 424 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 40, 43

*Cicippio-Puleo v. Islamic Republic of Iran,*
    353 F.3d 1024 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49-50

*Coles v. Harvey*,
    2007 WL 63666 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Collett v. Socialist People's Libyan Arab Jamahiriya*,
    362 F.Supp.2d 230 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*Conley v. Gibson*,
    355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 45

*Cronin v. Islamic Republic of Iran*,
    238 F. Supp. 2d 222 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Daliberti v. Republic of Iraq*,
    97 F. Supp. 2d 38 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Dammarell v. Islamic Rep. Of Iran*,
    370 F. Supp.2d 218 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 44

*Doe v. State of Israel*,
    400 F.Supp.2d 86 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Doss v. South Cent. Bell Telephone Co.*,
    834 F.2d 421 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Duncan v. Walker*,
    533 U.S. 167 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*EEOC v. O'Grady*,
    857 F.2d 383 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42-43

*Eisenfeld v. Islamic Republic of Iran*,
    172 F. Supp. 2d 1 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Elahi v. Islamic Republic of Iran*,
    124 F. Supp. 2d 97 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16, 33, 37, 49

*Geisler v. Petrocelli*,
    616 F.2d 636 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Gillespie v. United States Steel Corp.*,
    379 U.S. 148 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Global Index, Inc. v. Mkapa*,
    290 F.Supp.2d 108 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 55

*Gwartz v. Jefferson Memorial Hosp. Ass'n*,
    23 F.3d 1426 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Hanson v. Hoffman*,
    628 F.2d 42 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Hartford Ins. v. Socialist People's Libyan Arab Jamahiriya*,
    422 F. Supp. 2d 203 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Hilao v. Estate of Marcos*,
    103 F.3d 767 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hishon v. King & Spaulding*,
    467 U.S. 69 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Holy Land Found. For Relief and Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Air Crash off Long Island*,
    209 F.3d 200 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*I.T. Consultants, Inc. v. Republic of Pakistan*,
    351 F.3d 1184 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Jean v. Dorelien*,
    431 F.3d 776 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jungquist v. Sheikh Sultan Bin Khalifa*,
    115 F.3d 1020 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 55

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) ("*Kilburn II*") . . . . . . . . . . . . . . . . . . . . . .20, 25, 29, 32

*Kilburn v. Republic of Iran*,
    277 F. Supp. 2d 24 (D.D.C. 2003) ("*Kilburn I*") . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Kowal v. MCI Communications Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

*Krieger v. Fadely*,
    211 F.3d 134 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Macharia v. United States*,
　334 F.3d 61 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*,
　719 F.2d 1159 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Moragne v. States Marine Lines*,
　398 U.S. 375 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Mousa v. Islamic Republic of Iran*,
　238 F.Supp.2d 1 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Park v. Shin*,
　313 F.3d 1138 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Peterson v. Islamic Republic of Iran*,
　264 F. Supp. 2d 46 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Phillips v. Heine*,
　984 F.2d 492 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35, 39-42

*Phoenix Consulting, Inc. v. Republic of Angola*,
　216 F.3d 36 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Price v. Socialist People's Libyan Arab Jamahiriya*,
　294 F.3d 82 (D.C. Cir. 2002) ("*Price II*") . . . . . . . . . . . . . . . . . . . . . 13, 23, 24, 29, 40

*Price v. Socialist People's Libyan Arab Jamahiriya*,
　389 F.3d 192 (D.C. Cir. 2004) ("*Price IV*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Price v. Socialist People's Libyan Arab Jamahiriya*,
　384 F.Supp.2d 120 (D.D.C. 2005) ("*Price V*") . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
　2006 WL 2384915 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 49, 50, 54

*Republic of Austria v. Altmann*,
　541 U.S. 677 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Reyton v. Rowe*,
　391 U.S. 54 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
　362 F. Supp. 2d 168 (D.D.C. 2005) ("*Simpson I*") . . . . . . . . . . . . . . . . . . . . .44, 47, 48

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
  2006 WL 3359338 (D.C. Cir. 2006) ("*Simpson II*") . . . . . . . . . . . . . . . . . . . . . . . . .27

*Sparrow v. United Air Lines*,
  216 F.2d 1111 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 45, 46, 50

*The Schooner Exchange v. McFaddon*,
  11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812) . . . . . . . . . . . . . . . . . . . . . . . . .53-55, 57

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Barnes*,
  295 F.3d 1354 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Noriega*,
  117 F.3d 1206 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 56

*Vine v. Republic of Iraq*,
  2006 U.S. Dist. LEXIS 63716 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Weinstein v. Islamic Republic of Iran*,
  184 F. Supp. 2d 13 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 46

*Wyatt v. Syrian Arab Republic*,
  362 F.Supp.2d 103 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34, 37, 48

**Statutes**

28 U.S.C. § 1603. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 55

28 U.S.C. § 1605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1606. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

18 U.S.C. § 1608. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

28 U.S.C. § 1350. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

**Secondary Sources**

S. Rep. 102-342 at 22 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

COME NOW the Plaintiffs, by and through counsel, and hereby file this Memorandum of Law with Points and Authorities in Opposition to Libyan Defendants'[1] Motion to Dismiss.  In opposition to said Motion, Plaintiffs rely on the following Memorandum.

## INTRODUCTION

This action arises out of the terrorist attack committed upon the victim Plaintiffs at the Leonardo da Vinci Airport, a/k/a Fiumicino Airport ("Rome Airport") in Rome, Italy at 9:00 a.m. on December 27, 1985 ("Rome Airport Attack" or "Attack").  As Plaintiffs have already alleged in their pleadings before this Court and will further demonstrate in this Opposition, at the time of the Rome Airport Attack, the Abu Nidal Organization ("ANO"), the terrorist organization that executed the Attack, was materially sponsored and directly supported by the government of Libya[2].  Compl. ¶¶ 67 – 94; Declassified CIA Report, *NID-Libya: Arms Support for Abu Nidal* ("CIA Grenade Report"), attached hereto as Plaintiffs' Exhibit 1; U.S. Dep't of State, Office of the Sec'y of State, Ambassador-at-Large for Counter-Terrorism, *Fact Sheet: Abu Nidal Organization* (February 1989), attached hereto as Plaintiffs' Exhibit 2; *Libya Under Qadhafi: A Pattern of Aggression*, attached hereto as Plaintiffs' Exhibit 3.  During the Rome Airport Attack, the terrorists targeted the TWA and El Al Israel Airlines ("El Al") check-in counters in accordance with their advance instructions, Compl. ¶¶ 40, 59, Affidavit of Khaled Ibrahim ("Ibrahim Affidavit") at ¶ 26, attached hereto as Plaintiffs'

---

[1] "Libyan Defendants" collectively refers to The Socialist People's Libyan Arab Jamahiriya ("Libya"), the Libyan Internal Security Organization ("LISO"), the Libyan External Security Organization ("LESO"), Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Abrahim al-Bishari (hereinafter collectively "Libya" or "Defendants").

[2] In addition to the sponsorship and support Libya provided to the ANO at the time of the hijacking, ANO was also separately supported by Syria.  Plaintiffs have sued Syria and a default was entered by this Court against the Syrian defendants on October 4, 2006.

Exhibit 4, causing the injuries and deaths of John Buonocore III, Frederick Gage, Don Maland, Charles Shinn, and Elena Tommarello, and the injuries of Plaintiffs Salvatore Ferrigno, Mark Maland, Jeanette Sweis, Michael Sweis, Jeanne Shinn and Francesco Zerilli. These American victims were targeted because of their nationality (collectively referred to as "Plaintiff-Victims" or "Plaintiffs"). Compl. ¶ 59; Ibrahim Affidavit, ¶¶ 23-26. The Plaintiffs in this action are all U.S. nationals who were injured and/or killed during the commission of the Rome Airport Attack (and, where applicable, their estates) as well as the victims' family members who were also injured as a result of the Attack.

The Rome Airport Attack was planned and carried out simultaneously with, in conjunction with, and in coordination with the ANO terrorist attack at the Schwechat Airport outside of Vienna, Austria (hereinafter referred to as "Vienna Airport Attack", and collectively with the Rome Airport Attack as "Airport Attacks"). Compl. ¶ 80 and introduction; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*;Ibrahim Affidavit at ¶¶ 24, 25; Affidavit of Mustafa Badra, a/k/a Mongi Ben Abdalla Saadaoui ("Badra Affidavit"), attached hereto as Pltfs' Exhibit 5.

The ANO and its terrorist operatives carried out these two very complex and sophisticated international terrorist attacks – both the Rome Airport Attack and the Vienna Airport Attack –under the instruction, direction, sponsorship and/or control of, and with the support and involvement of, the Libyan Defendants, utilizingthe funding and support provided by Libya as a state-sponsor of terrorism. Compl. ¶¶ 67 – 94; CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit. Libya not only provided general material support to the ANO, but also directly participated in the planning and

execution of the Airport Attacks by, at least, providing the ANO terrorists with the

finances, weapons, and passports needed to conduct the Airport Attacks.  Compl. ¶¶ 67 –

94; CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under*

*Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.  Accordingly, the

Libyan Defendants are liable for their provision of material support and direct

involvement in the Rome Airport Attack.

## BACKGROUND AND STATEMENT OF FACTS

The Abu Nidal Organization, a brutal terrorist group, conducted its terrorist

attacks to "engage in indiscriminate violence against bystanders, including children."

State Department Fact Sheet On The ANO; Compl. ¶ 74; *Libya Under Qadhafi: A*

*Pattern of Aggression*.  Beginning in the early 1980s, Libya developed a relationship with

the ANO, providing assistance that allowed the ANO to become "one of the world's most

dangerous and violent terrorist organizations."  State Department Fact Sheet On The

ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Compl. ¶¶ 71-79.  Libya

supported the ANO generally and for specific terrorist operations by providing "safe

haven, finances, weapons, false travel documents and training facilities . . . ."  State

Department Fact Sheet On The ANO at 9; *Libya Under Qadhafi: A Pattern of*

*Aggression*; Compl. ¶¶ 71-79.  The United States government listed Libya as a state-

sponsor of terrorism on January 19, 1984.  In 1985 and 1986, the Libyans, working with

ANO, conducted a wave of terrorist attacks, including, but not limited to, the September

10, 1985 attack on the Café de Paris in Rome ("Café de Paris Attack"), the hijacking of

Egypt Air Flight 648 on November 23, 1985 ("Egypt Air Attack"), the Rome Airport

Attack itself, and the simultaneous Vienna Airport Attack.  State Department reports

show that Sabri Khalil Abdul Hamid Al Banna ("Abu Nidal"), head of the ANO, traveled

to Libya for high-level meetings with Libyan Government officials at least twice in 1985.

*Libya Under Qadhafi: A Pattern of Aggression*.  Declassified CIA reports show that the

hand grenades used during the Rome Airport Attack, the Vienna Airport Attack, the

Egypt Air Attack and the Café de Paris Attack all bear the same markings as hand

grenades that were obtained by four Libyans from the local Libyan People's Bureau, and

then confiscated from them on April 18, 1986 in Ankara, Turkey. CIA Grenade Report;

State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of*

*Aggression*.

On December 27, 1985, at approximately 9:00 a.m., four terrorists from the Abu

Nidal Organization, with the aid, support, encouragement and involvement of the Libyan

Defendants, stormed the International Flights terminal of the Rome Airport, brandishing

Kalashnikov submachine rifles and type F1 hand grenades, which they had smuggled into

the airport.  Compl. ¶ 39; Ibrahim Aff. at ¶¶ 26, 27.  Before commencing their Attack, the

terrorists divided themselves into two pairs of attackers, so that both pairs could enter

simultaneously through two different entrances and head for their intended targets, the

check-in counters for the TWA and El Al Airlines.  Compl. ¶ 40.  At the time of the

Rome Airport Attack, TWA was one of two flagship U.S. carriers, sharing the

international market with Pan American Airlines, and was thus an American symbol and

icon, as was El Al Airlines for the State of Israel.  In a burst of gunfire and exploding

hand grenades, the passengers waiting at the TWA and El Al check-in counters were

mercilessly attacked.  Compl. ¶¶ 41-42; Ibrahim Aff. ¶ 26.  Airport security agents for El

Al fired shots aimed for the terrorists, killing three of them and injuring one, Khaled

Ibrahim ("Ibrahim")[3], the sole surviving attacker who has executed a sworn Affidavit which is attached as Exhibit 4 and incorporated herein by reference.  Compl. ¶ 42; Ibrahim Aff. ¶ 27.  In the Rome Attack, 13 people were killed and 75 wounded, among them women, children and the elderly.  Compl. ¶ 45; Ibrahim Aff. ¶ 28;

A simultaneous and coordinated attack was executed by a related group of ANO terrorists employing the same strategy at the Schwechat Airport in Vienna, Austria, killing an additional three people and wounding 30.  Compl. ¶¶ 46, 80 and Introduction; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Aff. at ¶¶ 24-25; Badra Affidavit.  The members of the ANO hit team that carried out the Rome Airport Attack had trained with the members of the ANO hit team that carried the Vienna Airport Attack at the same terrorist training camp in Syrian-controlled Lebanon, in the Bekaa Valley near the Syrian border.  Ibrahim Aff. ¶¶ 9, 12, 18, 19, 24, 25; Badra Aff. ¶¶ 9-12; Compl. ¶¶ 52, 87.  Terrorists on each team were personally known to terrorists on the other team.  Ibrahim Aff. ¶ 25; Badra Aff. ¶ 12. Each team followed virtually identical *modus operandi*, including, *inter alia,* pre-attack preparation from a safe house in Damascus, travel into the target country through intermediate countries using false passports, meeting as a hit team locally in the target country before the Attack with an ANO contact to obtain weapons and instructions, using the same method of penetrating the respective airports and using the same kinds of weapons (F-1 grenades and Kalashnikov machine guns).  *See generally* Ibrahim Aff; Badra Aff.

---

[3] For the purposes of this brief, Plaintiffs will refer to Khaled Ibrahim as "Ibrahim", however in the Plaintiffs' Compliant they referred to him as "Khaled" due to variations in the spelling of his last name. Upon further investigation and after meeting with Mr. Ibrahim to obtain his Affidavit, Plaintiffs' counsel confirmed that "Ibrahim" is the most commonly used and appropriate spelling, and therefore the Plaintiffs refer to him as "Ibrahim" herein.

On the same day that the Rome and Vienna Airport Attacks were carried out, December 27, 1985, the ANO claimed responsibility for both massacres.  Compl. ¶ 47; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.  Defendant Qadhafi publicly praised the terrorists as heroes and martyrs.  Ibrahim Aff. ¶28; Compl. ¶¶ 83, 84.

The sole surviving terrorist in the Rome Airport Attack, Khaled Ibrahim, was arrested and tried in Italy in connection with the Rome Airport Attack.  Compl. ¶ 48.  On February 12, 1988, he was convicted by an Italian court of committing an act of terrorism, in addition to other related offenses, and sentenced to 30 years imprisonment and 1.5 million Italian lire in fines.  Compl. ¶ 49.  At his trial and in his Affidavit, executed on December 14, 2006, Ibrahim admitted to being a member of the ANO since the age of 11.  Moreover, in the December 14, 2006 Affidavit, Ibrahim provided details of the Libyan Defendants' involvement with the ANO and in the Rome Airport Attack. Compl. ¶¶ 50, 51; Ibrahim Affidavit.  Abu Nidal himself was convicted of the terrorist crimes in *absentia*.

Ibrahim confirmed that during the mid-to-late 1980s the ANO conducted a flurry of terrorist attacks aimed at Americans and Israelis, including the grenade attack on Rome's Café de Paris on September 10, 1985, during which the terrorists used the same type F1 grenades used in the Rome Airport Attack, the Vienna Airport Attack, and the hijacking of Egypt Air Flight 648 on November 23, 1985, all of which were directly supported by the government of Libya.  Ibrahim Aff. at ¶¶ 18-19; Compl. ¶¶ 50.   Ibrahim admitted to his involvement, the involvement of the other terrorists, and the involvement

of Libya in the Rome Airport Attack, and described in detail its planning and execution. *See generally* Ibrahim Aff.

Ibrahim and the other members of his ANO team knew and trained with the terrorists who conducted the Vienna Airport Attack at an ANO training camp in Syrian-controlled Lebanon. *See generally* Ibrahim Aff. ¶¶ 9, 12, 18, 19, 24, 25; Badra Aff. ¶¶ 9-12; Compl. ¶¶ 52, 87. During this training, he learned of a general plan to conduct other terrorist attacks at airports and tourist attractions frequented by Americans and Israelis, including an airport in Madrid, Spain. Compl. ¶ 53.

Upon conclusion of his training in Syria, Ibrahim met with other ANO leaders in charge of foreign operations and training at an apartment in Damascus, Syria, which served as the ANO's departure base for foreign operations. Compl. ¶ 55; Ibrahim Aff. ¶¶ 13-20. He received airline tickets for travel to Rome as well as a fake Moroccan passport before departing for Rome from Damascus, Syria. Compl. ¶ 56; Ibrahim Aff. ¶ 20. Libya provided the terrorists who conducted the Rome and Vienna airport attacks with weapons and passports. Compl. ¶ 57; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit. After arriving in Rome, Ibrahim met with ANO contacts Al Hamieda Rashid, a/k/a Mohamed Fouad ("Fouad") and Abu Mithkal, who provided him and his terrorist team members with weapons and operational instructions. Compl. ¶ 58; Ibrahim Aff. ¶¶ 22-26. Ibrahim and his terrorist team learned of the precise objective of their attack, and were instructed to target as many Americans and Jews as possible, to take their passports and to hold them hostage, and to hijack a plane to be flown to Tel Aviv and exploded. Compl. ¶ 59; Ibrahim Aff. ¶¶ 23, 24; Badra Aff. ¶¶ 11, 16. On the morning of December 27, 1985,

Ibrahim met his team of ANO terrorists and each carried one or more suitcases holding smuggled weapons (Kalishnikovs, bullets and F1 hand grenades) and personal belongings.  Compl. ¶ 62; Ibrahim Aff. ¶¶ 23-27.  Ibrahim and his team arrived at the airport at seven minutes before 9:00 a.m. and commenced the Attack at 9:00 a.m. as planned in coordination with the Vienna Airport Attack.  Compl. ¶¶ 39-46; Ibrahim Aff. ¶¶ 24, 27.  It is undisputed that the Rome Airport Attack was committed by ANO in cooperation with, and with the support of, Libya.  CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.

## DEFENDANTS' SPONSORSHIP AND MATERIAL SUPPORT FOR THE ABU NIDAL ORGANIZATION

Despite Libya's recent attempts to rejoin the laws of nations and forego a path of terrorism, this has not always been the case.  The government of Libya, and also separately the government of Syria, sponsored and supported the ANO prior to and at the time of the Rome and Vienna Airport Attacks.  Compl. ¶¶ 67 – 94; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.  Since Defendant Mu'ammar al-Qadhafi seized political control of Libya by military coup in 1969, Libya has balked at international norms, abused diplomatic privileges and used terrorism as an instrument of its own foreign policy.  Compl. ¶¶ 67 – 94; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.  Libya has used threats of terrorism, material support and operational assistance for terrorist attacks, and actual terrorist violence as a means of political opposition, specifically targeting the United States and Israel.

Libya supported radical terrorist groups generally by providing terrorist training outside of Libya and by operating terrorist training camps in Tripoli in order to train, instruct, support and educate terrorists on the use of explosive devices, hijacking, assassination, and various commando and guerrilla techniques, in addition to abusing its diplomatic privileges by, among other things, storing arms and explosives at its diplomatic establishments.  Compl. ¶¶ 67 – 94; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.  Throughout the 1980s, both directly and through material support and resources provided to terrorist organizations such as ANO, Libya engaged in a concerted campaign of terrorist activities directed at the United States, Israel and their allies. Compl. ¶¶ 67 – 94; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.

Libya's involvement in terrorism was particularly robust from early 1984 through several years after the December 27, 1985 Rome and Vienna Airport Attacks.  Compl. ¶¶ 67 – 94; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.  Also during 1985, Libya was directly involved and/or provided material support for numerous terrorist attacks in addition to the Rome and Vienna Airport Attacks.  Compl. ¶¶ 67 – 94; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Aff. ¶¶ 18, 19; Badra Aff. ¶¶ 11, 12.

The Abu Nidal Organization was, at all times relevant hereto, among the most dangerous and violent of the terrorist organizations supported by Libya and Syria, engaging in violence against bystanders, including children.  Compl. ¶ 74; State

Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

As of February 1989, the ANO had conducted terrorist attacks in more than 20 countries

on three continents, killing more than 300 people and injuring at least 650. Comp. ¶ 75;

State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of*

*Aggression*. Libya provided substantial material support and sponsorship to the ANO, as

well as providing logistical support for the ANO's specific terrorist operations. Compl.

¶¶ 67 – 94; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern*

*of Aggression*; Ibrahim Affidavit; Badra Affidavit. The substantial material support to

and sponsorship of the ANO by the government of Libya included, but was not limited

to, assisting and/or providing the following: (1) funds, (2) facilities, (3) airline tickets, (4)

free and unobstructed entry into, safe haven in, and exit from Libya by members of ANO,

(5) terrorist training in Libyan camps, (6) use of the privilege of Libya's "diplomatic

pouch", (7) use of Libya's diplomatic freight privileges, (8) official documents of all

kinds, including passports, (9) provision of uniforms, tanks and BM021 multiple rocket

launchers, (10) weapons, including hand grenades used in various ANO attacks, and (11)

actual operational assistance in pre-positioning of people and supplies for the conduct of

terrorist operations. Compl. ¶ 77; CIA Grenade Report; State Department Fact Sheet On

The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra

Affidavit.

      During the year 1985 alone, Abu Nidal, the leader of the ANO met with

Defendant Qadhafi at least twice, in addition to meeting separately with Qadhafi's chief

lieutenant, Abd al-Salam Jallud, and conducting public press interviews from Tripoli,

Libya. Compl. ¶ 78; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A*

*Pattern of Aggression*. Following these meetings, ANO leadership began to relocate to Libya from Syria for training and support.  Compl. ¶ 79; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.  With specific regard to the coordinated, simultaneous Rome and Vienna Airport Attacks, the government of Libya supported this operation by, among other things, providing the ANO and its terrorists who executed the Airport Attacks with funding, weapons and passports, which allowed the terrorists to travel.  Compl. ¶ 80; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.

The hand grenades used in the Rome Airport Attack and the Vienna Airport Attack, as well as in the ANO terrorist attacks on the Café de Paris and Egypt Air Flight 648 bear the same markings as those found on four Libyan terrorists, who were arrested on April 18, 1986, while approaching the US officers' club in Ankara, Turkey, carrying the hand grenades, which they had obtained from the Libyan People's Bureau.  Compl. ¶ 81; CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.  The United States Central Intelligence Agency therefore concluded that "[t]he similarities between the grenades seized in 1985 [in the Rome Airport Attack, the Vienna Airport Attack, the Café de Paris attack and the Egypt Air Flight 648 hijacking] and those captured in Turkey corroborate previous reporting that Tripoli provides operational support for the Abu Nidal group and uses its diplomatic installations to pass weapons to terrorists."  CIA Grenade Report; Compl. ¶ 82; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

In the aftermath of the Rome and Vienna Airport Attacks, on January 2, 1986, Qadhafi threatened to "pursue U.S. citizens in their country and streets" in retaliation for

any action taken by the United States in response to Libya's involvement in these terrorist attacks.  Compl. ¶ 83; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; .  A Libyan news agency applauded the Rome and Vienna Airport Attacks as "heroic operations carried out by the sons of the martyrs of Sabra and Shatila . . . ."  Compl. ¶ 84; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

The United States Department of State, Office of the Secretary of State, Ambassador-At-Large for Counter-Terrorism, concluded that the ANO conducted the Rome Airport Attack and the Vienna Airport Attack, classifying these terrorist attacks as among the most brutal examples of ANO violence.   Compl. ¶ 92; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.  The Defense Intelligence Agency of the United States Department of Defense, and other intelligence agencies of the United States government, determined that the Abu Nidal Organization was sponsored by the governments of Libya and Syria.  Compl. ¶ 93; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*.

## **PROCEDURAL POSTURE**

The Libyan Defendants filed a motion to dismiss the Plaintiffs' Complaint on December 5, 2006, raising several meritless issues regarding the Plaintiffs' claims, which include subject matter jurisdiction, statute of limitations, failure to state a claim, service of process and the common law Head-of-State Doctrine.  This Memorandum is filed in Opposition thereto.

## ARGUMENT

## I.    STATUTORY FRAMEWORK

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for the
exercise of jurisdiction over a foreign state in a United States Court. *Argentine Republic
v. Amerada Hess Shipping Corp.*, 488 U.S. 420, 434 (1989). Under the FSIA, subject
matter jurisdiction and personal jurisdiction over a sovereign defendant are established by
(1) proper service of the foreign state and (2) satisfaction of one of the statutory
exceptions to sovereign immunity. *Price v. Socialist People's Libyan Arab Jamahiriya*,
294 F.3d 82, 89 (D.C. Cir. 2002) ("*Price II*"). Section 1605 of the FSIA enumerates
specific exceptions to sovereign immunity, including cases "in which money damages are
sought against a foreign state for personal injury or death that was caused by an act of
torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material
support or resources (as defined in section 2339A of title 18) for such an act if such act or
provision of material support is engaged in by an official, employee, or agent of such
foreign state while acting within the scope of his or her office, employment, or agency . .
. ." 28 U.S.C. § 1605(a)(7). For this exception, known as the state-sponsored terrorism
exception, to apply, the foreign state must have been designated as a state-sponsor of
terrorism by the U.S. Department of State at the time of the act or as a result of the act.
*Id.* For the purposes of this case, it is relevant to note that the FSIA adopts the definitions
of "torture" and "extrajudicial killing" contained in section 3 of the Torture Victim
Protections Act ("TVPA")[4], and the definition of "material support or resources"

---

[4] The TVPA defines "extrajudicial killing" as "a deliberate killing not authorized by a previous judgment
pronounced by a regularly constituted court affording all judicial guarantees . . . ." 28 U.S.C. § 1350.

"Torture" is defined by the TVPA as

contained in the Antiterrorism Act ("ATA"), 18 U.S.C. § 2339A.[5]  *See* 28 U.S.C. §

1605(e).

Once a foreign sovereign's immunity has been lifted under § 1605 of the FSIA, as

has occurred in this action, § 1606 of that statute provides that "the foreign state shall be

liable in the same manner and to the same extent as a private individual under like

circumstances."  28 U.S.C. § 1606.  "Section 1606 acts as a 'pass through' to substantive

causes of actions against private individuals that exist in federal, state or international

law."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F.Supp.2d 120, 132

(D.D.C. 2005) ("*Price V*").  FSIA cases need only satisfy the liberal notice-pleading

standards of Fed. R. Civ. P. 8, and need only provide defendants "fair notice of each

---

any act, directed against an individual in the offender's custody or physical
control, by which severe pain or suffering . . . whether physical or mental, is
intentionally inflicted on that individual for such purposes as . . . punishing that
individual for an act that individual or a third person has committed or is
suspected of having committed, intimidating or coercing that individual or a
third person, or for any reason based on discrimination of any kind; and
(2) mental pain or suffering refers to prolonged mental harm caused by or
resulting from (A) the intentional infliction or threatened infliction of severe
physical pain or suffering; (B) the administration or application, or threatened
administration or application, of mind altering substances or other procedures
calculated to disrupt profoundly the senses or the personality; (C) the threat of
imminent death; or (D) the threat that another individual will imminently be
subjected to death, severe physical pain or suffering, or the administration or
application of mind altering substances or other procedures calculated to disrupt
profoundly the senses or personality.

28 U.S.C. § 1350 note.

[5] The ATA defines "material support of resources" as

any property, tangible or intangible, or service, including currency or monetary
instruments or financial securities, financial services, lodging, training, expert
advice or assistance, safehouses, false documentation or identification,
communications equipment, facilities, weapons, lethal substances, explosives,
personnel (1 or more individuals who may be or include oneself), and
transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

claim and its basis." *Sparrow v. United Air Lines*, 216 F.2d 1111, 1118 (D.C. Cir. 2000);

*Baker v. Great Socialist People's Libyan Arab Jamahiriya,* 2006 WL 3208662 at *3-5

(D.D.C. 2006) (*"Baker II"*)*; Dammarell v. Islamic Rep. Of Iran*, 370 F. Supp.2d 218,

223 (D.D.C. 2005)*.* Therefore, plaintiffs bringing FSIA cases need only identify the

source of law for their FSIA claims, and need not set forth a specific choice of law

determination. *Baker II*, 2006 WL 3208662 at *3-6; *Dammarell*, 370 F.Supp.2d at 223.

The FSIA sets forth its own 10-year statute of limitations for claims within the

ambit of the state-sponsored terrorism exception and applies an equitable tolling

principle. Specifically, the FSIA states:

> No action shall be maintained under subsection (a)(7) unless the
> action is commenced not later than 10 years after the date on which
> the cause of action arose. All principles of equitable tolling,
> ***including the period during which the foreign state was immune
> from suit***, shall apply in calculating this limitation period.

> 28 U.S.C. § 1605(f) (emphasis added).

While the claims "arose" at the time of the Rome Airport Attack, it is well-settled

that the equitable tolling provision of § 1605(f) dictates the statute of limitations for

actions against state-sponsors of terrorism is tolled until the date sovereign immunity was

stripped by § 1605(a)(7), which is April 24, 1996 when Congress passed § 1605(a)(7) or

the state-sponsorship of terrorism exception. *See* discussion, *infra* at III.A, III.B.

Congress enacted this equitable-tolling provision to ensure that cases could be brought

based upon acts of state-sponsored terrorism that occurred in the 1980s or earlier. *Id.*

The FSIA's equitable-tolling provision therefore tolls the period of time between the date

of an act of state-sponsored terrorism and the passage of the legislation that created the

state-sponsored terrorism exception to the FSIA on April 24, 1996. 28 U.S.C. § 1605(f).

Accordingly, "the earliest possible date for the statute of limitations to expire for any action brought pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note [was] April 24, 2006." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 23 (D.D.C. 1998). The instant action was accordingly timely filed within the statute of limitations on April 21, 2006.

Once the questions of subject matter jurisdiction and the statute of limitations have been analyzed, it is then proper for the Court to address Defendants' argument regarding whether Plaintiffs properly plead state common law and state and federal causes of action.

## II.    THIS COURT POSSESSES SUBJECT MATTER JURISDICTION OVER THE CASE.

Although the Defendants cite Fed. R. Civ. P. 12(b)(6) to assert their argument regarding the allegations of the Plaintiffs' Complaint relating to sovereign immunity and "torture", their challenge is actually to the allegations regarding subject matter jurisdiction in the Complaint and correspondingly should have been set forth under Rule 12(b)(1). The Plaintiffs asserted causes of action arising under state common law, state statutory law and the Flatow Amendment. Compl. ¶¶ 95-135. The Plaintiffs have not asserted a cause of action "under the FSIA" or the TVPA, nor do the Plaintiffs purport to do so now. The Libyan Defendants argue that the Plaintiffs failed to state a claim (1) under the TVPA because the Plaintiffs have not adequately pled the elements of "torture" as it is defined in the TVPA; (2) under the TVPA because that statute only applies to individuals; (3) against Abdallah Al-Sanusi because he has no affiliation with LESO or LISO; and (4) against Ibrahaim Al-Bishari because he died in 1997. In making these

arguments, the Defendants have unfortunately misconstrued the statutory framework of the FSIA and related counterterrorism statutes, as well as the Plaintiffs' Complaint.

As discussed, *supra* at I, the state-sponsored terrorism exception to the FSIA removes sovereign immunity for state-sponsors of terrorism for cases "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing . . . or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . ." 28 U.S.C. § 1605(a)(7). Once the exception is satisfied, i.e. by a foreign sovereign's act of torture, extrajudicial killing, or provision of material support or resources to the terrorist organization who executes such an act, section 1606 of the FSIA holds the foreign sovereign and its agencies and instrumentalities "liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

As the Plaintiffs' causes of action are neither based on the FSIA itself nor the TVPA, Defendants' arguments on the aforementioned points can only be analyzed in the context of the Court's jurisdiction over the subject matter jurisdiction of the suit pursuant to the FSIA, rather than the Plaintiffs' substantive causes of action.[6] Essentially, the Defendants argue that the state-sponsored terrorism exception to the FSIA does not remove immunity in this case because (1) the Rome Airport Attack did not constitute an act of "torture" for which Libya provided material support and (2) neither Abdallah Al-

---

[6] Libya addresses each of the Plaintiffs' causes of action as applied to Al-Sanusi and Al-Bishari elsewhere in its brief. (*See* Defs' Mot. at (B)(3), (B)(4), (B)(5) and (B)(6).)

Sanusi nor Ibrahaim Al-Bishari is an "official, employee or agent" of Libya as required by the exception. The Plaintiffs will therefore address each of these arguments in turn.

>    **A.    The Defendants Misconstrue The Plaintiffs' Complaint In That The Plaintiffs Have Not Pled Substantive Causes of Action Under The TVPA.**

Although the Plaintiffs' Complaint refers to "torture" and "extrajudicial killing", which are defined by the TVPA, the Plaintiffs have not asserted a cause of action under this statute. Defendants mistakenly argue Plaintiffs attempt to state a claim against Defendants under the TVPA. (Defs' Mot. at 19-22). Rather, the relevance of the TVPA in Plaintiffs' Complaint is merely to define the acts for which U.S. courts may maintain subject matter jurisdiction over the Libyan Defendants pursuant to §1605(a)(7) of the FSIA; namely, torture, extrajudicial killing, and/or material support for a foreign terrorist organization. 28 U.S.C. §1605(a)(7). The Defendants' confusion seemingly lies in the fact that the FSIA adopts the definitions of "torture" and "extrajudicial killing" contained in section 3 of the TVPA. 28 USC § 1605(e). The Defendants' argument with respect to the Plaintiffs' ability to state a claim under the TVPA is irrelevant because the Plaintiffs have not attempted to do so. Accordingly, as the Plaintiffs have not asserted a claim pursuant to the TVPA, the Defendants' Motion to Dismiss on this issue must be denied.

The Plaintiffs do not contend, as the Defendants assert, that "the Libya[n] Defendants provided support for and sponsored ANO in carrying out the [Rome Airport] [A]ttack and are therefore liable for ANO's alleged acts of torture under the TVPA." (Defs' Mot. at 23.) Rather, the Plaintiffs contend that the Libyan Defendants are not entitled to sovereign immunity under the FSIA because (1) the Defendants provided "material support or resources" to the ANO and (2) those victims who were injured

and/or killed during the Rome Airport Attack were victims of "torture" and/or were murdered by an "extrajudicial killing." Compl. ¶¶ 1-5. Either of those factors alone as alleged, but especially in tandem, is sufficient to bring the Defendants within the parameters of the state-sponsored terrorism exception to the FSIA. However, to the extent that the Libyan Defendants' argument regarding the definition of "extrajudicial killing" and "torture" challenges the Court's jurisdiction over this case, the Plaintiffs will briefly respond.

> **B.**   **The Court Possesses Subject Matter Jurisdiction of the Plaintiffs' Claims Under the FSIA, as the Plaintiffs' Allegations Demonstrate that the Rome Airport Attack Did Constitute Acts of "Extrajudicial Killing" and "Torture" As Defined By the TVPA.**

By arguing that the Rome Airport Attack did not constitute an act of torture, the Libyan Defendants have not challenged the factual underpinning of the Plaintiffs' Complaint, but rather the legal sufficiency of the Plaintiffs' claims. The Libyan Defendants do not argue that the Plaintiffs' facts as alleged are untrue and essentially concede the facts as recited. The Libyan Defendants instead argue that the Rome Airport Attack did not constitute an act of "torture" under the TVPA, which challenges only one of the jurisdictional predicates upon which the Plaintiffs' Complaint is based.

To properly analyze the Court's subject matter jurisdiction under the FSIA, it is appropriate to first review the relevant bases for subject matter jurisdiction under the state-sponsored terrorism exception to sovereign immunity. For a court to properly hear a case brought under this exception, the action must be against a foreign state (including against its agencies and instrumentalities) for personal injuries or deaths that were "caused by" either (1) an act of torture or extrajudicial killing engaged in by an official, employee or agent of the foreign state, or (2) the provision of material support or

resources by an official, employee or agent of a foreign state for an act of torture or extrajudicial killing, which as discussed *infra* at II.D.2, is satisfied by the foreign state's provision of general material support. 28 U.S.C. § 1605(a)(7). The foreign state's involvement in and sponsorship of the relevant terrorist attack may therefore be ***either*** direct (i.e. by an official, employee or agent executing the actual attack) ***or*** indirect (i.e. through the provision of general material support to the organization who executes out the attack). *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004) ("*Kilburn II*") (finding that "imposing a jurisdictional requirement that a state sponsor's financial assistance to a terrorist organization must be directly traceable to a particular terrorist act would likely render § 1605(a)(7)'s material support provision ineffectual.").

The instant matter fully satisfies § 1605(a)(7) because, as discussed *infra* at II.D, the Plaintiffs have alleged that the personal injuries and/or deaths they suffered were "caused by" not only the general material support provided by Libya to the ANO, but also by Libya's provision of material support specifically for the Rome Airport Attack. Compl. ¶¶ 95-135. As the Rome Airport Attack on its face constituted an act of "extrajudicial killing" and "torture", there can be no question that the exercise of subject matter jurisdiction is fully supported by the law.

### 1.    The Rome Airport Attack Was An "Extrajudicial Killing" As Defined By The TVPA.

The Defendants do not dispute that the Rome Airport Attack, which resulted in 13 unjustified and senseless deaths and numerous injuries, constituted an act of "extrajudicial killing", which is defined as a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial

guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350; 28 U.S.C. § 1605(a)(7) (referencing § 1350 of the TVPA to define the term "extrajudicial killing" as a jurisdictional predicate to the state-sponsored terrorism exception to sovereign immunity). If terrorists unload their machine guns and throw grenades into a crowd of innocent civilians, this is, on its face, an extrajudicial killing. In analyzing whether conduct constitutes an "extrajudicial killing" and warrants the lifting of sovereign immunity, courts look to the attack as a whole rather than its impact on each individual plaintiff and his or her resulting injuries. *See, e.g., Pugh v. Socialist People's Libyan Arab Jamahiriya*, 2006 WL 2384915 at * 9 (D.D.C. 2006) (finding that the bombing of UTA Flight 772 was an extrajudicial killing that removed Libya's sovereign immunity under the FSIA, thus permitting the estates of the Americans killed and their families to proceed with their causes of action).

The state-sponsored terrorism exception explicitly provides subject matter jurisdiction for US national claims for " . . . personal injury or death that was ***caused by*** an act of torture, extrajudicial killing. . . ." 28 U.S.C. § 1605(a)(7) (emphasis added). It is irrelevant, therefore, whether everyone in the crowd is killed or some are merely injured, so long as the Plaintiffs' injuries were "caused by" the extrajudicial killing. *Id.* While the Libyan Defendants' material support for and direction of the Rome Airport Attack as an "extrajudicial killing" will suffice to deprive them of ***sovereign immunity***, the specific actions and conduct of the Defendants, and the resultant injuries suffered by each respective plaintiff will serve to, in part, define the ***causes of action*** each plaintiff is able to assert. Here, the undisputed evidence, and the Plaintiffs' allegations in the Complaint, clearly establish that the Rome Airport Attack was deliberately planned with

the material support of and/or involvement of, by or with the Libyan Defendants, and

with the knowledge and intent that the deaths or injuries of innocent civilians would

result.  CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under*

*Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.  Moreover, the

victims were not convicted of any crime such that the killings or injuries would be

deemed to have been authorized or lawful.  Therefore, even should the Court find that the

Rome Airport Attack did not constitute an act of "torture" as defined by the TVPA, the

Court still remains fully vested with subject matter jurisdiction over all of the Plaintiffs'

claims, because the Rome Airport Attack was an act of "extrajudicial killing" carried out

with the material support of the Libyan Defendants.  The statutory definitions and

requirements are clearly met, and the Defendants' Motion to Dismiss should therefore be

denied.  In addition, as is demonstrated further below, the Rome Airport Attack also

constituted an act of "torture" as defined under the TVPA, and on those grounds as well,

the Defendants' Motion to Dismiss should be denied.

### 2.    The Rome Airport Attack Was An Act Of "Torture" As Defined By The TVPA.

"[T]orture" is defined by the TVPA as

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as . . . punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from (A) the intentional infliction or threatened infliction of severe physical pain or suffering . . . (C) the threat of imminent death; or (D) the threat that another

individual will imminently be subjected to death, severe physical
pain or suffering, or the administration or application of mind
altering substances or other procedures calculated to disrupt
profoundly the senses or personality.

28 U.S.C. § 1350 note.

The Defendants specifically argue that the Rome Airport Attack did not constitute
an act of torture because, according to the Defendants, (1) the Plaintiffs were not in the
Defendants' custody or control at the time of the Attack and (2) the Rome Airport Attack
was not conducted for one of the purposes enumerated in the TVPA. (Defs' Mot. at 23.)
The Defendants suggest that for an act to constitute torture, it must be severe, i.e.
"sufficiently extreme and outrageous to warrant the universal condemnation that the term
'torture' both connotes and invokes." (Defs' Mot. at 24) (quoting *Price II*, 294 F.3d at
92). However, the Defendants' reliance on *Price II* for their argument that the Rome
Airport Attack was not sufficiently "severe" is misplaced because in that case, the foreign
state's involvement in the actual act of torture was direct, hence the *Price* Court's
statement that "it is especially important for the courts to ensure that foreign states are not
stripped of their sovereign immunity unless they have been charged with actual torture,
and not police brutality." *Price II*, 294 F.3d at 93.

Moreover, the Defendants have misstated to the Court the finding of *Price II*. The
Court did not hold, as the Defendants suggest, that the plaintiffs' allegations regarding
the abuse inflicted upon them by Libyan officials did not rise to the level of severity,
frequency and duration necessary to amount to "torture" under the TVPA. (Defs' Mot. at
25.) Rather, the *Price II* Court held that because the plaintiffs in that case had offered no
"useful details" about the acts of violence carried out by the Defendants, there was "no
way to discern whether plaintiffs' complaint merely alleges police brutality that falls

23

short of torture." *Price II*, 294 F.3d at 93-94.  In addition, the court found that the *Price*

complaint alleged "virtually nothing about the purpose of the alleged torture.  Plaintiffs

seemingly have left it for the courts to conjure some illicit purpose to fill in this pleading

gap.  Obviously this will not do." *Id.*  Therefore, the Court allowed the *Price II* plaintiffs

to amend their complaint to plead facts demonstrating that the abuse they suffered was

more extreme than just police brutality, and that it was inflicted upon the plaintiffs for an

illicit purpose.  *Id.*  Once the plaintiffs did so, the Court held in *Price II* that they had

stated a valid claim for torture.  274 F.Supp.2d 20, 25 (D.D.C. 2003).

  The Plaintiffs in the instant matter cannot conceive of a situation more "extreme and

outrageous to warrant . . . universal condemnation" than a brutal attack executed by

bloodthirsty terrorists, using Kalishnikovs and hand grenades, all turned upon innocent

civilians at a public airport, with the material support of, full cooperation of and/or under

the direction of, a state-sponsor of terrorism.  As demonstrated below, the Rome Airport

Attack did constitute an act of "torture" as defined by the TVPA because (1) the

individuals were in the "custody or physical control" of the ANO terrorists who actually

conducted the Rome Airport Attack with the material support and at the behest of the

Libyan Defendants; (2) the Plaintiffs suffered physical and/or mental "severe pain or

suffering"; and (3) the Rome Airport Attack was intentionally committed for several of

the purposes enumerated in the TVPA.

  The Defendants advance the meritless argument that the Plaintiffs' causes of

action must fail because "the defendants in this case . . . are not alleged to have

committed any alleged acts of torture.  All such acts were allegedly committed by

members of ANO."  (Defs' Mot. at 26.)  For the purposes of the FSIA, however, the

innocent victims in the Fiumicino Airport during the Rome Airport Attack did not have to be in the actual "custody or physical control" of the Libyan Defendants in order for their sovereign immunity to be removed, and the fact that Libyan officials may not have been standing physically side-by-side with the ANO terrorists at the precise time of the Rome Airport Attack is not required for the purposes of the Court finding it has jurisdiction over this matter. *See, e.g., Baker v. Great Socialist People's Libyan Arab Jamahiriya*, No. 03-cv-749 (GK) (June 30, 2005 Opinion) ("*Baker I*"), Opinion, attached hereto as Plaintiffs' Exhibit 6, at 11-13 (finding Plaintiffs' allegations of Libya's general sponsorship of the ANO to be sufficient to bring Libya within the state-sponsored exception for foreign sovereign immunity); *Kilburn II*, 376 F.3d at 1130 (D.C. Cir. 2004) (finding that "imposing a jurisdictional requirement that a state sponsor's financial assistance to a terrorist organization must be directly traceable to a particular terrorist act would likely render § 1605(a)(7)'s material support provision ineffectual."); *Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1 (D.D.C. 2001) (finding the state-sponsored exception satisfied by Iran's general material support of Hamas, which conducted the terrorist attack at issue). As the FSIA and related precedent makes clear, a state-sponsor of terrorism's sovereign immunity can be stripped away for either its direct involvement in the execution of the terrorist attack at bar, and/or for its material sponsorship of the terrorist organization that executed the attack. *See* discussion, *infra* at II.D.2.

A review of the Plaintiffs' evidence, specifically the Affidavits of Khaled Ibrahim and Mustafa Badra, two of the ANO terrorists who executed the Rome and Vienna Airport Attacks, demonstrates Libya's active support for the ANO and its terrorist attacks. CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under*

*Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit. Whether the Plaintiffs' case involves actual direct or indirect **participation** in the Rome Airport Attack is not the test. The measure is the support of the Libyan Defendants. The Plaintiffs have alleged specific "useful details" regarding the acts of "torture" inflicted upon the Plaintiffs, including ample evidence regarding the Libyan Defendants' uncontroverted material support and sponsorship for the ANO, and for ANO acts of brutal terrorism committed upon innocent civilians without cause or legal justification. Compl. ¶¶ 67 – 94; CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit.

Moreover, the "custody or physical control" prong of the TVPA is satisfied because the victims present during the Rome Airport Attack were actually in the custody and control of the "offender[s]", who in this case were the Libyan sponsored ANO operatives who conducted the Attack using machine guns, grenades and actions designed to assert control over the victims, with the material support of and at the behest of the Libyan Defendants. 28 U.S.C. § 1350 note; Compl. ¶¶ 67 – 94; CIA Grenade Report; State Department Fact Sheet On The ANO; *Libya Under Qadhafi: A Pattern of Aggression*; Ibrahim Affidavit; Badra Affidavit. It is without question that the ANO terrorists did have actual custody or physical control over the people waiting at the TWA and El Al airport counters in the Fiumicino Airport when they intentionally conducted the designed Attack, launching hand grenades and brandishing large rifles aimed at innocent civilians frozen in fear. No victim was free, or would have felt free, to leave the area and many travelers were shot or killed.

The Rome Airport Attack caused the Plaintiffs both physical and mental harm, therefore satisfying the injury requirement of "torture". In addition to the physical injuries and deaths suffered by each of the Plaintiffs present during the Rome Airport Attack, they and their family members have suffered from "prolonged" mental harm that continues to this day. Compl. ¶¶ 95 – 135.

The Plaintiffs have offered more than ample evidence, which is uncontroverted, to demonstrate that the ANO terrorists inflicted the injuries and deaths upon the Plaintiffs for not one but several of the enumerated purposes set forth in the TVPA, which may clearly be inferred from the facts that are pled in the Complaint. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 2006 WL 3359338 at *6 (D.C. Cir. 2006) ("*Simpson II*").

The Plaintiffs' evidence and allegations demonstrate that the Rome Airport Attack was committed to punish the individuals for "an act that individual or a third person has committed or is suspected of having committed . . . ." 28 U.S.C. § 1350 note. Specifically, the Plaintiffs have demonstrated that the Rome Airport Attack was carried out partially in retaliation for the refugee camp bombing (at Sabra and Shatilla) in Lebanon which allegedly killed some of the terrorists' family members. Ibrahim Aff. at ¶ 23. The ANO falsely told its operatives that the people waiting at the TWA and El Al check-in counters were Israeli military pilots dressed in civilian clothes who had conducted the raid which killed their parents. *Id.*

The Plaintiffs have further adequately demonstrated that the Rome Airport Attack was meant to "intimidate or coerce that individual or a third person", 28 U.S.C. § 1350 note, as the ANO and Libya intended to cause a war between Israel and Arab countries

by conducting the Attack. Badra Aff. at ¶¶ 11, 16. It is indisputable that the Attack was conducted for discriminatory purposes, as it was aimed at Americans and Israelis, in an attempt to "target as many Americans and Jews as possible." Compl. ¶ 59; Ibrahim Aff. at ¶ 26.

The Rome Airport Attack therefore meets each of the elements of "torture" as set forth in the TVPA, and the Defendants' Motion to Dismiss should be denied on all grounds. Even should the Court find that the Rome Airport Attack did not constitute an act of "torture" as defined by the TVPA, the Court still remains fully vested with subject matter jurisdiction over all of the Plaintiffs' claims, because the Rome Airport Attack was by definition an act of "extrajudicial killing" carried out with the material support and/or at the behest of the Libyan Defendants.

> **C.    The Defendants Have Not Demonstrated That This Court Lacks Jurisdiction Over The Plaintiffs' Claims Against Defendant Al-Sanusi and Defendant Al-Bishari.**

The Defendants argue that the Plaintiffs cannot state a claim against Defendant Al-Sanusi because he "was not the head of, nor did he have any connection with either LISO or LESO at any time from 1985 to the present." The Plaintiffs sued Al-Sanusi and Al-Bishari in both their official and individual capacities.[7] The Defendants' argument that the Plaintiffs failed to properly allege Al-Sanusi was the head of LISO or LESO challenges whether Plaintiffs' have pled sufficient allegations to maintain their official capacity suit against Al-Sanusi as the head of LISO or LESO. This argument amounts to a challenge to the Court's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) rather than under Rule 12(b)(6) for failure to state a claim.

---

[7] Defendants have also argued Plaintiffs failed to allege proper claims under the Flatow Amendment against the Individual Defendants. (Defs' Mot. at p. 14-19). Plaintiffs, however, alleged all explicit requirements of the Flatow Amendment against the Individual Defendants. *See* discussion *infra* at IV.C.

On a Rule 12(b)(1) motion to dismiss in an FSIA case, the defendant may challenge either the legal sufficiency or the factual underpinnings of the relevant exception to sovereign immunity. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Here, by arguing that the Plaintiffs' factual allegations relating to Al-Sanusi's role within the Libyan government are wrong, the Libyan Defendants have elected to challenge the factual basis for the Court's jurisdiction.

"[W]hen a foreign state defendant raises a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA, the trial court is required to go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling on the motion to dismiss." *Price II*, 294 F.3d 82, 87 (D.C. Cir. 2002); *see also Phoenix Consulting*, 216 F.3d at 38. However, consistent with the "restrictive view of sovereign immunity reflected in FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to sovereign immunity." *Phoenix Consulting,* 216 F.3d 36, 40 (quotation omitted); *see also Kilburn II*, 376 F.3d at 1131; *Price v. Socialist People's Libyan Arab Jamahiriya ("Price IV")*, 389 F.3d 192, 197 (D.C. Cir. 2004). The defendant must therefore proffer some affirmative evidence in support of its claim that it retains sovereign immunity; the defendant may not "remain silent in the face of [the plaintiffs' allegations] and still be said to have carried its burden of showing this case does not come within the subject matter jurisdiction of the district court via the terrorism exception to the FSIA." *Price IV*, 389 F.3d at 199 (quoting *Price II* for the proposition that "[w]hen reviewing a plaintiff's unchallenged factual allegations to determine whether they are sufficient to deprive a foreign state of sovereign immunity, we assume those allegations to be true.").

The Court's resolution of the disputed facts is, at this stage of the litigation, "not a conclusive determination" of the facts at bar but is instead "subject to change in light of further development of the facts." *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003). The Court has "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," but it must give the plaintiff "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Id.*

In this case, the Defendants have provided no evidence to support their claim that al-Sanusi held no official position within LESO or LISO. The Defendants instead expect the Court to accept their factual allegations, without support by declaration or affidavit or otherwise, that Defendant Al-Sanusi (1) did not hold any office or position within LESO or LISO <u>and</u> (2) is suffering from a cryptic medical condition and his alleged incapacity essentially prevents the Defendants from otherwise finding and/or filing any and all evidence relating to his role within the Libyan government. According to the Defendants, "[d]ue to Major Al-Sanusi's medical condition, as well as his status as a foreign defendant, counsel for defendants is unable to provide the Court with supporting documentation at this time. To the extent necessary, defendants will supplement their filing with supporting documentation and proof that Major Al-Sanusi was not the leader of LISO during the relevant time period as soon as it becomes available." (Defs' Mot. at 14, n.5.) The Defendants have offered no proof whatsoever to satisfy their burden to prove that "plaintiff's allegations do not bring [this] case within a statutory exception to sovereign immunity . . . ." *Phoenix Consulting*, 216 F.3d at 40. Such a showing by the

Defendants is "necessary" at this stage and, failing same, Defendants' Motion to Dismiss must be denied.

With respect to Defendant Al-Bishari, assuming *arguendo*, that the Defendants' assertion is correct that Al-Bishari died in 1997, this also does not defeat the Plaintiffs' claims for Al-Bishari's actions in the 1980s while he was alive and an active Libyan leader.   Rather, the Plaintiffs will, with leave of court, upon a demonstration as to the identity of the personal representative of Al-Bishari's estate, amend their Complaint to substitute Defendant Al-Bishari's estate as a defendant in accordance with the Federal Rules of Civil Procedure.

> **D.    The Plaintiffs Need Not Set Forth The Specific Acts Of Material Support By Al-Sanusi and Al-Bishari Individually For The State-Sponsored Terrorism Exception To Apply To Them.**

The Libyan Defendants further argue that the Plaintiffs' Complaint fails to state a claim against the Defendants Abdallah Al-Sanusi and Ibrahaim Al-Bishari because the Plaintiffs allegedly did not "provide any allegations concerning the time or details of the specific acts of aid or material support provided by Abdallah Al-Sanusi and Ibrahaim Al-Bishari." (Defs' Mot. at 12.)  The Libyan Defendants essentially argue that Al-Sanusi and Al-Bishari are immune from suit under the FSIA because the Plaintiffs have not identified the specific material support these two individuals personally provided to the ANO, and have not traced such material support directly to the Rome Airport Attack.  To defeat this Court's subject matter jurisdiction, the Libyan Defendants essentially argue for an interpretation of § 1605(a)(7) that would require Plaintiffs to allege facts that demonstrate Al-Sanusi and Al-Bishari's specific material support of the specific terrorist act at issue, the Rome Airport Attack, rather than Libya's material support of the Abu

Nidal Organization in general.  (Defs' Mot. at 13, 14.)  It is well-settled, however, that this showing is unnecessary to establish subject matter jurisdiction under the FSIA.

### 1.    Al-Sanusi and Al-Bishari Constitute the "Foreign State" for the Purposes of the FSIA.

The definition of a "foreign state" under the FSIA "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . . ."  28 U.S.C. § 1603.  The FSIA further defines "an agency or instrumentality of a foreign state" to be "any entity (1) which is a separate legal person . . . and (2) which is an organ of a foreign state or political subdivision thereof . . . ."  *Id.*  This includes not only LESO and LISO, but also Al-Sanusi and Al-Bishari as the heads of those agencies.  The Plaintiffs' Complaint alleges that Libya carried out its material support and direct involvement in the ANO's terrorist activities through its agencies or instrumentalities such as LESO and LISO, and, therefore, through Defendant Al-Sanusi and Defendant Al-Bishari as the respective involved heads of LESO and LISO.  (*See* Plfs' Compl. at ¶¶ 30-34.)  For the purposes of the FSIA, therefore, Al-Sanusi and Al-Bishari qualify as the foreign state itself, and the material support and direct involvement that the Plaintiffs allege Libya provided is directly attributable to Al-Sanusi and Al-Bishari.

### 2.    Plaintiffs Need Not Plead "But For" Causation To Satisfy The Requirements of the State-Sponsored Terrorism Exception.

Moreover, the Plaintiffs have more than met their pleading requirements, as this Circuit interprets "material support or resources" such that a foreign state's *general support* of a terrorist group is sufficient to bring that state within the parameters of the state-sponsored terrorism exception.  *Kilburn II,* 376 F.3d at 1130 (finding that " . . . imposing a jurisdictional requirement that a state sponsor's financial assistance to a

terrorist organization must be directly traceable to a particular terrorist act would likely render § 1605(a)(7)'s material support provision ineffectual."); *Baker I Op. at 11-13; Wyatt v. Syrian Arab Republic*, 362 F.Supp.2d 103, 111 n.1 (D.D.C. 2005) ("A nation [and its agencies and instrumentalities as defined by the FSIA] loses immunity even if the support it provides does not directly fund the particular terrorist act that injured or killed the victim."); *Collett v. Socialist People's Libyan Arab Jamahiriya*, 362 F.Supp.2d 230, 236 (D.D.C. 2005); *Flatow*, 999 F. Supp. at 18 ("a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises in order to satisfy [the] statutory requirements for subject matter jurisdiction . . . [s]ponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient to invoke jurisdiction."); *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24 (D.D.C. 2003) ("*Kilburn I*") (reiterating that the terrorist exception "does not require a direct link between [the] material support [provided] and the acts in question), *abrogated on other grounds by* 353 F.3d 1024; *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 229 (D.D.C. 2002) (premising material support on funding, training and direction provided to terrorist groups, enabling them to "carry out terrorist *activities such as* the kidnapping and torture" at issue) (emphasis added), *abrogated on other grounds by* 353 F.3d 1024 (D.C. Cir. 2003); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 21 (D.D.C. 2002) (finding material support in the provision of technical knowledge and funding to terrorist group, making it "unlikely" that the attack at issue could have taken place without such support); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 107-108 (D.D.C. 2000) (finding that the act was perpetrated by Iran, and acknowledging that

33

previous courts premised liability under FSIA on general support to terrorist groups);
*Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000).

These decisions fully comport with logic, reason and Congressional intent.
Congress enacted the state-sponsored terrorist exception to "create a judicial forum for
compensating the victims of terrorism, and in so doing to punish foreign states who have
committed or sponsored such acts and deter them from doing so in the future." *Bettis v.
Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003) (internal citation omitted).
The Congressional record for § 2333, which, as previously noted, defines "material
support or resources," demonstrates an "intention to cut off the flow of money in support
of terrorism generally." *Boim v. Quranic Literacy Ins. And Holy Land Foundation For
Relief and Development*, 291 F.3d 1000, 1015 (7th Cir. 2002) (citing S. Rep. 102-342 at
22 (1992)). Were Congress to impose upon Plaintiffs the "insurmountable burden" of
requiring "but for" causation to establish jurisdiction, Congress' goal would be largely
unattainable. *See Kilburn I*, 277 F. Supp. 2d at 31.

The Defendants have erroneously asserted that the Plaintiffs must identify the
specific acts of material support by Libya and the Individual Defendants to the ANO
which actually and specifically caused the Rome Airport Attack in order to invoke the
state-sponsored terrorism exception to the FSIA. (Defs' Mot. at 12.) It is well-settled
that the Plaintiffs need not establish direct causation for the Court to have subject matter
jurisdiction over Plaintiffs' claims. *See Baker I* Op. at 11-13*; Wyatt*, 362 F.Supp.2d at
111; *Collett,* 362 F.Supp.2d at 236. Libya's uncontroverted support for the Abu Nidal
Organization amounted to a surrender of immunity under the state-sponsored terrorist

exception, and neither the foreign state itself – nor its individual officials or employees – can claim immunity from this lawsuit.

Accordingly, as all of the elements of the state-sponsored terrorism exception to the FSIA have been met, the Court is fully vested with subject matter jurisdiction over the Plaintiffs' claims and the Defendants' 12(b)(1) arguments in their Motion to Dismiss should be denied.

**III.    THE PLAINTIFFS FILED THEIR COMPLAINT WITHIN THE APPLICABLE STATUTE OF LIMITATIONS BECAUSE THE FSIA EXPLICITLY EXTENDS THE TIME FOR FILING CASES BROUGHT UNDER THE STATE-SPONSORED TERRORISM EXCEPTION TO SOVEREIGN IMMUNITY.**

The Libyan Defendants argue that the Plaintiffs' claims are barred by the statute of limitations set forth in the FSIA because (1) the Plaintiffs filed their Complaint more than 10 years after the Rome Airport Attack and (2) according to the Defendants, the principles of equitable tolling should not apply to the Plaintiffs' claims.  (Defs' Mot. at 8).  This argument is contrary to the large body of precedent in this Circuit which has found that the equitable tolling provision in § 1605(f) extended the filing deadline for claimants under the state-sponsored terrorism exception until, at least, April 24, 2006. *See* discussion *infra* at III.A.  As the Plaintiffs filed their Complaint in the instant action on April 21, 2006, the Court should deny the Defendants' statute of limitations argument and determine that the Plaintiffs' timely filed their Complaint.

This argument is also contrary to the explicit wording of the FSIA itself and the settled precedent regarding the interpretation of equitable tolling provisions generally. *See* discussion at III.B.  Libya's flawed interpretation of the FSIA's statute of limitations provision is based on its misplaced reliance upon the case of *Phillips v. Heine*, 984 F.2d

492 (D.C. Cir. 1993), a case that analyzes equitable tolling under the Death on the High

Seas Act ("DOHSA"), a statute with a different structure and legislative intent than the

statute under which this case was brought.  (Defs' Mot. at 8-9).  A case cited by

Defendants, *Arce v. Garcia*, instructs that the statute the case is brought under defines the

statute of limitation and equitable tolling analysis in an effort to effectuate the legislative

intent.  434 F.3d 1254, 1261 (11th Cir. 2006) (quoting from *Burnett v. New York Central

Railroad Co.*, 380 U.S. 424, 426 (1965)).  Accordingly, as this case was brought under

the state-sponsored terrorism exception to the FSIA and not the DOHSA, the Court must

look to the intent of the state-sponsored terrorism exception.

> **A.    The Relevant Decisions In This Circuit Overwhelmingly Support
> Plaintiffs' Interpretation of 28 U.S.C. § 1605(f).**

Libya's argument that Plaintiffs' complaint should be dismissed under Fed. R.

12(b)(6) clashes with 28 U.S.C. § 1605(f), the explicitly-worded, equitable tolling

provision passed by Congress contemporaneously with the state-sponsored terrorism

exception to foreign sovereign immunity in § 1605(a)(7).  The decisions in this Circuit

overwhelmingly hold that subsection 1605(f) commands the tolling of the statute of

limitations until April 24, 1996, the date of the passage of the state-sponsored terrorism

exception to foreign sovereign immunity.

The FSIA includes a specific provision that governs the statute of limitations for

all actions brought under section 1605(a)(7).

> No action shall be maintained under subsection (a)(7)
> unless the action is commenced not later than 10 years
> after the date on which the cause of action arose. **All
> principles of equitable tolling, including the period
> during which the foreign state was immune from
> suit, shall apply** in calculating this limitation period.

28 U.S.C. § 1605(f) (emphasis added). Defendants' acts that led to the deaths and injuries described in the complaint occurred on December 27, 1985, at a time when the Defendants enjoyed sovereign immunity in United States courts for such acts. Subsection 1605(f) tolls the beginning of the countdown for the statute of limitations until the enactment of the subsection of the FSIA that stripped the Defendants of that immunity, which occurred on April 24, 1996. The statute thus halted the running of the ten-year statute of limitations prescribed and allowed Plaintiffs to file this lawsuit at any time until at least April 24, 2006, ten years from the passing by Congress of § 1605(f), instead of ten years from the actual terrorist attack. The years when Libya was immune from suit are entirely excluded from the statute of limitations calculation. "Accordingly, the statute of limitations for the plaintiffs' claims must be tolled to begin when the defendants were stripped of their immunity with the 1996 enactment of 28 U.S.C. § 1605(a)(7)." *Collett*, 362 F. Supp. 2d at 242; *Wyatt*, 398 F. Supp. 2d at 145 (holding that the plaintiffs claims were not time-barred because "[u]nder the terms of § 1605(f), all claims brought under § 1605(a)(7) are tolled up to April 24, 1996, the date of passage of § 1605(a)(7) and the first date that any foreign state's immunity was waived."); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 60 (D.D.C. 2003) (holding that the plaintiffs' actions were not time-barred because "28 U.S.C. § 1605(f) provides for a statute of limitations of '10 years after the date on which the cause of action arose,' and provides for equitable tolling during the 'period during which the foreign state was immune from suit.' . . . [and] [t]he state of Iran was immune from suit until passage of Pub. L. 104-132 . . . on April 24, 1996.") (quoting 18 U.S.C. § 1605(f)); *Flatow*, 999 F. Supp. at 23 (ruling that "as a matter of law that the earliest possible date for the statute of

limitations to expire for any action brought pursuant to 28 U.S.C. § 1605(a)(7) and 28

U.S.C.A. § 1605 note will be April 24, 2006").

Relying on the settled precedent in this Circuit, this suit was filed on April 21,

2006, within ten years from April 24, 1996, the date Congress passed the subsection of

the FSIA that stripped the Defendants of their immunity.  Accordingly, the Plaintiffs'

Complaint was timely filed and is not time barred.

Libya's reading of 28 U.S.C. § 1605(f) would also violate important canons of

statutory construction.  § 1605(f) includes an explicit statutory provision that demands

that the calculation of the statute of limitations should include all principles of equitable

tolling.  It is significant that Congress included such language in the statute of limitation

for the state-sponsor of terrorism exception.  To apply § 1605(f) in the same manner as

the DOHSA, which does not have an explicit tolling provision would render the equitable

tolling provision of § 1605(f) ineffective, contrary to the specific intent of Congress.  "It

is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to

be so construed that, if it can be prevented, no clause, sentence, or word shall be

superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)

(citing to *Duncan v. Walker*, 533 U.S. 167 (2001)).  Subsection 1605(f) includes the

words:

> All principles of equitable tolling, including the period during
> which the foreign state was immune from suit, shall apply in
> calculating this limitation period.

This is not an invitation to toll the statute of limitations only under "extraordinary

circumstances" as Libya argues.  These words are a command from Congress to employ

the principles of equitable tolling in the calculation of the limitation period itself.  The

overwhelming majority of the decisions that have construed subsection 1605(f) have done so.[8]

### B. The Legislative Purpose and Structure of the State-Sponsored Terrorism Exception and its Equitable Tolling Provision Should be Read to Effectuate the Legislative Scheme.

Libya's argument of equitable tolling is based on *Phillips v. Heine*, which discusses equitable tolling in the context of the Death on the High Seas Act ("DOHSA"). 984 F.2d 489 (D.C. Cir. 1993). The DOHSA, however, is a very different statute from the state-sponsor of terrorism exception, both in its structure and Congressional purpose. "A 'statute should ordinarily be read to effectuate its purposes rather than frustrate them.'" *United States v. Barnes*, 295 F.3d 1354, 1364 (D.C. Cir. 2002) (quoting from *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159, 1165 (D.C. Cir. 1983)). This is also true of accompanying equitable tolling provisions. In *Arce v. Garcia*, a case cited by Libya, the panel notes the statute the case is brought under defines the statute of limitation analysis:

> We look to the relevant statute for guidance in determining whether equitable tolling is appropriate in a given situation. "The basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled, is one 'of legislative intent whether the right shall be enforceable . . . after the prescribed time.'"

---

[8] Only one federal judge has applied *Phillips* in a § 1605(a)(7) claim. In *Vine v. Republic of Iraq*, the court applied *Phillips* despite the wording of § 1605(f). 2006 U.S. Dist. LEXIS 63716 (D.D.C. 2006). One of the factors, however, that strongly motivated the *Vine* court to dismiss the claims based upon a statute of limitations violation is not present in our case. In *Vine*, the court found there was a strong presumption against the use of equitable tolling because Iraq's immunity was abrogated only six years after the passage of § 1605(a)(7), which meant equitable tolling was never required to allow the *Vine* claimants to press their claims. *Id.* at *29-30. "However, because more than four years remained in the limitations period at the time Iraq's immunity was abrogated, the 'presumption' that plaintiffs could have brought suit 'within the statutory period' applies." *Id.* In the instant case, such a presumption is not created because Libya's immunity was not abrogated within the limitations period. It was not until over ten years after the attack and the expiration therefore of the ten-year statutory period created by 1605(f) that Libya's immunity was arguably abrogated.

*Arce,* 434 F.3d at 1261 (holding that "[i]n order to determine congressional intent [on the question of equitable tolling], we must examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act.") (quoting *Burnett,* 380 U.S. at 426).  The interpretation of § 1605(f) should effectuate its expansive and remedial legislative intent.

Congress passed the "state-sponsored terrorism exception" to the FSIA for the purpose of to deterring and punishing state-sponsored terrorism.  *Price II,* 294 F.3d at 88; Pub. L. No. 104-132 § 221 (a), (Apr. 24 1996), 110 Stat. 1214.  Congress also sought to create a judicial forum so that the victims of state-sponsored terrorism could seek full compensation.  *Daliberti v. Republic of Iraq,* 97 F. Supp. 2d 38, 50 (D.D.C. 2000).  The state-sponsored terrorism exception to the FSIA, which was passed for the purposes of deterring state-sponsored terrorism and compensating its victims, requires a more expansive interpretation when a court calculates the applicable statute of limitations.

The *Phillips*[9] decision, drawn from the conservative DOHSA legislative scheme, does not support Libya's theories of how this Court should interpret the FSIA and the state-sponsored terrorism exception.  "The legislative history of the Death on the High Seas Act discloses a clear congressional purpose to leave 'unimpaired the rights under

---

[9] Furthermore, the *Phillips* decision is critically distinguishable on the facts of the case.  In *Phillips* the court refused to extend the statute of limitations through the doctrine of equitable tolling for a claim that had been brought in timely fashion by the two other claimants who had been injured in the same event as the *Phillips* plaintiffs.  984 F.2d 489, 490, 491 n.1 (D.C. Cir. 1993).  Moreover, the plaintiffs in *Phillips* discovered the necessary facts for bringing their claim three weeks before the statute of limitations would expire without any necessary tolling.  *Id.*  Thus, nothing prevented the *Phillips* plaintiffs from proceeding with their case within the limitations period.  *Id.*

In this matter, however, the Plaintiffs could not have been made aware of Libya's connections to the Rome and Vienna Airport Attacks by other lawsuits based upon the same event, because there are no other claimants who were injured in the Airport Attacks who had already filed suit.  In addition, Defendants' contention that the Plaintiffs knew of a connection between the ANO and Libya at the time of the attack is false.  Plaintiffs' allegations are a result of years of careful and diligent investigation and work.  Moreover, the Plaintiffs could not have brought their case before the initial 10-year period expired because of the Defendants' immunity.  Therefore, the basis for the Court's holding in *Phillips* (and *Vine*) is inapplicable.

State statutes as to deaths on waters within the territorial jurisdiction of the States.'"

*Gillespie v. United States Steel Corp.*, 379 U.S. 148, 165 (1964) (citation omitted).  The

DOHSA was intended to maintain the status quo by leaving existing state remedies in

place and creating a federal remedy only where there was not coverage by already-

existing remedies.  *Moragne v. States Marine Lines*, 398 U.S. 375, 398 (1970).  The

existing state remedies were usually more generous than the new and less-substantial

federal right created under the DOHSA.  *In re Air Crash off Long Island*, 209 F.3d 200,

209 (2d Cir. 2000).  The conservative nature of the DOHSA's provisions and its equally

conservative Congressional purpose stand in sharp contrast to the explicit and expansive

wording of the state-sponsorship of terrorism exception's tolling provision and its broad,

remedial, legislative purpose.

Although Libya's argument regarding the statute of limitations provision of the

TVPA is misplaced because the Plaintiffs did not assert any claims under the TVPA,

cases analyzing the equitable tolling of the TVPA's statute of limitations may be

instructive to the Court because the TVPA and the FSIA are similar in purpose and

legislative intent.  *Arce*, 434 F.3d at 1261-62 (noting that the TVPA was enacted to

address serious violations of international human rights abroad).  Both the TVPA and the

state-sponsorship of terrorism exception have broad, remedial purposes.  Such remedial

statutes must be broadly construed, consistent with their plain meaning.  *Reyton v. Rowe*,

391 U.S. 54 (1968).  Courts deciding the application of equitable tolling to TVPA cases,

like the courts that have decided equitable tolling in FSIA cases, have excluded periods

of immunity from the statute of limitations calculation. *Arce*, 434 F.3d at 1264; *Jean v.*

*Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005) (approving the *Collett* court's interpretation

of § 1605(f) that found "the statute of limitations for the plaintiffs' claims must be tolled to begin when the defendants were stripped of their immunity."); *Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996). The Court should do the same here.

Should the Court nevertheless agree with Libya that the *Phillips* framework binds the equitable tolling analysis in this case, it should still deny the Defendants' Motion because the Plaintiffs filed their claims within a "reasonable period" as a result of the peculiar circumstances surrounding this case. In an equitable tolling analysis, a court must weigh the balance between the competing interests of the plaintiff and defendant. The principal interest of defendants protected by a statute of limitations is their interest in evidentiary accuracy. *Phillips*, 984 F.2d at 492. In cases involving foreign governments and their sponsorship of terrorism, such as the case at bar, the tendency is for the quantity and quality of information to improve with time, not to deteriorate, thus ***improving*** the accuracy of the evidence plaintiffs present. This is due in part to the fact that the passage of time permits classified evidence to become available once unclassified, and often helps witnesses, and perpetrators, in their willingness to disclose pertinent facts, as here.

Moreover, the interests of the Plaintiffs in this case, as American victims of Libyan-sponsored terrorism, in obtaining compensation for their severe and long-lasting injuries, and ensuring that Libya is held accountable for its sponsorship of terrorism, far outweigh those of the Libyan Defendants. The fact that the state-sponsored terrorism exception to the FSIA was enacted by Congress for the specific purpose of protecting the claims of American victims of state-sponsored terrorism, such as the Plaintiffs here, against sovereign terrorist sponsors, only further counsels in favor of the Court denying the Defendants' Motion to Dismiss. *EEOC v. O'Grady*, 857 F.2d 383, 393 (7th Cir.

1988) ("Although statutes of limitations protect defendants from the burden of defending stale claims, this interest may be outweighed 'where the interests of justice require vindication of the plaintiff's rights.'") (quoting *Burnett*, 380 U.S. at 426).

As it is clear that the equitable tolling provision of the Foreign Sovereign Immunities Act applies to the Plaintiffs' claims, and the Plaintiffs have filed their Complaint within the statutory ten-year period provided by Congress in 28 U.S.C. § 1605(f), this Court should deny Defendants' Motion to Dismiss.

## IV.    THE PLAINTIFFS HAVE SET FORTH CLAIMS FOR WHICH RELIEF MAY BE GRANTED.

### A.    Standard of Review.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint, and "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiffs can prove no set of facts to support their claim that would entitle them to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "To that end, the complaint is construed liberally in the plaintiffs' favor, and [the court] will grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "The court must treat the plaintiffs' factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences in the plaintiffs' favor." *Coles v. Harvey*, 2007 WL 63666 (D.D.C. 2007) (citing *Macharia v. United*

43

*States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. For Relief and Dev. v.*

*Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003).

> **B.    Plaintiffs' Complaint States Sufficient Claims Under State Common Law and Statutory Law Because Neither the Federal Rules of Civil Procedure Nor Case Law Requires That Plaintiffs Identify In Their Complaint the Specific States' Common Law Upon Which They Intend To Rely.**

Libya's argument that the Plaintiffs' Complaint should be dismissed because it

fails to specifically identify each state's common law upon which the Plaintiffs intend to

rely has repeatedly failed in numerous courts in this Circuit.  It is well-settled that neither

Rule 8(a) nor Rule 12(b)(6) of the Federal Rules of Civil Procedure requires that

Plaintiffs identify in their Complaint the specific states' common law causes of action on

which they intend to rely.  *Baker II,* 2006 WL 3208662 at *5; *Simpson v. Socialist*

*People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 182 (D.D.C. 2005) ("*Simpson I*")

(rejecting Defendants' argument that a complaint that listed the torts of false

imprisonment, intentional and/or negligent infliction of emotional distress, assault,

battery, loss of consortium and solatium, and loss of prospective inheritance did not state

a claim upon which relief could be granted); *Dammarell*, 370 F. Supp. 2d at 221.

Plaintiffs Complaint properly lists the torts and resultant damages of (a) battery; (b)

assault; (c) intentional infliction of emotional distress; (e) solatium; (f) wrongful death;

(g) survival damages; (h) civil conspiracy; (i) aiding and abetting; (j) economic damages;

and (k) punitive damages.  (Pl. Compl. at 27-42).

The basis for analysis for a rule 12(b)(6) motion is the presence or absence of a

claim.  "A complaint should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." *Conley*, 355 U.S. at 45-6.  Under the standard rules of federal pleading, plaintiffs are not even required to identify the legal theory of relief or to state the causes of action, much less identify the specific state common law cause of action on which they intend to rely.  *Baker II,* 2006 WL 3208662 at * 5 (stating that "[n]either the Federal Rules nor case law require Plaintiffs to plead legal theories in their complaint."); *Sparrow,* 216 F.3d at 1114-15 (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)) ("In sum, we agree with the conclusion reached by Judge Easterbrook in *Bennett*: '[b]ecause racial discrimination in employment is a claim upon which relief can be granted, . . . . I was turned down for a job because of my race is all a complaint has to say' to survive a motion to dismiss under Rule 12(b)(6)."); *see also Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000).  If Plaintiffs are not required to name a legal theory of relief, then it is clear that Plaintiffs would not be required to name the specific source of law for that unnamed legal theory of relief.

In *Bennett*, the 7th Circuit specifically addressed whether a plaintiff was required to identify a state's common law cause of action.  *Bennett*, 153 F.3d at 519.  The court noted that so long as a complaint puts the defendant on notice of what the plaintiff believes the underlying wrongdoing to be, "the complaint need not offer specifics about which rules of law, state or federal," the wrongdoing offends.  *Id.*  The *Bennett* court held,

> They [defendants] observe that the complaint seeks relief under state as well as federal law but that it does not identify any 'state causes of action.' This is a defect, however, only if a complaint must identify legal theories. It need not. This is the difference between notice pleading and code pleading; abandonment of code pleading is the fundamental choice behind Rule 8, the reason why it does

> not contain the phrase 'cause of action,' a term of art in
> code-pleading days.

*Bennett,* 153 F.3d 516 at (emphasis added). This Circuit has adopted the *Bennett* court's rationale that "[c]omplaints need not plead law or match facts to every element of a legal theory." *Sparrow*, 216 F.3d at 1115; *Krieger*, 211 F.3d at 136.

Accordingly, it remains the law of this Circuit that so long as the "gist of the complaint is clear, and where the facts set forth the legal claim such that the parties are not prejudiced, the complaint should be read broadly . . . ." *Arakelian v. National Western Life Ins.*, 755 F. Supp. 1080, 1085 (D.D.C. 1990); *see also Hanson v. Hoffman*, 628 F.2d 42, 53 (D.C. Cir. 1980).

Other circuits explicitly agree with this interpretation of the "notice pleading" for the federal rules of pleading. "The function of a complaint under the Federal Rules is to give the defendant fair notice of plaintiff's claim and the grounds upon which plaintiff relies. Thus, the fact that a plaintiff pleads an improper legal theory does not preclude recovery under the proper theory." *Doss v. South Cent. Bell Telephone Co.*, 834 F.2d 421, 424 (5th Cir. 1987) (internal citations omitted); *Gwartz v. Jefferson Memorial Hosp. Ass'n*, 23 F.3d 1426, 1431 (8th Cir. 1994) (explaining that a court should re-characterize a plaintiff's legal theory of the case in light of the factual allegations in order to save the complaint from a motion 12(b)(6)).

Libya argues, however, that the decision in *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004) requires the Court to ignore this general rule of notice pleading and apply a heightened standard of pleading for FSIA cases, which would require Plaintiffs to identify the specific states' common law that they would apply. This argument has also been rejected numerous times in this Circuit. *See, e.g. Baker II*, 2006 WL 3208662 at *

5; *Simpson I,* 362 F. Supp. 2d at 183 (rejecting the *Acree* argument raised by the same defendants as in this case, and stating that "[t]he court does not read *Acree v. Iraq* to have modified the threshold for surviving a Rule 12(b)(6) motion to dismiss.") (internal citation omitted).  In an abundance of caution, however, the Plaintiffs will address this argument in turn.

The *Acree* court wrote that "generic common law" cannot furnish a federal cause of action.  *Id.* at 59.  In stark contrast to the stage that this Court finds itself in this litigation, the *Acree* court made its ruling upon a motion to intervene filed by the United States **after** the culmination of the trial in the district court below.  Plaintiffs in *Acree* had advanced far beyond the rule 12(b)(6) stage and their continuing failure to identify specific state common law causes of action meant something entirely different than a failure to identify specific state common law causes of action in a complaint.

The facts of *Acree* quickly establish its complete lack of precedential value to the question at issue.  In *Acree*, the Plaintiffs "pointed to no source of liability other than § 1605(a)(7) and the Flatow Amendment . . . ."  370 F.3d at 59.  Indeed, the *Acree* Court held that the plaintiffs in that case failed to properly state a cause of action because they merely "allude[d] to the 'traditional torts of assault, battery and intentional infliction of emotional distress' in their generic form, Compl. ¶ 597, J.A. 143, they did not point to any other specific source in state, federal, or foreign law for their cause of action." *Acree*, 370 F.3d at 59.

In this case, however, the Plaintiffs have specifically identified in each count whether they are relying on state common law, state statutory law and/or federal law for each particular cause of action.  Furthermore, the *Acree* Court did not raise the standard

of "what is required of Plaintiffs by notice pleading, nor does it raise the bar for surviving a motion to dismiss for failure to state a claim." *Hartford Ins. v. Socialist People's Libyan Arab Jamahiriya*, 422 F. Supp. 2d 203, 209 (D.D.C. 2006); *Baker II*, 2006 WL 3208662 at *4 (holding that "[n]either *Acree* nor *Cicippio-Puelo* [*sic*] imposed a heightened pleading requirement nor altered Plaintiffs' pleading burden"); *Simpson I*, 362 F.Supp.2d at 183 n. 13; *Wyatt*, 362 F.Supp.2d at 117 n.5 (stating that the *Acree* holding did not change the standard for a 12(b)(6) motion to dismiss, and directing the Plaintiffs, who failed to plead any sort of law upon which they relied, to submit a choice-of-law statement for purposes of "efficacy").

The Plaintiffs did in fact identify specific state common law causes of action, being: (a) battery; (b) assault; (c) intentional infliction of emotional distress; (e) solatium; (f) wrongful death; (g) survival damages; (h) civil conspiracy; (i) aiding and abetting; (j) economic damages; and (k) punitive damages. (Pl. Compl. ¶¶ 27-42). The Plaintiffs have never manifested intent to rely on "generic common law" and expressly identified in their Complaint that each cause of action is grounded in state common law, statutory law and/or the Flatow Amendment. Plaintiffs have met their burden to put the Defendants on notice as to the nature and extent of the Plaintiffs' causes of action, and accordingly, the Defendants' Motion to Dismiss on 12(b)(6) grounds must be denied.

### C. The Plaintiffs State Sufficient Claims Against the Individual Defendants Under the Flatow Amendment.

The Plaintiffs' Complaint also sets forth all of the allegations required by the Flatow Amendment to state a claim against Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari in their personal capacities. Libya mistakenly states that "Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, Ibrahaim al-Bishari were acting

within the scope of their duties" as proof that the Plaintiffs only sued the Libyan individual defendants in their official capacities. (Defs' Mot. at 14-19). The Flatow Amendment, codified as a note to 28 U.S.C. § 1605, however provides that an official, employee or agent of a foreign government may be held personally liable for acts taken within the scope or duty of his office. *See generally, Baker I; Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1034 (D.C. Cir. 2004).

The very purpose of the Flatow Amendment is to create personal liability for actions taken in the scope of official duties. The Flatow Amendment which contains specific language requiring an allegation that: "[a]n official, employee, or agent of a foreign state designated as a state-sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605 note. Plaintiffs Complaint alleges that Mu'ammar al-Qadhafi, Major Abdallah al-Sanusi, Ibraihim al-Bishari were each acting within the scope of their official duties, in compliance with the Flatow Amendment. Compl. ¶¶ 33, 34, 37, 97, 135.

By pleading that Qadhafi, Al-Bishari and Al-Sanusi were acting within the scope of their duties, the Plaintiffs did not defeat their claims under the Flatow Amendment. *SeePugh*, 2006 WL 2384915 at * 6-7 (refusing to dismiss claims against Libya while accepting that the relevant officials were sued in their personal capacity for acts taken within the scope of their authority). The Flatow Amendment requires such pleading. The Supreme Court has held that government officials may be liable "for damages in their personal capacities, [] even when the conduct in question relates to their official duties." *Id.* at *7 (citing to *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997)). Because a Flatow Amendment claim is inherently a personal capacity suit,

*Cicippio-Puleo* 353 F.3d at 1034,[10]  the Flatow Amendment would be rendered a "nullity by adopting defendants' view that the individual defendants cannot be held personally liable for actions taken 'for the furtherance of the Libyan state.'"  *Pugh*, 2006 WL 2384915 at * 7 (citation to defendants' brief omitted).

Indeed, the Flatow Amendment "'*impose[s]* liability on government agents and officials *because* they have committed their terrorist acts 'under actual or apparent authority, or color of law, of any foreign nation.'"  *Id.* (citation to plaintiffs' brief omitted).  "Accepting defendants' argument that actions against foreign government officials undertaken pursuant to the directive of the foreign state must proceed as official-capacity suits only would preclude liability from ever being imposed under" the Flatow Amendment.  *Id.*  The Plaintiffs therefore did not plead that the individual defendants "acted out of personal gain or private motivation" in providing material support for the ANO.  *Id.* at *6.  Moreover, to require Plaintiffs to plead the phrase "personal capacity" or "individual capacity" alongside the explicit requirements that make up the Flatow Amendment would violate the "notice pleading" spirit of Rule 8 of the Federal Rules of Civil Procedure, which, it is well-settled, applies to cases under the FSIA.  *See, e.g., Baker II,* 2006 WL 3208662 at *4.  As the Plaintiffs' Complaint has put each of the Defendants on "fair notice of each claim and its basis," *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1118 (D.C. Cir. 2000), they have satisfied the requirements of the Federal Rules of Civil Procedure and the Defendants' Motion to Dismiss should be denied.

---

[10] Plaintiffs believe the holding of *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004) was incorrect insofar as it precludes suits against foreign sovereigns and foreign officials or employees in their official capacity.  We therefore reserve our right to challenge *Cicippio-Puleo* before this Court and at the appropriate level of appellate proceedings.

**V.    PLAINTIFFS PROPERLY SERVED THE INDIVIDUAL DEFENDANTS
AL-QADHAFI, AL-SANUSI AND AL-BISHARI.**

The Defendants correctly state that the FSIA dictates the methods for service

upon a foreign state, political subdivision, agency or instrumentality.  28 U.S.C. § 1608.

The Defendants argue, however, that the Plaintiffs improperly served the Individual

Defendants with process using the service methods mandated by the FSIA because,

according to the Defendants, "the service provisions of § 1608 of the FSIA do not apply

to claims brought against individuals in their personal capacities.  In order to maintain

their claims under the Flatow Amendment and TVPA, plaintiffs must serve the individual

Libya Defendants in a manner which is consistent with Rule 4(f) of the Federal Rules of

Civil Procedure."  (Defs' Mot. at 30.)  This is simply wrong.[11]

It is "well settled that individuals who act in their official capacities on behalf of a

foreign state 'are considered agencies or instrumentalities of a foreign state.'"  *Baker I*,

Op. at 20 (quoting *Global Index, Inc. v. Mkapa*, 290 F.Supp.2d 108, 110 (D.D.C. 2003)

which quotes *Jungquist v. Sheikh Sultan Bin Khalifa*, 115 F.3d 1020, 1027 (D.C. Cir.

1997)).  Accordingly, an individual sued for **acts taken** within his official capacity –

whether or not the individual is **sued** for those acts in his personal or official capacity –

will still qualify as an agency or instrumentality of a foreign state and may therefore be

served pursuant to the FSIA.  *Jungquist*, 115 F.3d at 1027.  In this case, the Plaintiffs

allege that the Individual Defendants performed acts within the scope of their official

capacities that removed their sovereign immunity and subjected them to personal

liability.  *See* discussion *supra* at II.C.  Accordingly, even though the Individual

---

[11] As discussed *supra* at II.A, the Defendants mistakenly assumed that the Plaintiffs asserted causes of
action based on the TVPA.  The Defendants' argument regarding dismissal of the Plaintiffs' TVPA claims
is therefore irrelevant.

Defendants have been sued in their personal capacities, they nevertheless qualify as the agencies or instrumentalities of Libya, and Plaintiffs properly served them under the FSIA.

Specifically, the Plaintiffs served all of the Defendants in accordance with the provisions of 28 U.S.C. § 1608(a)(3), by requesting that the Clerk's Office "address[] and dispatch[]" the "summons and complaint and notice of suit, together with a translation of each . . . to the head of the ministry of foreign affairs of the foreign state concerned." The FSIA in § 1608(a)(1) through (a)(4) sets forth a list of four means of service, each of which must be either unavailable or attempted unsuccessfully in order for a plaintiff to utilize the next means of service.

Section 1608(a)(1) first provides for delivery of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state." If no such arrangement exists, § 1608(a)(2) permits delivery of the summons and complaint "in accordance with an applicable international convention on service of judicial documents." In this case, § 1608(a)(3) applied to service on the Libyan Defendants because there is  no "special arrangement" and no "applicable international convention on service of judicial documents" with Libya.  28 U.S.C. §1608 (a)(1) and (2).  This section allows a plaintiff to send the summons, complaint, and a notice of suit (together with a translation of each into the official language of the foreign state) "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."

Accordingly, delivery in this case was made upon the Libyan Defendants by DHL, which is recognized as a proper "form of mail" for delivery pursuant to the FSIA.

*Abur v. Rep. Of Sudan*, 437 F.Supp.2d 166, 173 (D.D.C. 2006). DHL provided the

Plaintiffs with a delivery record confirming that, on July 30, 2006, "Taher B Zetu"

accepted and signed for the documents at the Libyan Ministry of Foreign Affairs.

Plaintiffs filed a copy of the DHL delivery record and signature page for the Libyan

Defendants with Plaintiffs' Notice of Proof of Service, filed on August 17, 2006, attached

hereto as Plaintiffs' Exhibit 7. Accordingly, service upon the Libyan Defendants was

properly effected as of July 30, 2006, and therefore the Defendants engaged counsel

which has entered its appearance on behalf of the Libyan Defendants. The Plaintiffs have

thus fulfilled the primary purpose of service of process, which is to provide the defendant

with actual notice. *Ali v. Mid-Atlantic Settlement Services, Inc.*, 233 F.R.D. 32, 35-36

(D.D.C. 2006). Accordingly, on these grounds as well, the Defendants' Motion should be

denied.

## VI.     THE HEAD-OF-STATE DOCTRINE DOES NOT APPLY IN THIS CASE.

The Defendants argue that Defendant Qadhafi is immune from suit as the leader

of Libya because of the Head-of-State Doctrine. The Head-of-State Doctrine is the

common law doctrine that, on a case-by-case basis, would entitle recognized leaders of

foreign states that are friendly to the U.S. to immunity in U.S. courts for their official

acts. The doctrine originated from the Supreme Court decision in *The Schooner*

*Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), which articulated

certain principles of customary international law pertaining to the immunity of foreign

states and their leaders.

From its inception in *Schooner*, head-of-state immunity was considered to be part

of sovereign immunity: while sovereign immunity is grounded in the principles of equal

dignity and comity of nations, head-of-state immunity is grounded in the idea that a

foreign state and its leader are one and the same.  *Id.*  In creating the doctrine, therefore,

the Supreme Court made no distinction between the head of a foreign sovereign and the

sovereign itself, holding that a ruler could not be seen to "degrade the dignity of his

nation by placing himself or its sovereign rights within the jurisdiction of another."  *The*

*Schooner Exchange*, 11 U.S. (7 Cranch) 116.

Until the FSIA was enacted in 1976, the determination of immunity was the sole

province of the Executive Branch.  *Republic of Austria v. Altmann*, 541 U.S. 677, 678

(2004).  It is now generally recognized, however, that "[the FSIA] codified the State

Department's general criteria for making suggestions of immunity and transferred the

responsibility for case-by-case application of these principles from the Executive Branch

to the Judicial Branch."  *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997);

*see also Altman*, 541 U.S. at 678; *Pugh*, 2006 WL 2384915 at *8 (D.D.C. 2006).

According to the Libyan Defendants the determination of whether a leader of a

foreign state is entitled to immunity should still be made by the Executive Branch, as they

erroneously conclude that "the FSIA does not apply to foreign heads of state.  Rather, the

determination as to whether a foreign head of state enjoys immunity from suit rests with

the Executive Branch.  The U.S. Attorney General has not determined whether the head-

of-state doctrine applies to Qadhafi.  Therefore, plaintiffs should be barred from

proceeding with their claims against defendant Mu'Ammar al-Qadhafi subject to the

Executive Branch's decision regarding Qadhafi's immunity under the head-of-state

doctrine."  (Defs' Mot. at 34.)  This argument does not accurately reflect the outcome

when the Head-of-State Doctrine is analyzed within the context of a FSIA lawsuit, particularly one against a state designated as a state-sponsor of terrorism.

Heads of foreign states are covered by the provisions of the FSIA. "Individuals acting in their official capacities are considered "agencies or instrumentalities of a foreign state . . . ." *Jungquist*, 115 F.3d at 1027 ; *Baker I*, Op. at 20 (quoting *Global Index, Inc. v. Mkapa*, 290 F.Supp.2d 108, 110 (D.D.C. 2003)). In *Global Index*, the district court evaluated the president and prime minister of Zanzibar as "foreign states" under the FSIA. 290 F.Supp.2d at 110 (finding "[t]here is little question, therefore, that defendants are a 'foreign state' for purposes of analysis under the FSIA.").

Although the FSIA does not specifically address whether foreign heads of state are immune from suit, it does expressly set forth that its immunity provisions apply with equal force to "agencies and instrumentalities" of a foreign sovereign. 28 U.S.C. § 1603. The FSIA applies to individual government officers, agents and employees, so long as the suit arises out of acts taken by an individual in his official capacity. *Jungquist*, 115 F.3d at 1027; *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir. 2002). There is no distinction within the FSIA for the hierarchy of government officials, and no exception for foreign heads of state. Moreover, where a foreign sovereign's immunity has already been stripped, as is the case with Libya due to its material support for terrorist activities, there is no reason to believe that its ruler would "degrade the dignity of his nation by placing himself or its sovereign rights within the jurisdiction of another." *The Schooner Exchange*, 11 U.S. (7 Cranch) 116.

Although, as discussed above, the FSIA ensured that foreign sovereign immunity is the province of the judiciary, foreign relations are still the responsibility of the

Executive Branch.  Therefore, in cases where the Executive Branch makes an express determination that a foreign sovereign should be immune from suit in U.S. courts, that conclusion is determinative.  *Doe v. State of Israel*, 400 F.Supp.2d 86, 110 (D.D.C. 2005).  It is only when "the Executive Branch has filed a Suggestion of Immunity as to a recognized head of a foreign state, the jurisdiction of the Judicial Branch automatically ceases."  *Id.*  Absent such an affirmative statement by the Executive Branch, however, a head of state should not be entitled to immunity where it is removed by an exception to the FSIA.  *Noriega*, 117 F.3d at1212.

Accordingly, the Court in *Collett*, in analyzing whether head-of-state immunity should apply to Qadhafi, noted that it was awaiting a "potentially dispositive statement from the Executive Branch on head-of-state immunity . . . ."  362 F. Supp. 2d at 237-38. It therefore denied Libya's motion to dismiss Qadhafi for lack of personal jurisdiction without prejudice, permitting the Defendants to refile said motion if the Executive Branch decided that head-of-state immunity should apply.  Moreover, other courts have determined that the head-of-state doctrine does not apply to Qadhafi (or to other heads of state unless asserted by the Executive Branch) and that Qadhafi can be sued if the other requirements of the FSIA are met.  *See Baker I*, Op. at 19 (holding that the Plaintiffs may properly assert punitive damages claims against the individual defendants Mu'ammar al-Qadhafi, Major Abdallah al-Sanusi and Ibrahaim al-Bishari); *Weinstein v. Iran*, 184 F.Supp.2d 13, 24 n.1 (D.D.C. 2002) (same for punitive damages claims against agencies or instrumentalities of a foreign state).

The Executive Branch has not at any time, nor in any case, affirmatively asserted head-of-state immunity for Defendant Qadhafi, nor has it done so here, nor has it

indicated its intention to do so.  Justice mandates that the Court allow the Plaintiffs'

claims against Defendant Qadhafi to proceed.  Moreover, when considering that the

purpose behind the doctrine is to preserve the dignity of the nation itself by providing its

leader with immunity, *The Schooner Exchange*, 11 U.S. (7 Cranch) 116, it is clear that

there are no reasons for this Court, especially in the absence of a suggestion of immunity,

to render Defendant Qadhafi immune.  Congress previously stripped Libya of its

sovereign immunity for cases brought under the state-sponsored terrorism exception by

enacting § 1605(a)(7).  In doing so, it also intended that, absent a contrary statement from

the Executive Branch, Defendant Qadhafi be held to answer for his support of terrorism.

Therefore, the Plaintiffs should be permitted to properly proceed with their claims

against Defendant Qadhafi, and the Defendants' Motion to Dismiss should be denied.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny

the Defendants' Motion to Dismiss in its entirety.

Dated: January 19, 2007        Respectfully Submitted,

HEIDEMAN NUDELMAN & KALIK, PC
1146 19th Street NW, Fifth Floor
Washington, DC 2008
Telephone: 202.463.1818
Facsimile: 202.463.2999

By: _/s/Richard D. Heideman_____

_/s/ Tracy Reichman Kalik_____
Richard D. Heideman (No. 377462)
Noel J. Nudelman (No. 449969)
Tracy Reichman Kalik (No. 462055)

Steven R. Perles (No. 326975)
Edward MacAllister   (No. 494558)
THE PERLES LAW FIRM, PC
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
Telephone: 202-955-9055
Facsimile:    202-955-3806

*Of Counsel for Plaintiffs:*

F. R. Jenkins (Virginia Bar No. 36302)
MERIDIAN 361 INTERNATIONAL LAW
GROUP, PLLC
Room 146
Temple Chambers, Temple Avenue
London EC4Y 0DA
United Kingdom
Telephone: + 1-866-338-7087
Telefax: + 1-800-214-1494

## CERTIFICATE OF SERVICE

I hereby certify that on this the 19th day of December, 2007, I caused the above Consent Motion for an Extension of Time to be electronically filed and served on the following counsel for the Defendants:

Thomas J. Whalen, Esq.
Mark A. Johnston, Esq.
Eckert Seamons Cherin & Mellott, LLC
747 Pennsylvania Ave, NW
Twelfth Floor
Washington, DC  20006

Wendy West Feinstein, Esq.
Eckert Seamons Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA  15219

*Tracy Reichman Kalik, Esq.*