*Estate of John Buonocore III, et al.
v. Great Socialist People's Libyan
Arab Jamahiriya, et al.*

**06-cv-727 (GK)**

# Plaintiffs' Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICK SCOTT BAKER, <u>et</u> <u>al.</u>, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 03-749 (GK) |
| GREAT SOCIALIST PEOPLE'S ) | |
| LIBYAN ARAB JAMAHIRIYA, _____) | |
| <u>et</u> <u>al.</u>, ) | |
| ) | |
| Defendants. ) | |
| ) | |

MEMORANDUM OPINION

Plaintiffs, three of the passengers on board EgyptAir Flight 648, which was hijacked by the Abu Nidal Organization ("ANO") on November 23, 1985, and their families,[1] bring this suit against various foreign Defendants[2] under the state-sponsored terrorism

---

[1] Plaintiffs are EgyptAir Flight 648 passenger Patrick Scott Baker; Jerry Baker; Lois Baker; Craig Baker; Craig Baker, as the Personal Representative for the Estate of David Baker; Stacie Baker; Hetty E. Peterson, as Executrix and Successor in Interest of the Estate of EgyptAir Flight 648 passenger Scarlett M. Rogencamp; Patricia A. Henry, as Guardian of Hetty E. Peterson; Valerie Peterson, as Executor of the Estate of Vernon W. Peterson; Patricia A. Henry; Katharine D. Doris; Paul G. Peterson; Michelle Y. Holbrook; EgyptAir Flight 648 passenger Jackie Nink Pflug; Jim Olsen; Jim Olsen, as Friend and Next of Kin of Tanner Olsen; Rylma Nink; Eugene Nink; Gloria Nink; Mary Nink; and Scott Pflug.

[2] Defendants are the Great Socialist People's Libyan Arab Jamahiriya ("Libya"); Libyan Internal Security ("LISO"); Libyan External Security ("LESO"); Mu'ammar al-Qadhdhafi, Supreme Leader of Libya; Major Abdallah al-Sanusi, Chief of LISO; and Ibraiham al-Bishari, Chief of LESO. The Syrian Arab Republic ("Syria"); Syrian Air Force Intelligence; and General Muhammed Al Khuli, Chief of Syrian Air Force Intelligence were originally named as Defendants. On October 16, 2003, however, a default judgment was entered against them. The Republic of Iraq ("Iraq"); General Intelligence; (continued...)

exception, 28 U.S.C. § 1605(a)(7), to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq..

This matter is now before the Court on the Motion to Dismiss filed by Libya, LISO, LESO, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibraihaim al-Bishari.[3]  Upon consideration of the Motion, Opposition, Reply, Surreply, and the entire record herein, and for the reasons stated below, the Libyan Defendants' Motion to Dismiss is **granted in part** and **denied in part**.

I.  **BACKGROUND**

On November 23, 1985, three ANO terrorists boarded EgyptAir Flight 648 in Athens, Greece "for the purpose of accomplishing the mission of hijacking the plane."  Pls.' More Definite Statement ¶ 5.  A typically multinational and multicultural mix of passengers, including three Americans, Plaintiff Patrick Scott Baker, Plaintiff Jackie Nink Pflug, and decedent Scarlett M. Rogencamp, was on board the plane.  Id. ¶¶ 7, 8.  Twenty-two minutes into the flight, the terrorists hijacked the plane "us[ing]

---

[2](...continued)
Military Intelligence; Saddam Hussein, then-President of Iraq; Major General Sabir Abde al-Aziz al Duri, Chief of General Intelligence; Colonel Abd Hasan al Majid, Chief of General Intelligence; and Major General Fanar Zibin Hasam al Tikriti, Chief of Military Intelligence, were also originally named as Defendants. On March 3, 2004, however, they were voluntarily dismissed from the Complaint for inability to serve them.

[3] These Defendants are collectively referred to herein as the "Libyan Defendants."  Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibraihaim al-Bishari are collectively referred to herein as the "individual Defendants."

weapons provided by Libyan government agents which had been transported in Libyan diplomatic pouch(es)." Id. ¶ 9. The hijackers then instructed the passengers to surrender their passports. Id. ¶ 20.

A shootout then ensued between an Egyptian Sky Marshall and one of the hijackers. Id. ¶ 21. The shootout resulted in the death of a hijacker, the wounding of the Sky Marshall and two stewardesses, and the piercing of the fuselage. Id. The plane was subsequently diverted to Malta. Id. At first, the tower at Malta's International Airport refused to allow the plane to land, but the Maltese authorities relented after the pilot informed them that the plane was in imminent danger of crashing into the sea as it was nearly out of fuel. Id. ¶ 22. The hijackers forced the pilot to land the plane in Malta on a runway without lights and with a gun to his head. Id. ¶ 23. The tower ordered the pilot to taxi to a remote parking area; four police buses then blocked both ends of the runway. Id. ¶ 24.

The hijackers demanded that the Maltese airport authorities refuel the plane, but they refused. Id. ¶¶ 25, 26. In response, the hijackers threatened to shoot one passenger every fifteen minutes until they acquiesced. Id. ¶ 27. Meanwhile, at the pilot's request, the hijackers agreed to release eleven women: seven Filipinos and four Egyptians. Id. ¶ 28.

The hijackers then asked the two Israeli women on board the plane to identify themselves. Id. ¶ 29. In response, Tamar Artzi, one of the Israeli women on board, stepped forward, thinking that

-3-

she too would be released.  She was, however, shot in the head
thrown from the plane and onto the tarmac.[4]  Id. ¶ 30.  The
hijackers identified Nitzan Mendelson, the other Israeli woman on
board the plane, from her passport photo.  They tied her hands and
dragged her to the open doorway of the plane where they shot her in
the head and threw her body onto the tarmac.[5]  Id. ¶ 33.

According to Plaintiffs, the three American passengers on
board the plane were "[n]ext on the terrorist agenda."  Id. ¶ 35.
Plaintiffs claim that "[t]he terrorists had specific advance
instructions to use the American passengers in their attempt to
obtain fuel to fly the plane to their desired destination, and to
kill each of them if their demands were not met."  Id.  One by one,
each of the Americans were brought to the front of the plane where
they were shot in the head and then thrown out of the plane and
onto the tarmac.  Id. ¶ 36.

Patrick Scott Baker was the first American to be shot and
thrown from the plane onto the tarmac.  While he was injured and
laying on the tarmac, the hijackers actually carried him back up
the stairs, only to shoot him again and throw him back down.  This
time, Mr. Baker pretended he was dead and waited for the hijackers
to return to the plane.[6]  Id. ¶ 37.  Scarlett M. Rogencamp was
next.  She, like the three prior victims, was shot in the head and

---

[4] Ms. Artzi survived her injuries.  Id. ¶ 34.

[5] Ms. Mendelson never regained consciousness.  She was
pronounced dead three days later.  Id. ¶ 34.

[6] Mr. Baker survived his injuries.  Id. ¶ 37.

thrown from the plane onto the tarmac.[7]  Finally, Jackie Nink Pflug was shot in the head and thrown from the plane onto the tarmac.[8] Plaintiffs claim that "[e]ach time the leader of the terrorists shot a passenger, he danced and sang and made jokes to his comrades." Id. ¶ 42.

Twenty-four hours after the hijacking began, Egyptian troops stormed the plane. Id. ¶ 43. Fifty-seven additional passengers died during the rescue attempt. Id. ¶ 44.

According to Plaintiffs, "[a]t the time of the hijacking, the [ANO] had previously received and was then receiving direct and/or material support from defendants, Libya and Syria." Id. ¶ 11. See id. ¶¶ 12-19. Specifically, they claim that "[t]he substantial material support to and sponsorship of ANO by the government of Libya included, but [was] not limited to, assisting and/or providing the following: (a) funds, (b) facilities, (c) airline tickets, (d) free and unobstructed entry into, safe haven in, and exit from Libya by members of ANO, (e) terrorist training in Libyan camps, (f) use of the privilege of Libya's 'diplomatic pouch,' (g) use of Libya's diplomatic freight privileges, (h) official documents of all kinds, and (i) actual operational assistance in pre-positioning of people and supplies for the conduct of the hijacking of Flight 648." Id. ¶ 2. See id. ¶¶ 14-19. Plaintiffs also claim that "[t]he sponsorship [of ANO] by the government of

---

[7] Ms. Rogencamp did not survive her injuries. Id. ¶ 39.

[8] Ms. Pflug survived her injuries but she continues to suffer from permanent and severe brain damage. Id. ¶ 41.

-5-

Syria included, <u>inter</u> <u>alia</u>, the providing of training in Syrian sponsored ANO terrorist training camps, military and general intelligence, [and] safe haven and free passage in and through Syrian controlled territory." <u>Id.</u> ¶ 3. <u>See</u> <u>id.</u> ¶¶ 12, 13.

On March 25, 2003, Plaintiffs filed the instant action seeking recovery against all Defendants for battery, assault, false imprisonment, wrongful death, intentional infliction of emotional distress (including solatium), civil conspiracy and aiding and abetting. <u>See</u> Compl. ¶¶ 81-94, 98-103. In addition, they asserted claims against all Defendants for survival damages; economic damages; and punitive damages. <u>See</u> <u>id.</u> ¶¶ 95-97, 104-109. On May 12, 2004, the Libyan Defendants filed the instant Motion to Dismiss.

## II. STANDARD OF REVIEW

The Foreign Sovereign Immunities Act ("FSIA") renders a foreign state immune from suit unless the case falls within one of the statutory exceptions to immunity. <u>See</u> 28 U.S.C. §§ 1605, 1607. "'In accordance with the restrictive view of sovereign immunity reflected in the FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" <u>Kilburn v. Socialist People's Libyan Arab Jamahiriya</u>, 376 F.3d 1123, 1131 (D.C. Cir. 2004) (quoting <u>Phoenix Consulting, Inc. v. Republic of Angola</u>, 216 F.3d 36, 40 (D.C. Cir. 2000) (internal quotation and citations omitted)). A court may dismiss a complaint brought under the FSIA only if it appears beyond doubt that the plaintiff can prove no set

of facts in support of her claims that would entitle her to relief. See Peterson v. Royal Kingdom of Saudi Arabia, 332 F.Supp.2d 189, 195 (D.D.C. 2004) (citing Daliberti v. Republic of Iraq, 97 F.Supp.2d 38, 42-43 (D.D.C. 2000)).

On a motion to dismiss a FSIA case, a defendant may challenge either the legal sufficiency or the factual underpinning of an exception to foreign-state immunity. Phoenix Consulting, 216 F.3d at 40. If a defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the court "should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." Id. at 39 (internal citations omitted). If, however, the defendant challenges the factual underpinning of the court's jurisdiction, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." Id. at 40. Instead, the "court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Id.

In the instant case, the Libyan Defendants challenge only the legal sufficiency of Plaintiffs' jurisdictional allegations. Thus, the Court must take Plaintiffs' factual allegations as true and determine whether they bring the instant case within the exception Plaintiffs have invoked to foreign-state immunity, namely, the state-sponsored terrorism exception, codified at 28 U.S.C.

-7-

§ 1605(a)(7), enacted as part of the comprehensive Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 221(a), 110 Stat. 1214 (April 24, 1996).[9]  It provides that foreign sovereigns are not immune when

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency[.]

28 U.S.C. § 1605(a)(7).  This exception applies only if (1) the foreign state was designated by the State Department as a state sponsor of terrorism at the time the act occurred or was designated as such as a result of such an act; (2) the foreign state was afforded a reasonable opportunity to arbitrate the claim regarding an act which occurred within that state's borders; and (3) either the claimant or the victim was a United States national at the time the act occurred.  Id. §§ 1605(a)(7)(A)-(B).

## III. ANALYSIS

### A. The Court Has Personal Jurisdiction Over Libya and the Non-Resident Alien Individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi and Ibrahaim al-

---

[9] Our Circuit has noted that this standard is similar to that applied under Federal Rule of Civil Procedure 12(b)(6), where dismissal is warranted only if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002).

**Bishari because the Due Process Protections of the Fifth Amendment Do Not Extend to Those Defendants**

While the Libyan Defendants challenge the Court's assertion of personal jurisdiction over Libya as violative of the Due Process Clause of the Fifth Amendment, they acknowledge that our Circuit has recently conclusively held that foreign states may not cloak themselves in the protections of the Due Process Clause of the Fifth Amendment. See TMR Energy Ltd. v. State Property Fund of Ukraine, -- F.3d --, 2005 WL 1412415 at *3 (D.C. Cir. 2005) ("it is not to the due process clause but to international law and to the comity among nations, as codified in part by the FSIA, that a foreign state must look for protection in the American legal system") (citing Price); Price, 294 F.3d at 99 ("[W]e are unwilling to interpret the Due Process Clause as conferring rights on foreign nations that States of the Union do not possess. Neither the text of the Constitution, Supreme Court decisions construing the Due Process Clause, nor long standing tradition provide a basis for extending the reach of this constitutional provision for the benefit of foreign states."). In light of our Circuit's clear and binding precedent on this point, the Court concludes that it has personal jurisdiction over Libya.

The Libyan Defendants also challenge the Court's assertion of personal jurisdiction over the individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi and Ibrahaim al-Bishari on the ground that they "lack[] minimum contacts with the United States."

Def.s' Mot. at 6. This challenge fails because it is premised upon the flawed assumption that the due process protections of the Fifth Amendment are available to these Defendants.[10]

In fact, however, "[t]he Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (internal citations omitted). See People's Mojahedin Org. of Iran v. United States Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) ("'[A]liens receive constitutional protections only when they have come within the territory of the United States and developed substantial connections with this country.'") (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990)). By their own admission, the individual Defendants in this case "have no presence in the United States, do not conduct any businesses in the United States, either directly or through an agent, and do not have any affiliating contacts with the United States." Def.s' Mot. at 6. The individual Defendants in this case may not, therefore, claim

---

[10] Due process requires that if, as in this case, "the defendant is not present within the forum territory, ... 'he have certain minimum contacts with [the forum territory] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" El-Hadad v. Embassy of the United Arab Emirates, 69 F.Supp.2d 69, 78 (D.D.C. 1999) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Here, Defendants do not have even the minimum contacts with the United States that would entitle them to Fifth Amendment protections.

the due process protections of the Fifth Amendment.[11]  Accordingly,
the Court concludes that it has personal jurisdiction over the non-
resident alien individual Defendants Mu'ammar al-Qadhdhafi, Major
Abdallah al-Sanusi and Ibrahaim al-Bishari.[12]

    **B.**    **The Court Has Subject-Matter Jurisdiction because
Plaintiffs' Allegations of Libya's General Sponsorship of
ANO Are Sufficient to Bring Libya within the State-
Sponsored Terrorism Exception to Foreign Sovereign
Immunity**

---

[11] The Libyan Defendants cite <u>Pugh v. Socialist People's Libyan
Arab Jamahiriya</u>, 290 F.Supp.2d 54, 58 (D.D.C. 2003), in support of
their claim that the individual Defendants "are entitled to the
protections of the Due Process Clause of the Constitution." Def.s'
Reply at 2.  <u>Pugh</u>, however, is distinguishable, given that the
individual Defendants in this case, by their own admission, "have
no presence in the United States."  Def.s' Mot. at 6.  <u>See Pugh</u>,
290 F.Supp.2d at 58 ("[A]lien individuals, even suspected
terrorists -- <u>at least those who have a 'presence' in the United
States</u> -- are [] entitled ... to the protections of the Due Process
Clause of the United States Constitution.") (emphasis added).

[12] The Libyan Defendants argue that "[t]he 1996 Amendment to
the FSIA is unconstitutional in that it grants personal
jurisdiction over an individual defendant simply through service of
process, under 28 U.S.C. § 1608, absent and without regard for any
of the <u>constitutionally</u> required contacts."  Def.s' Mot. at 11
(emphasis in original). However, in <u>TMR Energy Ltd.</u>, -- F.3d --,
2005 WL 1412415 at *3, the Court of Appeals made it clear that
"[t]he FSIA confers upon district courts subject matter
jurisdiction as to 'any claim for relief in personam with respect
to which the foreign state is not entitled to immunity,' 28 U.S.C.
§ 1330(a), and personal jurisdiction follows where proper 'service
has been made under § 1608.'" (quoting 28 U.S.C. § 1330(a)).  <u>See
Practical Concepts, Inc. v. Republic of Bolivia</u>, 811 F.2d 1543,
1548, n.11 (D.C. Cir. 1987) ("under the FSIA, subject matter
jurisdiction plus service of process equals personal
jurisdiction").

The Libyan Defendants claim that the Court lacks subject matter jurisdiction because Plaintiffs have failed to show that the "material support or resources" provided by Libya to ANO was used by ANO to directly fund the specific acts giving rise to Plaintiffs' claims, as required by 28 U.S.C. § 1605(a)(7). Def.s' Mot. at 13. Subsequent to the parties' briefing on this issue, this argument was rejected by our Court of Appeals in Kilburn. The court reasoned that "imposing a jurisdictional requirement that a state sponsor's financial assistance to a terrorist organization must be directly traceable to a particular terrorist act would likely render § 1605(a)(7)'s material support provision ineffectual. Money, after all, is fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records." Kilburn, 376 F.3d at 1130. See Wyatt v. Syrian Arab Republic, 362 F.Supp.2d 103, 111, n.1 (D.D.C. 2005) ("A nation loses immunity even if the support it provides does not directly fund the particular terrorist act that injured or killed the victim. The only requirement is that the provision of support proximately causes the terrorist act.") (citing Kilburn); Collett v. Socialist Peoples' Libyan Arab Jamahiriya, 362 F.Supp.2d 230, 236 (D.D.C. 2005) (same). Consequently, the Libyan Defendants' argument that the material support provided by a foreign state to a terrorist organization must fund the specific acts that caused the alleged injury must be rejected.

The Court, therefore, concludes that it has subject matter jurisdiction because Plaintiffs' allegations of Libya's general sponsorship of ANO are sufficient to bring Libya within the state-sponsored terrorism exception to foreign sovereign immunity.

**C.    Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted but They Will Be Allowed to Amend Their Complaint**

**1.    Plaintiffs cannot state a valid cause of action against Libya under the Flatow Amendment through Section 1606**

In addition to challenging the Court's jurisdiction, the Libyan Defendants also seek dismissal of Plaintiffs' Complaint on the ground that Plaintiffs have failed to state a claim upon which relief can be granted.  In particular, they rely on <u>Cicippio-Puleo v. Islamic Republic of Iran</u>, 353 F.3d 1024, 1033 (D.C. Cir. 2004) which held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government."  Plaintiffs respond that the Flatow Amendment should be read to apply to foreign states through 28 U.S.C. § 1606.[13]   <u>See</u> Pl.s' Opp'n at 23-29.  The reasoning of Judge Bates in his comprehensive opinion in <u>Dammarell v. Islamic Republic of Iran</u>, 2005 WL 756090 (D.D.C. 2005) persuasively demonstrates that Congress did not intend to create a cause of action against foreign states under the Flatow Amendment

---

[13] 28 U.S.C. § 1606 states, in relevant part, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."

through Section 1606. In <u>Dammarell</u>, the court rested its conclusion that Congress did not intend to allow the Flatow Amendment to be expanded to foreign states through Section 1606 on the following factors:

> (i) the text of the statute applies only to foreign state officials or agents but not the foreign state itself, (ii) the legislative history does not evince any intent that the statute would apply to foreign states, (iii) section 1605(a)(7) was enacted only five months before the statute, and the legislative history nonetheless does not indicate any anticipation or understanding that the statute would be applied to foreign states, and (iv) [] the statute does not obviously extend to private individuals within the meaning of section 1606. Indeed, it would be odd if, as <u>Cicippio-Puleo</u> held, the combination of section 1605(a)(7) and the Flatow Amendment did not create a private right of action against foreign states, but the combination of section 1606 and the Flatow Amendment (despite congressional silence) somehow did. For all these reasons, the cause of action in the Flatow Amendment cannot be read to apply to foreign states through section 1606.

<u>Id.</u> at 30. <u>See also</u> <u>Roeder v. Islamic Republic of Iran</u>, 195 F.Supp.2d 140, 174 (D.D.C. 2002) (rejecting argument that plaintiffs "unambiguously have a cause of action against Iran by virtue of ... § 1606," because "the Supreme Court has made clear that this provision does not impact the substantive liability of a foreign government") (internal citation omitted). For all the reasons discussed in <u>Dammarell</u>, the Court concludes that Plaintiffs cannot state a valid cause of action against Libya under the Flatow Amendment through Section 1606.

> **2. Plaintiffs have failed to allege viable state or federal common law causes of action against Libya, LISO and LESO**

The Libyan Defendants also seek dismissal of the Complaint on the ground that Plaintiffs have asserted no state law causes of action.  See Def.s' Mot. at 15, n.5.

"Section 1605(a)(7) only removes the immunity of a foreign state; it does not itself describe a cause of action against the foreign state."  Dammarell, 2005 WL 756090 at *7 (citing Cicippio, 353 F.3d at 1033).  Thus, a plaintiff must look elsewhere for the source of her cause of action.

In the instant case, Plaintiffs maintain that causes of action exist under state common law.  See Pl.s' Opp'n at 30-31.  Although Plaintiffs state traditional, generalized claims for battery, assault, false imprisonment, intentional infliction of emotional distress, etc., they fail to specify whether these claims are grounded in state common law, state or federal statutory law, or foreign law.  See Bettis v. Islamic Republic of Iran, 315 F.3d 325, 332-333 (D.C. Cir. 2003).  The Complaint, therefore, fails to "identify a particular cause of action arising out of a specific source of law," and thus falls short of the standard set by the D.C. Circuit in Acree v. Republic of Iraq, 370 F.3d 41, 58-59 (D.C. Cir. 2004) (plaintiffs cannot state a right of action under the "generic common law" or merely "allude[] to the traditional torts ... in their generic form" but instead must "identify a particular cause of action arising out of a specific source of law").

-15-

However, in light of considerations of judicial economy and Plaintiffs' clearly stated desire to press their state law claims, see Pl.s' Opp'n at 30-31, the Court will allow Plaintiffs an opportunity to amend their Complaint to plead state law causes of action with the detail required by our appellate case law.[14] See Cicippio, 353 F.3d at 1036 (allowing plaintiffs an opportunity to amend their complaint where they alleged only generic common law torts); Dammarell, 2005 WL 756090 at *32 (same); Simpson v. Socialist People's Libyan Arab Jamahiriya, 2005 WL 517850 at *1 (D.D.C.) (same); Welch v. The Islamic Republic of Iran, 2004 WL 2216534 at *4 (D.D.C.) (same); Owens v. Republic of Sudan, 2005 WL 724592 at *19 (D.D.C.) (same).

Plaintiffs in this case also maintain that causes of action exist under federal common law. See Pl.s' Opp'n at 31-32. In light of Bettis, supra, which cautioned against the creation of a

---

[14] The Libyan Defendants argue that Plaintiffs should identify "which one of the common laws of the fifty states of the Union they intend to rely on." Def.s' Reply at 6. The notice pleading standard of Federal Rule of Civil Procedure 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," does not require Plaintiffs to include their specific choice of law determination in their amended complaint. Fed. R. Civ. P. 8(a). See Hanson v. Hoffman, 628 F.2d 42, 53 (D.C. Cir. 1980) ("The liberal concepts of notice pleading embodied in the Federal Rules do not require the pleading of legal theories."). See also Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1118 (D.C. Cir. 2000) ("Under Rule 8, all that is required is that the complaint give [] the defendants fair notice of each claim and its basis.") (internal quotation and citation omitted). Moreover, the Court is "unaware of any law, either in the FSIA setting or out, that would require such a result." Dammarell v. Islamic Republic of Iran, 370 F.Supp.2d 218, 221 (D.D.C. 2005).

federal common law remedy in this context,[15] the Court concludes that "federal common law should not serve as a rule of decision in the run of section 1605(a)(7) cases."[16]  Dammarell, 2005 WL 756090 at *23.

### D. No Plaintiffs Will Be Dismissed from this Case for Failure to Allege a Valid Cause of Action

The Libyan Defendants argue that certain Plaintiffs should be dismissed from this case for failure to allege a valid cause of action.

Specifically, they claim that Valerie Peterson, as Executor of the Estate of Vernon W. Peterson, the father of EgyptAir Flight 648

---

[15] In Bettis, our Circuit noted that, because Section 1606 of the FSIA provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," it in effect instructs federal courts "to find the relevant law, not to make it." Bettis, 315 F.3d at 333.  It then explained that federal courts could look to state common law to determine the meaning of a cause of action. See id.  Thus, our Circuit appears to be "cautioning courts not to create new federal common-law claims for use against foreign sovereigns while at the same time condoning the use of pre-existing common-law claims." Kilburn v. Republic of Iran, 277 F.Supp.2d 24, 36 (D.D.C. 2003).

[16] Dammarell also articulated other persuasive reasons for this conclusion:

[T]he Court does not find this to be one of the 'few and restricted' cases where it is appropriate to fashion federal common law as the rule of decision.  The desire for uniformity alone is not a sufficient reason to create federal common law, no other unique federal interest is implicated, and there is no significant conflict between some important federal policy or interest and the application of state law.

Id., 2005 WL 756090 at *28.

passenger Scarlett M. Rogencamp, should be dismissed because "[i]t is unclear to [Defendants] how an estate of a deceased father can assert a cause of action for infliction of emotional distress and loss of solatium." Def.s' Mot. at 16.  They also claim that the Court should dismiss Scott Pflug, the ex-husband of EgyptAir Flight 648 passenger Jackie Nink Pflug, from this case because "an ex husband ... may not bring suit against [Defendants] for emotional distress or the loss of solatium as he is no longer married to her and there is no further legal obligation between the individuals." Id.  In addition, they claim that Jim Olsen, who married EgyptAir Flight 648 passenger Jackie Nink Pflug twelve years after the EgyptAir Flight 648 hijacking, and Jim Olsen, as Friend and Next of Kin of Tanner Olsen, Jackie Nink Pflug's son who was born twelve years after the hijacking, should be dismissed.  They argue that "[t]he assertion of a cause of action on behalf of a husband who married plaintiff Jackie Nink Pflung 12 years after the alleged incident, or a son born over 12 years after the incident for emotional distress and the loss of solatium has no basis under any relevant [] statutes." Id.

        In light of the Court's holding supra, that Plaintiffs have failed to state a claim upon which relief can be granted because their Complaint fails to plead state law causes of action with the detail required by our appellate case law, it would be premature to dismiss individual Plaintiffs from this case before Plaintiffs have

had an opportunity to amend their Complaint. Accordingly, no Plaintiffs will be dismissed from this case for failure to allege a valid cause of action at this stage in the litigation.

> **E.   Plaintiffs May Not Bring a Claim for Punitive Damages Against LISO and LESO; They May Bring Such a Claim Against the Individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi and Ibrahaim al-Bishari**

The Libyan Defendants argue that Plaintiffs may not sustain a claim for punitive damages against them pursuant to 28 U.S.C. § 1606.  Section 1606 of the FSIA provides, in relevant part, that "a foreign state, <u>except for an agency or instrumentality thereof</u> shall not be liable for punitive damages."  28 U.S.C. § 1606 (emphasis added).  Thus, while the FSIA does not permit the award of punitive damages against a foreign state,[17] <u>see</u> <u>Weinstein v. Islamic Republic of Iran</u>, 184 F.Supp.2d 13, 24, n.1 (D.D.C. 2002), it does allow for the award of such damages against an "agency or instrumentality thereof."[18]  Our Circuit has adopted "a categorical approach: if the core functions of the entity are governmental, it

_____

[17] It is clear that the FSIA does not permit the award of punitive damages against Libya.  <u>See</u> 28 U.S.C. § 1606.

[18] An "agency or instrumentality" of a foreign state means any entity "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country."  28 U.S.C. § 1603(b).

is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." See Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (citing Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 149-50 (D.C. Cir. 1994)).

The Libyan Defendants argue that LISO and LESO must be treated as the state of Libya itself rather than as its agent, and thus, that they may not be held liable for punitive damages.  Plaintiffs fail to respond to this argument.  See Pl.s' Opp'n at 36-37.  The Court thus treats the Libyan Defendants' argument as conceded.  See United States v. Real Property Identified As: Parcel 03179-005R, 287 F.Supp.2d 45, 61 (D.D.C. 2003) ("If the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded.") (internal citation omitted), and cases cited therein. Plaintiffs' claim for punitive damages against LISO and LESO must, therefore, be dismissed.  See Roeder, 333 F.3d at 234 (citing Transaero, Inc., 30 F.3d at 149-50).

It is, however, "well-settled that individuals who act in their official capacities on behalf of a foreign sovereign 'are considered agencies or instrumentalities of a foreign state.'" Global Index, Inc. v. Mkapa, 290 F.Supp.2d 108, 110 (D.D.C. 2003) (quoting Jungquist v. Sheikh Sultan Bin Khalifa, 115 F.3d 1020, 1027 (D.C. Cir. 1997)).  In the instant case, the Libyan Defendants

concede that "Plaintiffs have [] not asserted any causes of action against the individual Libyans named as defendants in their individual capacities[.]" Def.s' Mot. at 14, n.4. Accordingly, the Court concludes that Plaintiffs may sustain a claim for punitive damages against the individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari pursuant to 28 U.S.C. § 1606.

### III. CONCLUSION

Accordingly, for the foregoing reasons, the Libyan Defendants' Motion to Dismiss is **granted in part** and **denied in part**.

An Order will issue with this Memorandum Opinion.


June 30, 2005

/s/ _____
GLADYS KESSLER
United States District Judge

-21-