# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ESTATE OF JOHN BUONOCORE III,** *et al.*,

      **Plaintiffs,**

              **v.**                                  **Civil Action No. 06-727 (JMF)**

**GREAT SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA,** *et al.*,

      **Defendants.**


**VICTOR SIMPSON,** *et al.*,

      **Plaintiffs,**

              **v.**                                  **Civil Action No. 08-529 (JMF)**

**GREAT SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA,** *et al.*,

      **Defendants.**


## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Currently pending and ready for resolution are two actions brought under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*:  1) Buonocore v. Great Socialist People's Libyan Jamahiriya, Civil Action No. 06-727, originally filed on April 21, 2006,[2] but amended on March 28, 2008,[3] and again on April 2, 2010[4] (only as to plaintiff Juliet Sweis); and

2) Simpson v. Great Socialist People's Libyan Jamahiriya, Civil Action No. 08-529, originally

---

[1] Because these findings of fact and conclusions of law resolve two pending cases, documents that were filed in each of the cases will be referenced as follows:  Plaintiff's Name, Civil Action No. XX-XXXX, Document Caption [#Docket Number], as in footnote 2 below.

[2] See Buonocore, Civil Action No. 06-727, Complaint for Compensatory and Punitive Damages [#1].

[3] See Buonocore, Civil Action No. 06-727, Amended Complaint for Compensatory and Punitive Damages [#53].

[4] See Buonocore, Civil Action No. 06-727, Second Amended Complaint for Compensatory and Punitive Damages [#82].

filed on March 27, 2008,[5] but amended on April 2, 2010.[6]  The named Libyan defendants were dismissed from each of these actions by Judge Kessler, pursuant to the enactment of the Libya Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008).[7]  Plaintiffs' claims remain pending against the following defendants:  1) the Syrian Arab Republic; 2) the Syrian Air Force Intelligence agency (Idarat al-Mukhabarat al-Jawiyya); and 3) Syria's Director of Military Intelligence (General Muhammad al-Khuli) (hereinafter collectively the "Syrian defendants" or "Syria").[8]

An evidentiary hearing on liability and damages as to all plaintiffs was held from February 22-25, 2011.[9]  During the hearing, this Court accepted evidence in the form of, *inter alia*, live testimony, live video-link testimony, affidavits, *de bene esse* depositions, and original documentary evidence.  The Court also accepted testimony on various subjects from six qualified experts.[10]  The following findings of fact and conclusions of law, however, address only those

---

[5] See Simpson, Civil Action No. 08-529, Complaint for Compensatory and Punitive Damages [#1].

[6] See Simpson, Civil Action No. 08-529, Amended Complaint for Compensatory and Punitive Damages [#22].

[7] See Buonocore, Civil Action No. 06-727, Order [#78] at 2; Simpson, Civil Action No. 08-529, Order [#18] at 2.

[8] Id.

[9] The hearing transcripts are all docketed in Buonocore, Civil Action No. 06-727.  The transcript for February 22, 2011 is docketed at [#92] for the morning session and [#101] for the afternoon session; February 23, 2011 at [#102]; February 24, 2011 at [#103]; and February 25, 2011 at [#97].

[10] Marius Deeb, Ph. D. was accepted by this Court as an expert witness in the following areas:  1) the Syrian government; 2) the Syrian government's structure; 3) the Syrian government's foreign policy; 4) the Syrian government's past and continuing support of terrorism; 5) the Syrian government's designation as a state sponsor of terror; and 6) the Syrian government's support of the Abu Nidal Organization ("ANO"), which committed the EgyptAir Flight 648 hijacking, and the Rome and Vienna Airport attacks. (M. Deeb, T-23-191)

Col. Patrick Lang was accepted by this Court as an expert witness in the following areas:  1) terrorism; 2) counterterrorism; 3) Middle Eastern affairs; 4) politics; 5) Syria as a designated state sponsor of terrorism; 6) Syria's sponsorship of the ANO; 7) the terrorist hijacking of Egypt Air Flight 648, committed on November 23, 1985 by the ANO with Syrian sponsorship; and 8) the Rome and Vienna Airport attacks of December 27, 1985, also committed by the ANO, with Syrian sponsorship. (P. Lang, T-23-167)

David Long, Ph.D. was accepted by this Court as an expert witness in the following areas:  1) terrorism; 2) counterterrorism; 3) Middle Eastern affairs; 4) politics; 5) Syria's sponsorship of terrorism; 6) Syria's sponsorship of ANO; and 7) the terrorist hijacking of EgyptAir Flight 648, committed on November 23, 1985 by the ANO with Syrian sponsorship, and 8) the Rome and Vienna Airport attacks of December 27, 1985, also committed by the ANO, with Syrian sponsorship. (D. Long, T-23-144)

claims made by U.S. citizens seeking redress for actions taken against them or other U.S. citizens. The remaining plaintiffs and their respective claims will be addressed in a separate opinion.

## FINDINGS OF FACT

I. <u>Syria and the ANO</u>

   A.   <u>Syria is a State Sponsor of Terrorism</u>

   1.   Prior to the December 27, 1985 attacks, and continuing to the present time, terrorism was, and remains, an integral tool for the Syrian regime. (Ex. 54[11] – M. Deeb, May 2010 Trial Testimony at pg. 197; Ex. 54 – M. Deeb, Affidavit ¶ 7; M. Deeb, T-23-192; Lang, T-23-171-72)[12]

   2.   The United States designated Syria as a state sponsor of terrorism primarily because of its active and direct involvement in terrorist activities beginning in the mid-1970's. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pgs. 201-02; Ex. 54 – M. Deeb, Affidavit ¶ 8; M. Deeb, T-23-193-94)

---

<u>James Markham, Ph. D.</u> was accepted by this Court as an expert witness in the following areas:  1) forensic economics; and 2) calculations involving damages for each of the killed or injured plaintiffs. (J. Markham, T-25-9)

<u>Ambassador Robert Oakley</u> was accepted by this Court as an expert witness in the following areas:  1) terrorism; 2) counterterrorism; 3) Middle Eastern affairs; 4) politics; and 5) Syria's sponsorship of the ANO prior to, during, and following the EgyptAir Flight 648 hijacking, and the Rome and Vienna Airport attacks. (R. Oakley, T-23-153)

<u>Yoram Schweitzer, Ph.D.</u> was accepted by this Court as an expert witness in the following areas:  1) terrorism; 2) counterterrorism; 3) Middle Eastern affairs; 4) politics; and 5) Syria's sponsorship of the ANO prior to, during, and following the EgyptAir Flight 648 hijacking, and the Rome and Vienna Airport attacks. (Y. Schweitzer, T-23-181)

[11] Exhibit 54 contains the following documents:  1) M. Deeb, May 2010 Trial Testimony; 2) U.S. Department of State, Report entitled "Patterns of Global Terrorism:  1985"; 3) M. Deeb, Curriculum Vitae; 4) M. Deeb, Affidavit; 5) M. Deeb, Curriculum Vitae (duplicate); 6) U.S. Department of State, State Sponsors of Terrorism; 7) U.S. Department of State, Report entitled "Syrian Support for International Terrorism:  1983-86"; and 8) U.S. Department of State, February 1989 Fact Sheet on the ANO.

[12] In citations to the transcript of the evidentiary hearings in this case, the following convention is used:  witness' name, T-date in February 2011 of testimony-transcript page(s).  The first day of the evidentiary hearings in this case was February 22, 2011.  The transcripts from that day are divided into a morning session, designated "22A," and an afternoon session, designated "22B."  In citations to exhibits that contain witness testimony, in the form of, for example, previously given testimony or affidavits, the following convention is used:  witness' name, date (if known), description of testimony, page or paragraph number(s).

3.      Historically, Syria has provided material support to terrorist groups primarily in order to achieve foreign policy goals, such as pushing the United States and its allies out of the region. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pgs. 197-98; Ex. 54 – M. Deeb, Affidavit ¶ 7; M. Deeb, T-23-193)

4.      Syria has supported terrorism to undermine the peace process between the Arabs and Israelis. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pg. 198; Ex. 58[13] – Y. Schweitzer, Feb. 4, 2010 *De Bene Esse* Deposition at pg. 11)

5.      Syrian sponsored terrorist activities were, and continue to be, primarily directed against any entity supportive of that process, including moderate Arab states such as Egypt, pro-Yassir Arafat Palestinian groups, and U.S. and Israeli targets. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pg. 198; Ex. 54 – M. Deeb, Affidavit ¶ 8)

6.      Syria supported the Abu Nidal Organization ("ANO")'s operations against Arab countries that supported the Israel-Egypt peace treaty. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pg. 198; Ex. 58 – Y. Schweitzer, Feb. 4, 2010 *De Bene Esse* Deposition at pg. 11)

7.      Syria utilized, and continues to utilize, terrorist groups as a means of achieving foreign policy goals without resorting to conventional methods of warfare, which it cannot afford to wage against either Israel or the United States. (Ex. 54 – M. Deeb, Affidavit ¶ 7; M. Deeb, T-23-193)

8.      As a result of its past support of terrorism, Syria was among the first countries designated in 1979 by the United States Department of State as a state sponsor of terrorism. (Ex.

---

[13] Exhibit 58 contains the following documents:  1) Y. Schweitzer, Feb. 4, 2010 *De Bene Esse* Deposition; and 2) Y. Schweitzer, Curriculum Vitae)

54 – M. Deeb, Affidavit ¶ 7; Ex. 55[14] – R. Oakley, Affidavit ¶ 6; M. Deeb, T-23-193; R. Oakley, T-23-155-56)

9.      Syria was designated as a state sponsor of terrorism on December 29, 1979. (Ex. 54 – M. Deeb, Affidavit ¶ 7; Ex. 55 – R. Oakley, Affidavit ¶ 6; M. Deeb, T-23-193)

10.     Syria, as a result of its ongoing, current, and continuous sponsorship of terrorism, today remains designated by the State Department as a state sponsor of terrorism. (Ex. 55 – R. Oakley, Affidavit ¶ 6)

11.     During the period encompassing the Rome and Vienna Airport attacks of December 1985, Syria continued to support the most active and brutal international terrorist group operating at the time, the ANO. (Ex. 55 – R. Oakley, Affidavit ¶ 6)

12.     During that time period, the United States considered Syria one of the worst sponsors of terrorism in the world. (Ex. 55 – R. Oakley, May 2010 Trial Testimony at pg. 22; R. Oakley, T-23-158)

13.     Beginning on or about 1983, Syria began to rely increasingly on terrorist groups comprised of non-Syrians in order to deflect detection of Syria's support and liability for the actions of its terrorist surrogates. (Ex. 54 – M. Deeb, Affidavit ¶ 8; M. Deeb, T-23-194-95)

14.     During the period encompassing the Rome and Vienna Airport Attacks, President Hafiz al-Assad ("al-Assad") ruled Syria under an authoritarian government whereby all organs of the state were directly under his control. (Ex. 54 – M. Deeb, Affidavit ¶ 9; M. Deeb, T-23-195)

---

[14] Exhibit 55 contains the following documents:  1) R. Oakley, May 2010 Trial Testimony; 2) R. Oakley, Curriculum Vitae; 3) R. Oakley, Affidavit; 4) R. Oakley, 5) R. Oakley, Curriculum Vitae (duplicate); 6) U.S. Department of State, State Sponsors of Terrorism; 7) U.S. Department of State, Foreign Terrorist Organizations; 8) U.S. Department of State, Report entitled "Syrian Support for International Terrorism:  1983-86"; 9) Central Intelligence Agency, National Intelligence Daily dated December 1985; and 10) U.S. Department of State, February 1989 Fact Sheet on the ANO.

15.     One of the primary organs al-Assad utilized to sponsor terrorist organizations, such as the ANO, was the Syrian Air Force Intelligence agency, Idarat al-Mukhabarat al-Jawiyya. (Ex. 54 – M. Deeb, Affidavit ¶ 9; Ex. 55 – R. Oakley, May 2010 Trial Testimony at pg. 13; M. Deeb, T-23-195-96; R. Oakley, T-23-159)

16.     The Syrian Air Force Intelligence agency acted more as a presidential intelligence service than an instrumentality of the Air Force, and was of paramount importance because it functioned as the highest intelligence organization in Syria. (Ex. 54 – M. Deeb, Affidavit ¶ 9; M. Deeb, T-23-196)

17.     The head of the Syrian Air Force Intelligence agency, General Muhammad al-Khuli ("al-Khuli") was the most powerful intelligence chief within Syria. (Ex. 54 – M. Deeb, Affidavit ¶ 10; M. Deeb, T-23-196)

18.     Syria remains a major sponsor of terrorism today. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pgs. 198-99)

19.     At present, Syria, as a state sponsor of terrorism, spends between U.S. $500,000,000 (at a minimum) and U.S. $700,000,000 annually on terrorism-related expenditures. (M. Deeb, T-24-6)

20.     Syria's current and ongoing support of international terrorism includes, but is not limited to, providing material support to HAMAS and Hezbollah. (Ex. 44[15] – P. Lang, May 2010 Trial Testimony at pg. 160; Ex. 54 – M. Deeb, May 2010 Trial Testimony at pg. 197-99, 232-34)

---

[15] Exhibit 44 contains the following documents:  1) P. Lang, May 2010 Trial Testimony; 2) P. Lang, Revised Curriculum Vitae; 3) P. Lang, Affidavit; 4) P. Lang, Revised Curriculum Vitae (duplicate); 5) U.S. Department of State, Report entitled "Syrian Support for International Terrorism:  1983-86"; 6) Central Intelligence Agency, National Intelligence Daily dated December 1985; 7) U.S. Department of State, February 1989 Fact Sheet on the ANO; 8) Photograph; 9) U.S. Department of State, State Sponsors of Terrorism; 10) U.S. Department of State, Foreign Terrorist Organizations; 11) Map of Lebanon; 12) Photograph (duplicate); 13) U.S. Department of State, February 1989 Fact Sheet on the ANO (duplicate); 14) U.S. Department of State, Report entitled "Syrian Support for International Terrorism:  1983-86"; and 15) O. Rezaq, Affidavit.

21.     Both HAMAS and Hezbollah have been designated by the U.S. Department of State as Foreign Terrorist Organizations ("FTOs"). (Ex. 55 – U.S. Department of State, Foreign Terrorist Organizations at pg. 1)

**B.      The ANO is a Foreign Terrorist Organization**

22.     The ANO was established and led by Sabri al-Banna a/k/a Abu Nidal. (Ex. 44 – P. Lang, May 2010 Trial Testimony at pg. 141)

23.     Abu Nidal was originally a leading member and operative of Yasser Arafat's Fatah organization which was, and is, the backbone of the Palestine Liberation Organization ("PLO"). (Ex. 54 – M. Deeb, Affidavit ¶ 12; M. Deeb, T-23-198)

24.     In October of 1974, when Abu Nidal was serving as Arafat's Fatah organization representative in Baghdad, Iraq, he decided to break away from Arafat's Fatah movement and form his own more radical organization, which he called the Fatah-Revolutionary Council, a.k.a. the ANO. (Ex. 54 – M. Deeb, Affidavit ¶ 12; M. Deeb, T-23-198)

25.     Abu Nidal broke away from Arafat because of Arafat's support of the Middle East peace process. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pgs. 208-09)

26.     Abu Nidal was a violent individual, and the ANO was brutal; their documented methodology for the commission of terrorist attacks required bloodshed. (Ex. 56[16] – D. Long, Mar. 16, 2010 letter at pg. 2)

27.     During the relevant time period of the Rome and Vienna Airport attacks, the ANO became one of the most sophisticated terrorist groups of its day, with a global network of operations. (Ex. 56 – D. Long, Mar. 16, 2010 letter at pg. 2; D. Long, T-23-147)

---

[16] Exhibit 56 contains the following documents:  1) D. Long, Mar. 16, 2010 letter; 2) U.S. Department of State, Report entitled "Syrian Support for International Terrorism:  1983-86"; 3) U.S. Department of State, February 1989 Fact Sheet on the ANO; and 4) Central Intelligence Agency, National Intelligence Daily dated December 1985.

28.     One of the primary reasons that the ANO was so effective was the high level of internal security Abu Nidal achieved within his organization. (Ex. 56 – D. Long, Mar. 16, 2010 letter at pg. 2)

29.     Compartmentalization within the ANO was rigid, both horizontally and vertically; personnel were organized into small cell groups with minimal interaction among the members. (Ex. 56 – D. Long, Mar. 16, 2010 letter at pg. 2)

30.     The ANO was run like a commercial enterprise, with different departments, including secret service, military, archives, and foreign relations. (Ex. 25 – M. Badra,[17] Affidavit ¶ 10)

31.     ANO terrorists used assumed names, along with matching forged identification and travel documents, which were changed constantly so that no one could be sure of their real names. (Ex. 56 – D. Long, Mar. 16, 2010 letter at pg. 2)

32.     The ANO required the support of governments to conduct its operations.  Syria allowed the ANO to train, house, and dispatch its operatives within Syria.  The operatives were also given passage to return to Syria or the Syrian-controlled Baaka Valley in Lebanon for further terrorist training and operations. (Ex. 24[18] – K. Ibrahim,[19] Affidavit ¶ 13; Ex. 26 – O. Rezaq,[20] July 1996 Trial[21] Testimony at pg. 2763-64; Ex. 44 – P. Lang, May 2010 Trial

---

[17] Mustafa Badra, *a.k.a.* Mongi Ben Abdalla Saadaoui, is serving a prison term in Austria for his participation in the Vienna Airport attack that took place on December 27, 1985. (Ex. 25 – M. Badra, Affidavit ¶¶ 1-2)

[18] Exhibit 24 contains the following documents:  1) K. Ibrahhim – *De Bene Esse* Deposition; 2) K. Ibrahim – Notice of *De Bene Esse* Deposition; 3) K. Ibrahim – Notice of *De Bene Esse* Deposition (duplicate); 4) K. Ibrahim – Notice of *De Bene Esse* Deposition (duplicate); 5) K. Ibrahim – Notice of *De Bene Esse* Deposition (duplicate); 6) K. Ibrahim – Affidavit (in Italian); and 7) K. Ibrahim – Affidavit (in English).

[19] Khaled Ibrahim is serving a prison term in Italy for his participation in the Rome Airport attack that took place on December 27, 1985. (Ex. 24 – K. Ibrahim, Affidavit ¶¶ 1-2 )

[20] Omar Mohammed Ali Rezaq is serving a prison term in Colorado for his participation in the EgyptAir hijacking that took place on November 23, 1985. (Ex. 27 – O. Rezaq, Affidavit ¶¶ 1-2)

[21] In July of 1996, O. Rezaq was tried on criminal charges by Judge Royce Lamberth of this Court. (O. Rezaq, T-23-74)

Testimony at pg. 143; Ex. 58 – Y. Schweitzer, Feb. 4, 2010 *De Bene Esse* Deposition at pgs. 29-31; P. Lang, T-23-172-73; O. Rezaq, T-23-75-76; K. Ibrahim, T-23-83)

33.     The ANO was known by the United States government in 1985 and 1986 to be a brutal, violent, and dangerous terrorist organization and ANO was subsequently designated as an FTO. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at 226)

34.     According to the most recent FTO list, which was released on September 28, 2012, the ANO remains designated as a FTO. Foreign Terrorist Organizations, http://www.state.gov/j/ct/rls/other/des/123085.htm (last visited Oct. 31, 2012).

35.     The ANO, in at least the fall of 1985, trained its terrorist squads in the Syrian controlled Baaka Valley in Lebanon, maintained safe houses and headquarters in Damascus, and with the permission of the Syrian government and the Syrian Defendants, dispatched its terrorist operatives from its training camps. (Ex. 44 – P. Lang, Affidavit ¶¶ 9, 10; P. Lang, T-23-172-73)

### C.     Syria Sponsored and Supported the ANO

36.     In his official capacity, al-Khuli, the head of the Syrian Air Force Intelligence agency, invited Abu Nidal and his organization to move to Syria in January of 1981. (Ex. 54 – M. Deeb, Affidavit ¶ 10; M. Deeb, T-23-196)

37.     When al-Khuli officially invited the ANO to be based in Syria, he was following the orders of Syrian President al-Assad. (Ex. 54 – M. Deeb, Affidavit ¶ 10; M. Deeb, T-23-196)

38.     During the relevant period of the Rome and Vienna Airport attacks, and up to the present, Syria was a police state under the al-Assad family. (Ex. 54 – M. Deeb, Affidavit ¶ 13; M. Deeb, T-23-199)

39.     While the ANO was based in Syria, its actions and terrorist operations would not have been possible without the full knowledge and support of al-Assad and his chief intelligence officer, al-Khuli. (Ex. 54 – M. Deeb, Affidavit ¶ 13; M. Deeb, T-23-199)

40.     Beginning in 1983, the ANO more concretely established itself in Syria with headquarters and physical bases for training and other purposes.  This also marked the exponential growth of ANO attacks around the world. (Ex. 54 – M. Deeb, Affidavit ¶ 11)

41.     ANO operations expanded to include attacks in the greater Middle East, Turkey, Pakistan, and Western Europe. (Ex. 54 – M. Deeb, Affidavit ¶ 11)

42.     The ANO's establishment of a base of operations in Syria in 1983 also marked a dramatic increase in the number of ANO terrorist attacks; more than one dozen ANO attacks in 1984, and twice that number in 1985. (Ex. 54 – M. Deeb, Affidavit ¶ 11; Deeb, T-23-197)

43.     The extensive support and infrastructure provided by the Syrian defendants enabled the ANO to expand its scope of operations, resulting in more terrorist attacks. (Ex. 56 – D. Long, Mar. 16, 2010 letter at pg. 4)

44.     Both before and after the November-December 1985 time period during which the Rome and Vienna Airport attacks occurred, Syria provided logistical support to the ANO, including permitting the ANO to maintain offices and safe houses in Syria, maintaining training camps in Syrian controlled territory including the Baaka Valley in Lebanon, and providing identification and travel documents to ANO operatives. (Ex. 24 – K. Ibrahim, Affidavit ¶ 13; Ex. 26 – O. Rezaq, July 1996 Trial Testimony at pg. 2756, 6l, 63-64; Ex. 44 – P. Lang, Affidavit ¶¶ 9-10; Ex. 54 – M. Deeb, Affidavit ¶ 16; Ex. 55 – R. Oakley, Affidavit ¶ 8; P. Lang, T-23-172-74; R. Oakley, T-23-159-60, 62-63; O. Rezaq, T-23-75-76; K. Ibrahim, T-23-83; M. Deeb, T-23-201)

45.     Syria allowed the ANO to move about freely in Syria and in Syrian-controlled Lebanon, including allowing ANO operatives to transit to and through the Damascus airport, (Ex. 54 – M. Deeb, Affidavit ¶ 16; M. Deeb, T-23-201), and also to and through the Beirut airport. (Ex. 44 – P. Lang, May 2010 Trial Testimony at pg. 155)

46.     Moreover, Syria also allowed ANO agents to travel on military highways between training camps in Syrian-controlled Lebanon and Damascus, without passport control. (Ex. 44 – P. Lang, May 2010 Trial Testimony at pg. 144; P. Lang, T-23-174)

47.     Surviving ANO terrorists from the Rome and Vienna Airport attacks have corroborated, by sworn depositions and filed affidavits, each of which has been admitted into evidence by the Court, Syria's specific logistical and material support and sponsorship of the ANO during the time period from November to December of 1985, to include the Rome and Vienna airport attacks. (Ex. 24 – K. Ibrahim, De Benne Esse Deposition; Ex. 24 – K. Ibrahim, Affidavit; Ex. 25 – M. Badra, Affidavit; Ex. 28 - O. Rezaq, July 1996 Trial Testimony)

48.     Syria had a role in the timing, the methodology, and the operation of the Rome and Vienna Airport attacks. (Ex. 54 – M. Deeb, May 2010 Trial Testimony at pg. 200)

49.     The Syrian government, both directly and acting through Syrian Air Force Intelligence, provided support to the ANO and specifically sponsored the ANO Rome and Vienna Airport attacks. (Ex. 44 – P. Lang, May 2010 Trial Testimony at pg. 145)

50.     The Rome and Vienna Airport attacks could not have taken place without Syria's direct support. (Ex. 44 – P. Lang, Affidavit ¶ 22; Ex. 54 – M. Deeb, Affidavit ¶ 11; Ex. 56 – D. Long, Mar. 16, 2010 letter at pg. 4; Ex. 58 – Y. Schweitzer, *De Bene Esse* Deposition at pg. 35; M. Deeb, T-23-197-98; Lang, T-23-179)

###     D.        The ANO Perpetrated the Rome and Vienna Airport Attacks

11

51.      Approximately one month prior to the Rome airport attack, ANO member Khaled

Ibrahim ("Ibrahim") traveled to Damascus, Syria, to meet with Salim, head of the ANO

committee on foreign operations. (Ex. 24 – K. Ibrahim, Affidavit ¶¶ 10, 20)

52.      At that meeting, Ibrahim was told that he would be going to Rome for an

operation. (Ex. 24 – K. Ibrahim, Affidavit ¶ 20)

53.      Ibrahim was given a Moroccan passport, tickets, $2,000 in U.S. currency, and

instructions for the operation. (Ex. 24 – K. Ibrahim, Affidavit ¶ 20)

54.      Ibrahim then traveled to Rome along with Taysir, another member of the ANO.

(Ex. 24 – K. Ibrahim, Affidavit ¶ 20)

55.      After they arrived in Rome, Ibrahim and Taysir met up with two other ANO

members, Bilal and Mohamed. (Ex. 24 – K. Ibrahim, Affidavit ¶ 20)

56.      ANO leaders instructed the men to wait in Rome until contacted and provided

orders and details of the operation. (Ex. 24 – K. Ibrahim, Affidavit ¶ 22)

57.      On December 25, 1985, the men met with Fouad, an ANO contact, who instructed

them to 1) go to Fiumicino airport; 2) take hostages; 3) take them to an Israeli airplane; and 4)

request that all the Palestinian prisoners be freed. (Ex. 24 – K. Ibrahim, Affidavit ¶ 23)

58.      Fouad instructed the men that the time of the attack was important, in order to

show people that they could coordinate the Rome and Vienna Airport attacks and demonstrate

the power of the ANO. (Ex. 24 – K. Ibrahim, Affidavit ¶ 24)

59.      On December 27, 1985, the men went to the Rome airport and positioned

themselves for the 9:00 a.m. attack on people located in the vicinity of the El Al and TWA

check-in counters. (Ex. 24 – K. Ibrahim, Affidavit ¶¶ 26, 27)

60.      Each of the ANO members had his own bag, which contained a Kalashnikov,

12

bullets, and grenades. (Ex. 24 – K. Ibrahim, Affidavit ¶ 26)

61.     Three of the four ANO members who carried out the Rome Airport attack were killed. (Ex. 24 – K. Ibrahim, Affidavit ¶ 27)

62.     Ibrahim, the only surviving member of the ANO team that perpetrated the Rome Airport attack, was shot and injured, but survived. (Ex. 24 – K. Ibrahim, Affidavit ¶ 27)

63.     Ibrahim was later arrested and convicted in an Italian court for his participation in the attack. (Ex. 24 – K. Ibrahim, Affidavit ¶¶ 2, 27)  He is currently serving a life sentence at Rebibbia Prison in Rome, Italy. (Ex. 24 – K. Ibrahim, Affidavit ¶¶ 2, 27)

## II.     Plaintiffs

### A.     The Maland Family

#### 1.     Don Maland

64.     Don Maland ("Don") was born in Mineola, New York on November 30, 1955. (Ex. 13)

65.     Don was born a United States citizen and was a United States citizen at the time of his murder. (E. Maland, T-22A-83)

66.     Don's biological father was Einar Maland ("Einar") and his biological mother was Grace (McDonough) Maland ("Grace"). (Ex. 13)

67.     Don's siblings are Mark Maland ("Mark"), Ellen Maland ("Ellen"), Tim Maland ("Tim"), and Jane Maland ("Jane"). (M. Maland, T-22A-31)

68.     At the time of the attack, Don worked for Ford Aerospace in the Cairo branch office. (E. Maland, T-22A-82)

69.     Ellen serves as the personal representative of Don's estate. (Ex. 16)

#### 2.     Einer Maland

70.     Einar is now deceased. (Ex. 9)

71.     Einar was a naturalized United States citizen and was so prior to the Rome and
Vienna Airport attacks. (M. Maland, T-22A-28)

72.     Mark serves as the personal representative of Einar's estate. (Ex. 10; M. Maland,
T-22A-30)

### 3.     Grace Maland

73.     Grace is now deceased. (Ex. 7)

74.     Grace was born a United States citizen and remained a citizen throughout her
lifetime. (M. Maland, T-22A-26)

75.     Mark serves as the personal representative of Grace's estate. (Ex. 8; M. Maland,
T-22A-27)

### 4.     Mark Maland

76.     Mark was born a United States citizen and has remained a United States citizen at
all times since his birth. (Ex. 2; M. Maland, T-22A-23)

77.     Mark has a J.D. and practices law. (Ex. 86 – Economic Loss Calculation for D.
Maland at pg. 2)

### 5.     Ellen Maland

78.     Ellen was born a United States citizen and has remained a United States citizen at
all times since her birth. (Ex. 11, 12; E. Maland, T-22A-79-80)

79.     Ellen has a J.D. and practiced law for a period of time but now teaches. (Ex. 86 –
Economic Loss Calculation for D. Maland at pg. 2)

### 6.     Tim Maland

80.     Tim was born a United States citizen and has remained a United States citizen at all times since his birth. (Ex.17, 18; T. Maland, T-22B-28-29)

### 7.      Jane Maland

81.     Jane was born a United States citizen and has remained a United States citizen at all times since her birth. (Ex. 20; J. Maland, T-22B-6)

82.     Jane has a B.A. and is a nurse. (Ex. 86 – Economic Loss Calculation for D. Maland at pg. 2)

### 8.      The Attack and its Aftermath

83.     On December 27, 1985, Don was at the Rome Fiumicino Airport with his brother, Mark. (M. Maland, T-22A-50-51)

84.     Don was shot in the head. (M. Maland, T-22A-54).

85.     Don was fully conscious before he was shot and remained conscious after the attack ended.  (M. Maland, T-22A-54).

86.     After Don was shot, Mark used a handkerchief to try to staunch the profuse bleeding from Don's head. (M. Maland, T-22A-54, Ex. 6).

87.     Mark and Don continued to talk and pray together on the floor of the airport concourse until Don was taken away for treatment. (M. Maland, T-22A-54-57).

88.     Although he survived for a period of time, and was able to speak coherently at the hospital, Don ultimately died from his wounds. (M. Maland, T-22A-64; T. Maland, T-22B-48).

89.     Mark suffered gunshot wounds to his leg in the attack. (M. Maland, T-22A-50, 53)

90.     Mark was fully conscious before he was shot and remained conscious after the attack ended. (M. Maland, T-22A-52-57)

91.     Mark testified that immediately after he was shot in the leg and his brother, Don, was shot in the head, he was "scared." (M. Maland, T-22A-55-56)

92.     Mark testified that after Don was picked up off the floor and taken away to be treated, he felt "exhausted" and "very, very tired." (M. Maland, T-22A-55-56)

93.     Mark testified that, when he was in the hospital being treated for his broken leg, he was in shock and felt "tired," was "crying and worried about Don," and was "unable to concentrate, unable to sleep," and "unable to eat." (M. Maland, T-22A-60)

94.     Mark testified that when Jane told him that Don had died, he couldn't believe it and dropped the phone. (M. Maland, T-22A-64)

95.     After Mark returned to the United States, he was diagnosed with "acute depression with some anxiety secondary to the death of [his] brother." (M. Maland, T-22A-68)

96.     Mark testified that after the shooting, he was "paranoid," and was afraid the attackers would come back to "finish the job." (M. Maland, T-22A-69)

97.     For two years after Don died, Mark attended grief counseling services. (M. Maland, T-22A-71)

98.     Mark often wonders what Don would look like today had he not been killed as a result of the attack. (M. Maland, T-22A-72)

99.     Although prior to the attack, Mark had been a long-distance runner, as a result of the injuries he sustained from the attack, he was never able to run again. (M. Maland, T-22A-49-50; 69)

100.     As a result of the attack, Mark can only walk limited distances and his injured leg becomes stiff when he drives a car or keeps his leg in any one position for more than 20 minutes. (M. Maland, T-22A-74-75)

101.    As a result of the attack, Mark avoids crowds. (T. Maland, T-22B-47-48).

102.    Mark testified that the incident was too painful for his father to talk about. (M. Maland, T-22A-73)

103.    Ellen testified that she always thought of Don as a "special gift" since he was born on her birthday. (M. Maland, T-22A-78)

104.    Ellen testified that the relationship between Don and their parents was the strongest of all the siblings, because he was the last to leave for college and because he lived near them after finishing school. (M. Maland, T-22A-86)

105.    Ellen testified that at the time of his death, Don was engaged to an Egyptian Muslim woman, and that he was learning Arabic and considering converting to Islam. (M. Maland, T-22A-89-90)

106.    Testifying about the shooting, Ellen stated, "I would say that it's really just a big absence in my life, an absence in the life of the family . . . It's 25 years now so things are a little bit softened in terms of the impact, but certainly for years afterwards, everything was measured in terms of Don isn't experiencing this, Don will never see this.  Family gatherings were particularly poignant." (M. Maland, T-22A-91)

107.    Ellen testified that her father "probably [had] a silent heart attack around the time of Don's death." (M. Maland, T-22A-93)

108.    Ellen testified about the effect of the shooting on her parents:  "I think we all felt that the burden on our parents was particularly strong and, in particular, on our mother.  She was much more emotional." (M. Maland, T-22A-106)

109.    Ellen testified that her parents "missed [Don] till the days of their deaths." (M. Maland, T-22A-93)

110.     Ellen testified that when she heard of Don's death, she was "overwhelmed" by the thought "that nobody was with him when he died." (M. Maland, T-22A-96)

111.     Ellen testified that her parents were especially close to Don. (E. Maland, T-22A-86)

112.     Jane testified about what happened when her parents learned that Don had been killed:  "I can remember Mommy saying that Daddy was standing in front of the TV and he just was sobbing, and she said she'd never seen him cry ever, and that he was just standing in front of the TV, and he was just sobbing like a baby, and she said how awful it was to watch." (J. Maland, T-22B-20)

113.     Jane testified about the first time she and her siblings saw her parents after Don was killed:  "At first we didn't recognize them and then realized who it was.  They looked so old, so tiny, just really, really small.  And it was so sad to see them and see the pain on their face." (J. Maland, T-22B-23)

114.     Jane testified about the effects of Don's death on their mother:  "I think she took Don's death very, very hard, and I think it affected—I think it affected her health with her Parkinson's disease." (J. Maland, T-22B-24)

115.     Jane testified that Don could make their mother laugh "easier than anybody could." (J. Maland T-22B-9)

116.     Jane testified about how Don's death affected her:  "It was very difficult to get back to work because it just didn't feel like—it just felt like this horrible thing had happened, and I didn't know how to cope with it.  It seemed like a waste of time to go to work.  It seemed like a waste of time to do anything . . . it still hurts.  I still feel a tremendous loss, yes . . . And when

18

Don was killed and Mark was shot, it changed my level of safety, my feeling about safety in the world . . . It does change your life forever." (J. Maland, T-22B-25-27)

117.    Jane was Don's eldest sister and testified that she "felt very motherly towards him." (J. Maland T-22B-9)

118.    Jane testified that when she told Mark about Don's succumbing to his wounds in the Rome Airport attack, "[Mark] just kept saying, no, no, no; and then the phone dropped or was hung up." (J. Maland T-22B-19).

119.    Jane testified that losing Don "still hurts." (J. Maland T-22B-26)

120.    Jane testified that she sought counseling after Don was killed, and that she believed that her siblings, Mark and Ellen, may have as well. (J. Maland T-22B-26)

121.    Tim testified that he missed Don "terribly." (J. Maland, T-22B-32)

122.    Tim testified that when he heard that Don had died, he felt the "total loss" of his "best friend, felt horrible." (J. Maland, T-22B-41)

123.    Tim testified about what it was like telling his parents that Don had died:  "Just lots of crying.  You know, somehow I blubbered out Don had died . . . You could tell from dad's voice that, you know, he didn't want to accept it, but I was giving him what appeared to be facts. There's no fighting the facts, he lost his son." (J. Maland T-22B-43)

124.    Tim testified that he was "very close" with Don. (T. Maland T-22B-31)

125.    Tim testified that he misses Don "terribly," (T. Maland T-22B-32), and that the "[l]oss of a brother is huge, loss of a close brother that's just a couple of years away from you is losing a friend as well as a brother." (T. Maland T-22B-50)

126.    Tim testified that he was tasked with physically identifying his brother's body at the morgue in Rome. (T. Maland T-22B-45)

19

127.     The Maland family kept in contact with each other by circulating a family letter, in which the recipient of the letter added his or her news and forwarded the letter to the next family member in the rotation. (J. Maland T-22B-12).

**B.     The Buonocore Family**

   **1.     John Buonocore, III**

128.     John Buonocore, III ("John III") was born in New York, New York, on February 16, 1965. (Ex. 30)

129.     At the time of his murder, John III was a United States citizen. (Ex. 31; T. Buonocore, T-23-10)

130.     John III's biological father was John Buonocore, Jr. ("John Jr."). (Ex. 30; T. Buonocore, T-23-8)

131.     John III's biological mother was Cecile Buonocore ("Cecile"), whose birth name was Cecile Hall. (Ex 30; T. Buonocore, T-23-8)

132.     John III's only sibling is Todd Buonocore ("Todd"). (T. Buonocore, T-23-8).

133.     In December of 1985, John III was a student at Dickinson College and was studying abroad at the Intercollegiate Studies program of Stanford University, which was based in Rome, Italy. (T. Buonocore, T-23-14)

134.     Cecile currently serves as the administrator of John III's estate. (Ex. 34; T. Buonocore, T-23-10)

   **2.     John Buonocore, Jr.**

135.     John Jr., was born a United States citizen and has remained a United States citizen. (J. Buonocore, T-24-74)

   **3.     Cecile Buonocore**

136.    Cecile was born a United States citizen and has remained a United States citizen. (Ex. 37; C. Buonocore, T-23-42)

### 4.    __Todd Buonocore__

137.    Todd was born a citizen of the United States and has remained a United States citizen from the time of his birth through the present. (Ex. 28, 29; T. Buonocore, T-23-6)

### 5.    __The Attack and its Aftermath__

138.    Todd testified that from the time he was young, he looked up to John III and always wanted to play on the same sports teams as him. (T. Buonocore, T-23-12)

139.    Todd testified that the family went on ski trips and trips to Disney World together. (T. Buonocore, T-23-13)

140.    Todd testified that, even after John III had left home for school, the family, and especially his mother, stayed close to him through correspondence and phone calls. (T. Buonocore, T-23-20)

141.    Todd testified that when his mother received confirmation over the phone that John III had been killed, "[s]he screamed out, she cried out, you know, just with emotion." (T. Buonocore, T-22B-24)

142.    Todd testified that after his brother's murder, his mother was overly protective of him, and also very involved in a support network that counseled parents who had lost a child. (T. Buonocore, T-22B-26, 34)

143.    Todd testified that his mother had difficulty sleeping and that "she is worried about violence, worried about break-ins, worried about [Todd] traveling." (T. Buonocore, T-22B-35)

144.    Todd testified that when his father heard the news, "[h]e went into their bedroom and basically rolled up into a cocoon, not to be heard from again for—he was in a zombie-like trance for days and days and days." (T. Buonocore, T-22B-25)

145.    Todd testified that when he heard the news of John III's death, he laid "on the couch almost in kind of a haze or fog" (T. Buonocore, T-23-25).

146.    Todd testified that he is reluctant to travel internationally because he doesn't want to put his parents through the stress of worrying about him. (T. Buonocore, T-22B-35-36)

147.    Todd testified that he cried on his wedding day because he missed his brother, and had hoped his brother would be his best man. (T. Buonocore, T-22B-40)

148.    Todd testified that he named his prematurely-born son, who did not survive, "John," after his brother. (T. Buonocore, T-23-40).

149.    Todd testified that the family now keeps a picture of John III in their family room, and lights a votive candle beneath the picture on special occasions (his birthday, date of death, holidays) in order to keep his memory alive. (T. Buonocore, T-23-15-16).

150.    John Jr. testified about his reaction to the news that his son had been killed in the attack: "Basically, I think I became inert.  I was kind of it a state of shock.  And I just retreated to a bedroom and stayed there.  I just—and I stayed there for several days, like five.  I just couldn't acknowledge that." (J. Buonocore, T-24-81)

151.    John Jr. testified that, after his son was killed, he spent most of his time and energy pursuing business-related matters, and that he now regretted not supporting his wife as much as he should have. (J. Buonocore, T-24-83)

152.    John Jr. testified that he blamed himself for his son's death:  "I should have never, never, ever consented for him to go to the intercollegiate studies in Rome." (J. Buonocore, T-24-84)

153.    John, Jr. testified that he relives the loss of John III every year on John III's birthday, which is December 27. (J. Buonocore, T-24-79, 81, 83).

154.    Cecile testified that when they heard the news, John Jr. and Todd "fell on the floor and started pleading with God that this information was wrong." (C. Buonocore, T-23-44, Ex. 37).

155.    Cecile testified about how she tried to carry on after her son was killed:  "I made every effort to pull myself up and carry on, for my husband John, and for my son Todd.  I tried to channel my grief into productive work." (T. Buonocore, T-22B-44)

156.    Cecile testified that she has channeled her grief into charity work for surviving family members of children who have died. (C. Buonocore, T-23-44, Ex. 37).

## C.    **The Gage Family**

### 1.    **Frederick Gage**

157.    Frederick Gage ("Frederick") was born in Madison, Wisconsin on August 17, 1956. (Ex. 40)

158.    From the time of his birth until his murder, Frederick was a United States citizen. (N. Gage, T-23-52)

159.    At the time of his death, Frederick had only one surviving sibling, Nancy Gage ("Nancy"). (N. Gage, T-23-49)

160.    Nancy currently serves as the administrator of Frederick's estate. (Ex. 42; N. Gage, T-23-51)

2.      **Nancy Gage**

161.    Nancy was born a citizen of the United States and has remained a United States citizen from the time of her birth through the present. (Ex. 38, 39; N. Gage, T-23-46-47)

3.      **The Attack and its Aftermath**

162.    On December 27, 1985, Frederick was at the Rome Fiumicino airport on his way to Austria to visit friends. (N. Gage, T-23-62-63)

163.    Nancy testified about her reaction when she found out Frederick had been murdered: "I was in absolute shock.  I couldn't believe it.  I was—it was—it was surreal . . . You go cold and your teeth chatter . . . It was absolutely so unbelievable, so unbelievable that I had my mother's death that was so shocking and now this.  It was—I still—to this day, it's difficult to fathom." (N. Gage, T-23-64)

164.    Nancy testified about how she feels years after Frederick's murder:  "I believe that the people who are living really are just as much victims because they've got to live through every day, especially in the beginning.  It's almost a physical pain; and, you know, there's a funeral, and everybody sends cards and brings a casserole.  But then in the subsequent months and years, you're left with your memories, and people want you to move on, and it sometimes is very difficult, and it is a very lengthy and gut-wrenching process." (N. Gage, T-23-69)

165.    Nancy testified that their sister, Barbara Gage, died of kidney disease when Nancy was three years old. (N. Gage, T-23-48)

166.    Nancy testified that her mother suffered from mental illness her entire life and that she committed suicide when Nancy was seventeen. (N. Gage, T-23-52-54)

167.    Nancy testified that, although their father had remarried, she and her stepmother were not close. (N. Gage, T-23-56)

168.     Nancy testified about her relationship with Frederick: "Fred and I had a very close bond because of instances like this, surviving tragedies . . ." (N. Gage, T-23-54)

169.     Nancy testified that she felt responsible for Frederick as they were growing up, as a mother would. (N. Gage, T-23-55)

170.     Nancy testified that she resembled Frederick physically, and traveled with him extensively. (N. Gage, T-23-55)

171.     Nancy testified that she avoided people, suffered from insomnia, suffered loneliness and isolation, developed an addiction to reading obituaries, and never had children for fear that something terrible might happen to them. (N. Gage, T-23-69-70)

172.     Nancy testified that she felt guilty for failing to protect Frederick from the attack. (N. Gage, T-23-70).

173.     Nancy testified that she went to a psychiatrist once after Frederick's death but did not feel as though "anybody could empathize with the suicide and an attack in an airport in Rome." (N. Gage, T-23-71)

**D.     The Shinn Family**

**1.     Charles Shinn**

174.     Charles Shinn ("Charles") was born in Missouri on July 5, 1916. (Ex. 45)

175.     Charles was born a United States citizen and remained a United States citizen from the time of his birth until his death. (B. Mignerey,[22] T-23-112)

**2.     Jeanne Shinn**

176.     Jeanne Shinn ("Jeanne") was a United States citizen. (B. Mignerey, T-23-118)

---

[22] Beverly Mignerey ("Beverly") was best friends with Susan Shinn ("Susan"), the daughter of Charles and Jeanne. (B. Mignerey, T-23-103)  Susan was murdered in 1974 and as a result, Beverly became very close to Charles and Jeanne. (B. Mignerey, T-23-103)  Beverly is the personal representative of both Shinns' estates. (B. Mignerey, T-23-103-04)

### 3.     The Attack and its Aftermath

177.     On December 27, 1985, the Shinns were at the Rome Fiumicino Airport, on a Christmas holiday trip. (B. Mignerey, T-23-119)

178.     Charles suffered gunshot and shrapnel wounds to his arms, legs, and chest, and died as a result of the attack. (B. Mignerey, T-23-122)

179.     Jeanne suffered shrapnel wounds in her arm, face, and wrist, and ruptured her eardrum a result of the attack. (B. Mignerey, T-23-122)

180.     Beverly testified that she spoke to Jeanne after the attack and that Jeanne didn't know where Charles was and that Jeanne sounded "very afraid." (B. Mignerey, T-23-121)

181.     Beverly testified about how Charles' personality changed after the attack: "Charles was easily angered by anything that Jeanne would say, which I had never experienced with them before, they were always very sweet to each other.  And he was actually very irritated with my children, as well, if they would do anything that he thought was inappropriate." (B. Mignerey, T-23-127)

182.     Beverly testified that, while Charles and Jeanne were recovering from their injuries, they both began to drink more than usual. (B. Mignerey, T-23-128)

183.     Beverly testified that, as a result of their independent injuries, neither of the Shinns was able to care for themselves or each other. (B. Mignerey, T-23-127-28)

184.     Beverly testified about the Shinns' quality of life after the shooting:  "Very diminished, very difficult, very depressing, very restrictive.  They were used to eating out and, you know, socializing with their friends in the neighborhood in Colorado Springs. . . [Their neighbors] began shunning them and not involving them, and they became actually very reclusive as a result." (B. Mignerey, T-23-129-30)

185.    Dr. Herbert Kaplan, Charles' physician, testified about how Charles presented after the attack:  "My observation of Charles Shinn during his Rose Medical Center admission revealed a dramatic change in his persona.  Prior to the physical injuries he suffered during the Rome Airport attack, I recall Charles Shinn as an active, cheerful man.  He was no longer the same man I had seen prior to the trip.  He was severely depressed and in significant pain and had difficulty ambulating because of his injuries . . . In my medical opinion, the severe injuries and mental stress that Charles Shinn suffered as a result of the Rome Airport terrorist attack contributed to and may have in some way caused his death." (B. Mignerey, T-23-133-34)

186.    Beverly testified that Jeanne had a permanent speech impairment after the attack and also had to give up her favorite hobbies, such as knitting and needle work. (B. Mignerey, T-23-138)

187.    Beverly testified that, after Jeanne died, she learned from friends of Jeanne's that she had been severely depressed and had attempted to commit suicide. (B. Mignerey, T-23-140)

**E.    The Sweis Family**

**1.    Michael Sweis**

188.    Michael Sweis ("Michael) was born in Jordan, and became a naturalized United States citizen in 1977. (Ex. 75; Ju. Sweis,[23] T-24-12)

189.    From the time of his naturalization until the date of his death, Michael did not renounce his United States citizenship. (Ju. Sweis, T-24-12)

190.    Michael and his wife, Aida Sweis ("Aida"), were the parents of four children:  1) Juliet Sweis ("Juliet"), 2) Sayel Sweis ("Sayel"), 3) Jeanette Sweis ("Jeanette"), and 4) Saied Sweis ("Saied"). (Ju. Sweis, T-24-12)

191.    Michael is now deceased. (Ex. 78)

---

[23] "Ju. Sweis" refers to Juliet Sweis.

192.     Jeanette serves as the executor of Michael's estate. (Ex. 79; Je. Sweis,[24] T-24-93)

     **2.**    **Aida Sweis**

193.     Aida was born in Jordan and became a naturalized United States citizen in 1978. (Ex. 80; Ju. Sweis, T-24-12)

194.     From the time of her naturalization until the date of her death, Aida did not renounce her United States citizenship. (Ju. Sweis, T-24-12)

195.     Aida is now deceased. (Ex. 82)

196.     Jeanette serves as the personal representative of Aida's estate. (Ex. 92; Je. Sweis, T-24-94)

     **3.**    **Juliet Sweis**

197.     Juliet was born in the United States and since her birth has been and remains a United States citizen. (Ju. Sweis, T-24-13)

     **4.**    **Sayel Sweis**

198.     Sayel was born in the United States and since his birth has been and remains a United States citizen. (Ju. Sweis, T-24-13)

     **5.**    **Jeanette Sweis**

199.     Jeannette was born in the United States and since her birth has been and remains a United States citizen. (Ju. Sweis, T-24-13)

     **6.**    **Saied Sweis**

200.     Saied was born in the United States and since his birth has been and remains a United States citizen. (Ju. Sweis, T-24-13)

     **7.**    **The Attack and its Aftermath**

---

[24] "Je. Sweis" refers to Jeanette Sweis.

201.    On the morning of December 27, 1985, the Sweis family was at the Rome

Fiumicino Airport preparing to travel back to Chicago; they were in the McDonalds café at the

airport eating breakfast. (Je. Sweis, T-24-97)

202.    While in the café, gunfire erupted and many of the Sweis family members were

wounded as a result of gunshots and shrapnel. (Je. Sweis, T-24-97)

203.    Michael suffered gunshot and shrapnel wounds. (Je. Sweis, T-24-98)

204.    Juliet, who was six years old at the time of the attack, suffered shrapnel wounds to

her head. (Ex. 65 – Say. Sweis, Affidavit ¶ 4; Ju. Sweis, T-24-17)

205.    Juliet testified about how she felt during the attack:  "I was terrified.  I didn't

know what was going on.  I was just screaming for my mother." (Ju. Sweis, T-24-17)

206.    Juliet testified about how she felt while recuperating alone in the hospital in

Rome:  "I was terrified because I was in a woman's ward alone and my brothers were

somewhere else." (Ju. Sweis, T-24-24)

207.    Juliet testified that, as a result of the attack, she had a permanent scar on her head,

which could not be corrected surgically, and also a pituitary gland tumor, which caused her to

suffer "extreme headaches," and resulted in her not being able to conceive children, should she

want to, without extensive treatment by an endocrinologist. (Ju. Sweis, T-24-27-28)

208.    Juliet testified about her mother's reaction to the attack:  "She was screaming, of

course, at the sight of us getting wounded, and terrified.  She didn't know what to do." (Ju.

Sweis, T-24-18)

209.    Juliet testified about what her mother had to do after the attack because the

various family members were sent to different hospitals:  "My mother was running around

between hospitals trying to find Jeanette and my father and us three." (Ju. Sweis, T-24-24)

210.    Juliet testified that her mother died on January 19, 2004, which was 32 days after her father died. (Ju. Sweis, T-24-37-38)

211.    Juliet testified about why she believed her mother died so soon after her father: "I think the horror she went through with my father's death and Jeanette caused her thyroid cancer . . . Because from all the sorrow and pain and torture she went through, I believed it caused her thyroid to just kill her." (Ju. Sweis, T-24-38)

212.    Juliet testified that because her mother had to care for Jeanette and her father, her mother did not have her own life after the attack. (Ju. Sweis, T-24-38-39)

213.    Juliet testified about the effect of the attack on her family:  "Well, the attack really hurt my family physically and mentally.  My father was hurt badly to the point where eventually it led to his heart attack, which led to his death.  Jeanette was physically, mentally scarred.  She had to deal with all her injuries and constant surgeries.  She developed drop foot, so she was constantly breaking her foot, tripping over it, plus the physical therapy.  She had to learn to walk again.  And medically myself, I've been depressed about this tumor." (Ju. Sweis, T-24-30)

214.    Juliet testified about the effect of the attack on her father:  "When he went back to—or after the attacks, back in Jordan, his mobility was very limited.  He had a cane.  He relied on my mother or us for anything for assistance with walking.  He couldn't just use a cane.  It wasn't enough . . . He suffered from horrible insomnia.  He never slept at night.  He would stay up throughout the night while we slept.  If at times he needed to doze off, he would make noise with his cane, hoping that one of us would wake up so he could take a nap.  He feared dying in his sleep." (Ju. Sweis, T-24-33)

215.     Juliet testified that her father wanted to be driven around in the car "[b]ecause he believed if anything were to happen with him, he would be ready in the car to be taken to the ER." (Ju. Sweis, T-24-33)

216.     Juliet testified that, prior to the attack, her father had not had a heart condition. (Ju. Sweis, T-24-35)

217.     Juliet testified that, as a result of the injuries her father sustained in the attack, he developed poor blood circulation, which in turn led to his being hospitalized, where he developed bed sores on both heels, which ultimately became infected with gangrene, necessitating the amputation of both legs. (Ju. Sweis, T-24-36-37)

218.     Juliet testified about how her father felt after losing both of his legs:  "It killed him, his dignity, his pride, everything.  A man that was so strong was nothing.  He had to rely on us for everything." (Ju. Sweis, T-24-37)

219.     Saied, who was eight years old at the time of the attack, suffered shrapnel wounds to his calf and arm. (Ex. 65 – Say. Sweis, Affidavit ¶ 4; Ju. Sweis, T-24-18)

220.     Saied testified about his reaction immediately after the shooting:  "At first I was in shock and not thinking.  Then I felt confused, terrified, and worried.  I saw people wounded and bleeding, scattered all over the place.  There was blood on the floor.  I saw people [I knew were dead].  I felt trapped, and I could not escape the horror in the airport.  I was worried that I would be seriously hurt and might be killed and that my family might die.  The attack seemed to last forever, and I was afraid it would never end.  My father, my sister Juliet, and Jeanette, and I were wounded and lying helplessly on the airport floor . . . I was bleeding a great deal.  This terrified me . . . I could see that my sister Jeanette was severely wounded, having been shot in both of her legs, b[l]eeding profusely, crying and screaming.  I could see that my little sister

31

Juliet was wounded in her head and bleeding, crying and screaming.  I could see that my father was wounded in both of his legs and head, bleeding profusely and in great pain.  I saw my mother screaming and crying and the look of terror on her face as she rushed to assist us.  I saw the horror and shock reflected in my brother Sayel's face . . . During the stay [at the hospital], I was left alone because my mother had to leave to check on Jeanette and my father, and Juliet was put into a different room from me.  This was terrifying for me.  I was only eight years old and had just witnessed mass murder." (Sai. Sweis,[25] T-24-142-44)

221.     Saied testified about the effect the shooting had on his life:  "[The shooting] has had a lasting negative effect on the trajectory of my life, on my career, and on my personal relationships.  I wish this were not the case, but it is.  The trauma of the attack has undermined my sense of security, both physically and in my relationships with people and my ability to trust others.  It has undermined my self-confidence, my sense of self-worth.  It hurts that my entire family was seriously victimized, and no one has ever been held accountable to us." (Sai. Sweis, T-24-146)

222.     Jeanette, who was eleven years old at the time of the attack, suffered gunshot and shrapnel wounds to her legs. (Ex. 65 – Say. Sweis, Affidavit ¶ 4; Je. Sweis, T-24-97-98)

223.     Jeanette testified about what she saw when the shooting began:  "At first, I remember thinking it might have been fireworks because New Year's Eve was so close, but then we realized that people were screaming, and it was just chaos, and all I remember is just falling to the floor, not realizing why.  And then the next thing I remember, I see my mom screaming, my father on the floor bleeding, my sister bleeding from her head, and my brother—my brother's pants were full of blood.  It was just surreal." (Je. Sweis, T-24-97)

---

[25] "Sai. Sweis" refers to Saied Sweis.

224.    Jeanette testified that when she returned to the United States, immediately after the shooting, her legs were so severely injured that there was a possibility, which she was aware of, that her left leg would have to be amputated.  Ultimately, her leg was not amputated but multiple painful procedures were required, followed by skin grafts and several additional surgeries. (Je. Sweis, T-24-103-06)

225.    Jeanette testified that she now has a permanent limp and permanent scarring on her legs. (Je. Sweis, T-24-108)

226.    Jeanette testified that she cannot partake in activities that require extensive standing or walking because of the pain and swelling, and that her work as a pharmacist is difficult, because it requires that she be standing for long periods. (Je. Sweis, T-24-110)

227.    Jeanette testified about her emotional state:  "I was a tomboy before, I never cried . . . Now I feel like a little baby all the time because the slightest things make me emotional . . . I have an 11-month old daughter . . . now I know how [my mom] felt when she saw us lying on the floor . . . I'm so scared for my daughter I can't even send her to daycare because I'm worried she'll get sick or some other kid would hit her." (Je. Sweiss T-24-111)

228.    Jeanette testified about the effect the shooting had on her father: "My father was always a fighter, I mean he—he came from poor means, and he made himself, regardless of what happened.  He lost a business, you know.  That cost him a couple of million, and he bounced right back.  He was always a fighter.  But when his legs went, he felt like he wasn't a man anymore.  You know, he couldn't get up.  He couldn't take care of his family.  He couldn't work. I mean, he couldn't even go to the bathroom on his own.  I remember an incident that made us all sit there and cry.  He couldn't get up to the bathroom and he wet himself and he starting crying. He couldn't speak." (Je. Sweis, T-24-115-16)

229.     Sayel, who was twelve years old at the time of the attack, testified about what he saw immediately after the shooting: "I saw my father, my sisters Juliet and Jeanette, and my brother Saied wounded and lying in blood on the airport floor.  I could see that my sister Jeanette was severely wounded, shot in both of her legs, bleeding profusely, crying and screaming.  I could see that my little sister Juliet was wounded in her head and bleeding, crying and screaming.  I could see that my father was wounded in both of his legs and head, bleeding profusely and in great pain.  I could see that Saied was wounded in his leg and arm, bleeding from his wounds and crying.  I was worried that they were all going to die.  I saw my mother yelling and crying and frantically rushing to their side to help them." (Ex. 65 – Say. Sweis,[26] Affidavit ¶ 4; Say. Sweis, T-24-148-49)

230.     Sayel testified about the effect the shooting had on his life:  "I have no doubt that the attack has damaged me psychologically and emotionally permanently.  I don't trust anyone. I don't like being around people.  I have never tried to have a serious emotional relationship with anyone.  I have not been able to maintain a long-term job.  Physically, I am overweight, and I am a very stressed-out person.  I have never really sought help for my issues because I am afraid of the pain that process will cause me, and I don't trust anyone enough to let them try to help me." (Say. Sweis, T-124-150)

231.     Sayel testified about the effect of the attack on his father: "I lost the vibrant, happy, role model father that I once had, and instead I had a father who was now physically crippled and mentally and emotionally very limited, a father who was my patient.  This was very painful for me." (Say. Sweis, T-24-150)

F.     **The Simpson Family**

1.     **Victor Simpson**

---

[26] "Say. Sweis" refers to Sayel Sweis.

232.    Victor Simpson ("Victor") was born in New York on May 11, 1942. (Ex. 59 at pg. 3; V. Simpson, T-24-156)

233.    Victor was born a United States citizen and has remained a United States citizen from the time of his birth through the present. (V. Simpson, T-24-156)

234.    At the time of the Rome Airport attack on December 27, 1985, Victor and his wife, Antonia Daniela Petroff Simpson ("Daniela"), were the parents of two children: 1) Natasha Simpson ("Natasha"); and 2) Michael Simpson ("Michael"). (M. Simpson, T-24-151)

### 2.    Antonia Daniela Simpson

235.    Daniela was born in Germany on March 12, 1945. (Ex. 59 at pg. 4)

236.    Daniela became a naturalized United States citizen in the 1940s. (Affidavit of Tracy Reichman Kalik [#104] at pg. 5)

237.    From the time of Daniela naturalization until the present, she has remained a United States citizen. (Ex. 59 at pg. 4; [#104] at pg. 5)

### 3.    Natasha Simpson

238.    Natasha was born in Rome, Italy, on April 28, 1974 and was born a United States citizen. (Ex. 59 at pg. 5)

239.    From the date of her birth until the date of her death, Natasha remained a citizen of the United States. (Ex. 59 at pg. 5; [#104] at 5)

240.    Victor and Daniela currently serve as the personal co-representatives of Natasha's estate. (Ex. 59 at pg. 10)

### 4.    Michael Simpson

241.    Michael was born in Rome, Italy, on October 14, 1976, and was born a United States citizen. (Ex. 60 at pg. 2)

242.     From the date of his birth until the present, Michael has remained a United States citizen. ([#104] at pg. 6)

### 5.     The Attack and its Aftermath

243.     On the morning of December 27, 1985, the Simpson family was at the Rome Fiumicino Airport preparing to travel to the United States. ([#104] at pg. 6)

244.     While at the airport, gunfire erupted, and Victor, Natasha, and Michael were struck with bullets. ([#104] at pg. 10)

245.     Victor suffered gunshot wounds to his wrist and hand. ([#104] at pg. 13)

246.     Victor was fully conscious before and after he was shot. ([#104] at pg. 13)

247.     Michael suffered shrapnel wounds to his abdomen. (Ex. 60 at pg. 3)

248.     Natasha was killed in the attack. (Ex. 60 at pg. 3)

249.     Natasha was fully conscious before she was shot. ([#104] at pg. 11)

250.     When the attack began, Victor attempted to shield Natasha by covering her with his body as they both lay on the ground. ([#104] at pg. 11)

251.     After Natasha was shot, Victor called out for help, and Natasha was taken by ambulance to San Eugenio Hospital, where she was pronounced dead shortly after arrival. ([#104] at pgs. 11-12, 16)

252.     After Natasha was taken away by ambulance, Victor realized that his right hand was severely injured, and he, too, was taken by ambulance to San Eugenio Hospital. ([#104] at pgs. 12-13)

253.     Victor underwent emergency surgery at the hospital. (#[104] at pg. 14)

254.     In the years following the attack, Victor underwent a second surgery, and had to have physical therapy to regain some of the use of his right hand. ([#104] at pg. 14)

255.    As a result of his injuries, Victor suffered permanent disability in his hand, making it difficult for him to take notes and type, skills he needed as a professional journalist. ([#104] at pgs. 14-15)

256.    According to Victor, he has never gotten over the loss of his daughter. ([#104] at pg. 15)

257.    Michael testified about how he felt during the attack:  "[A]t the time of the attack, I was separated from my parents and sister . . . I had never been in the presence of gunfire or explosions, and the combination of the noise and what I was seeing put me into shock . . . I immediately started screaming and began to frantically try to locate my dad and sister.  I saw bodies and pools of blood everywhere.  I felt like the attack went on forever.  I was terrified, as I feared not only for myself but for my family." (M. Simpson, T-24-153)

258.    Michael testified about his and his family's reaction to his sister's death as a result of the attack:  "I was not able to attend Natasha's funeral because of my injuries and the devastation I felt.  It is impossible for me to describe in words the loss I felt and continue to feel each day because of the death of my sister . . . I am unable to verbalize the depth of my despair over the loss of my sister, Natasha, and how the injuries that my father and I have suffered have forever changed my life.  I do not believe that I could ever explain how Natasha's death has changed my life and has left an emotional and unfilled void for me and my family . . . the murder of Natasha has had a profound effect on my mother . . . to this day, my mother finds it difficult to speak and discuss the events of December 27, 1985; however, I have seen how she continues to mourn the loss of my sister.  I know that although it is difficult, she continues to visit her grave site each year." (M. Simpson, T-24-154-55)

**G.    Elena Tommarello**

1.     **Elena Tommarello**

259.    Elena Tommarello ("Elena") was born in Italy on January 18, 1918, and became a

naturalized United States citizen on November 10, 1972. (Ex. 89; B. Pepenella, T-24-122)

262.    From the time of her naturalization until the date of her death, Elena did not

renounce her United States citizenship and she remained a U.S. citizen. (B. Pepenella, T-24-137)

263.    At the time of her death, Elena had two sons:  1) Bruno Pepenella ("Bruno"); and

2) Armando Pepenella ("Armando"). (A. Pepenella, T-24-139)

264.    Originally, Armando served as the executor of Elena's estate. (A. Pepenella, T-

24-140)  Now, Bruno serves as the substitute administrator and will soon be appointed the

administrator. Buonocore, Civil Action No. 06-727, Praecipe [#108] at 1-2.

2.     **The Attack and its Aftermath**

265.    On the morning of December 27, 1985, Elena was at the Rome Fiumicino airport

preparing to travel back to the U.S. to spend the New Year's holiday with her children and

grandchildren. (B. Pepenella, T-24-130)

266.    After the attack, Elena was transported to the hospital, where she died in the early

hours of December 28, 1985. (Ex. 91; B. Pepenella, T-24-132-33)

267.    Elena's son, Armando, testified about what the doctor told him about his mother's

condition:  "The doctor told me that her body was shattered from the waste [sic] down – her

midriff and legs – by bullets fired by an automatic weapon.  The doctor told me that she was

conscious in the hospital and aware of what was happening but that her condition was very grave

. . . She lived for many hours, and was conscious for part of them, with these horrific wounds."

(Ex. 69 – A. Pepenella, Affidavit ¶¶ 14-15)

## CONCLUSIONS OF LAW

I.      **Plaintiffs' Federal Law Claims Under 28 U.S.C. § 1605A**[27]

In 2008, the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008) ("2008 NDAA") revised the FSIA framework under which state-sponsored terrorism cases may be brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7).  Most importantly, it furnished a cause of action against state sponsors of terrorism, whereas the earlier law, § 1605(a)(7) could only be used as a "pass through" for plaintiffs seeking to bring suit in federal court against foreign sovereigns for terrorism-related claims; the claims themselves had to be based in state law. Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 55 (D.D.C. 2010).

One of the reasons why the creation of a federal cause of action was so important was the frequent disparities among state laws.  Plaintiffs who were victims of the same terrorist attack could be subject to different levels of recovery, or even no recovery at all, based entirely on their state of domicile at the time of the incident.  See In re: Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 46-47 (D.D.C. 2009).  Thus, in an effort to rectify the potential for further uneven treatment, the 2008 NDAA also provided for the retroactive application of the § 1605A cause of action for certain pending cases.  Under § 1083(c)(2), captioned "Prior Actions," cases that were brought under § 1605(a)(7) that were before the courts at the time of the enactment of the 2008 NDAA could, on plaintiffs' motion, be given effect "as if the action had originally been filed" under § 1605A. 2008 NDAA § 1083(c)(2).  Under § 1083(c)(3), captioned "Related Actions," if an action arising out of an incident had been timely commenced under § 1605(a)(7),

---

[27] In addition to asserting claims under 28 U.S.C. § 1605A, plaintiffs also assert common law claims, which would have to be predicated on the law of the forum, the District of Columbia.  Because the Court's analysis is based on the plaintiffs' invocation of 28 U.S.C. § 1605A, and because the Court will not award plaintiffs double recovery, plaintiffs' common law claims will not be separately reviewed.  See Medina v. District of Columbia, 643 F.3d 323, 328 (D.C. Cir. 2011)  (holding that, if a federal claim and a state claim arise from the same operative facts and seek identical relief, an award of damages under both theories constitutes impermissible double recovery); Haim v. Islamic Republic of Iran, 784 F. Supp. 2d 1, 12-13 (D.D.C. 2011).

any other action arising out of the same incident could be brought under § 1605A. 2008 NDAA § 1083(c)(3).

Parties seeking to take advantage of the new federal cause of action and punitive damages allowance under the 2008 NDAA found themselves somewhat confused by the new statute; filing deadlines were missed by those who thought retroactivity was automatic, whereas others seemed unclear as to whether they should file under § 1083(c)(2) or (3), and thus filed under both.  See Terrorism Litig. at 66-67.  The latter approach is what Chief Judge Lamberth, in his omnibus In re: Islamic Republic of Iran Terrorism Litig. opinion, referred to as the "belt and suspenders" approach. Id.

In Buonocore, the original complaint claimed that subject matter jurisdiction was appropriate under 28 U.S.C. § 1605(a)(7). Buonocore, Civil Action No. 06-727, [#1] ¶¶ 1-3, 5. Both the amended complaint and the second amended complaint asserted that subject matter jurisdiction was appropriate under either 28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7). Buonocore, Civil Action No. 06-727, [#53] ¶¶ 1-3; Buonocore, Civil Action No. 06-727, [#82] ¶¶ 1-3.  In Simpson, the original complaint asserted the subject matter jurisdiction for the case under 28 U.S.C. § 1605(a)(7). Simpson, Civil Action No. 08-529, [#1] ¶¶ 1-3, 5.  The amended complaint asserted that subject matter jurisdiction was appropriate as to all plaintiffs (both the Simpson and Buonocore plaintiffs) solely under 28 U.S.C. § 1605A. Simpson, Civil Action No. 08-529, [#22] ¶¶ 1-3, 5.  Therefore, whether viewed as having filed two separate complaints or one omnibus complaint in Simpson, plaintiffs have successfully established this Court's subject matter jurisdiction under 28 U.S.C. § 1605A.

## II.    Service of Process

Service under the FSIA is governed by 28 U.S.C. § 1608.  Subsection (a) governs service upon a foreign state or political subdivision of a foreign state, while subsection (b) provides for service upon an agency or instrumentality of a foreign state.  In determining whether a foreign entity is to be treated as the state itself or as an agency or instrumentality, courts employ the "core functions" test as it was set out in Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003).  The approach is categorical: if the core functions of the entity are governmental, it is considered to be the foreign state itself. Id.  If its core functions are commercial, then it is an agency or instrumentality of the foreign state. Id.

As the Syrian Arab Republic is a foreign state, the Court applies the standard articulated in § 1608(a).  Each of the other remaining defendants, however, is also treated as the foreign state under the law.  Applying the Roeder core functions test, the Syrian Air Force Intelligence agency, Idarat al-Mukhabarat al-Jawiyya, is characterized as a foreign state, because its core functions are governmental, not commercial.  See Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 64 (D.D.C. 2008) ("Gates I") (citing Roeder, 333 F.3d at 234).

Syria's Director of Military Intelligence, General al-Khuli, is also characterized as a foreign state because "an officer of an entity that is considered the foreign state itself under the core-functions test should also be treated as the state itself for purposes of service of process under § 1608." Nikbin v. Islamic Republic of Iran, 471 F. Supp. 2d 53, 65-66 (D.D.C. 2007).  In both Buonocore and Simpson, the complaints assert that al-Khuli "performed acts within the scope of his office, which caused the terrorist acts described below." See Buonocore, Civil Action No. 06-727, [#53] ¶ 43; Buonocore, Civil Action No. 06-727, [#82] ¶ 43; Simpson, Civil Action No. 08-529, [#22] ¶ 43.  An official-capacity claim against a government official is a

claim against the government itself. Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1034 (D.C. Cir. 2004).

Service upon each of the Syrian defendants in Buonocore was perfected under 28 U.S.C. § 1608(a)(3) through delivery of the required documents (accompanied by Arabic translations) to the Head of the Ministry of Foreign Affairs via international courier service, as evidenced by a report from the international courier service, indicating that the shipment containing two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, was signed for by "Esam" at the Syrian Ministry of Foreign Affairs for the defendants on July 30, 2006. Buonocore, Civil Action No. 06-727, Notice of Proof of Service [#4] at Group Exhibit B.

Service upon each of the Syrian defendants in Simpson was perfected under 28 U.S.C. § 1608(a)(4) through delivery of the required documents (accompanied by Arabic translations) to the Secretary of State in Washington, D.C. Simpson, Civil Action No. 08-529, Declaration in Support of Default [#37] at 2. According to William P. Fritzlen, Attorney Adviser for the State Department's Office of Policy Review and Interagency Liaison, the American Embassy in Damascus transmitted the summonses, complaints, and notices of suit to the Syrian Ministry of Foreign Affairs, but the Ministry refused to accept them. Simpson, Civil Action No. 08-529, Return of Service/Affidavit [#36]. Because each defendant is treated as the state itself under the core functions test, and because service was never made on al-Khuli in his individual capacity, Syria is the only defendant against whom damages can be sought. See Gates I, 580 F. Supp. 2d at 64.

## III. Standing

In order to have standing in an action under 28 U.S.C. § 1605A, either "the claimant or the victim [must be] a national of the United States" at the time of the terrorist act. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I).  The United States Code defines the term "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22).

As noted above, this opinion only resolves claims brought by U.S. citizens seeking redress for actions taken against them or other U.S. citizens.  The following plaintiffs had U.S. citizenship at the time of the attack:  1) Don Maland (estate of); 2) Einar Maland (estate of); 3) Jane Maland; 4) Mark Maland; 5) Ellen Maland; 6) Tim Maland; 7) Grace Maland (estate of); 8) John Buonocore, III (estate of); 9) John Buonocore, Jr.; 10) Cecile Buonocore; 11) Todd Buonocore; 12) Frederick Gage; 13) Nancy Gage; 14) Charles Shinn (estate of); 15) Jeanne Shinn (estate of); 16) Michael Sweis (estate of); 17) Aida Sweis (estate of); 18) Jeanette Sweis; 19) Juliet Sweis; 20) Sayel Sweis; 21) Saied Sweis; 22) Natasha Simpson (estate of); 23) Antonia Daniela Simpson; 24) Victor Simpson; 25) Michael Simpson; and 26) Elena Tommarello (estate of).

Claims brought by individuals who were not U.S. citizens at the time of the attack (Bruno Pepenella, Armando Pepenella, Salvatore Ferrigno, and Francesco Zerilli) will be addressed in a separate opinion.

## IV.   Jurisdiction

### A.      Subject Matter Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state" in United States courts. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  One of the enumerated exceptions to the FSIA is 28 U.S.C. § 1605A, the state-

sponsored terrorism exception to sovereign immunity.  Under § 1605A, a foreign state that is or

was a state sponsor of terrorism shall be liable to a United States citizen for personal injury or

death. 28 U.S.C. § 1605A(c).  Damages under this private right of action may include economic

damages, solatium, pain and suffering, and punitive damages. Id.  In such an action, a foreign

state is vicariously liable for the acts of its officials. Id.

Under § 1605A, "[a] foreign state shall not be immune from the jurisdiction" of the

United States courts in a case where "money damages are sought against a foreign state for

personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft

sabotage, hostage taking, or provision of material support or resources for such an act" if an

"official, employee, or agent of [the] foreign state" engages in such provision of material support

"while acting within the scope of his or her office."[28] 28 U.S.C. § 1605A(a)(1).  In addition to

the requirements for the sovereign immunity exception, a court shall hear a claim under § 1605A

if 1) the foreign state was designated as a "state sponsor of terrorism"[29] by the State Department

at the time the act took place; and 2) the victim or plaintiff was a national of the United States at

the time the act took place. 28 U.S.C. § 1605A(a)(2); see also Acosta, 574 F. Supp. 2d at 25.

As to sovereign immunity, testimony both from expert witnesses and Abu Nidal terrorists

themselves makes clear that Syria knowingly provided material support to the ANO for its

---

[28] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18." 18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

[29] The term "state sponsor of terrorism" is defined at 28 U.S.C. § 1605A(h)(6):

> [T]he term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

training operations, and participated in the logistical planning and operations concerning the

EgyptAir hijacking, as well as the Rome and Vienna Airport attacks.  Syria provided safe haven

for the ANO at least as early as 1983.[30]  Syria was designated by the State Department as a state

sponsor of terrorism in December 1979, and has retained that designation to this day. [31]

> **B.**      **Personal Jurisdiction**

As noted above, the FSIA establishes requirements for proper service upon a foreign state

in 28 U.S.C. § 1608.  As further noted above, plaintiffs properly served Syria, the only defendant

against whom an action may be maintained.  That suffices for this Court to assert jurisdiction

over Syria. 28 U.S.C. § 1330(b); TMR Energy Ltd. v. State Property Fund, 411 F.3d 296, 327

(D.C. Cir. 2005).

## V.     Legal Standard for FSIA Default Judgment

Under the FSIA, a default judgment may only be entered if "the claimant establishes his

claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  All

uncontroverted evidence is accepted as true. Id.  See also Campuzano v. Islamic Republic of

Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (the "satisfactory to the court" standard is identical

to the standard for entry of default judgments against the United States in Federal Rule of Civil

Procedure 55(e)).

---

[30] When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory
definition of "safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or
> encouraged al Qaeda and Hezbollah to operate their terrorist enterprises within
> its borders, and thus provided a base of operations for the planning and
> execution of terrorist attacks—as the complaint unambiguously alleges—Sudan
> provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as
> incorporated in 28 U.S.C. § 1605(a)(7).

Owens v. Republic of Sudan, 412 F. Supp. 2d 99, 108 (D.D.C. 2006).
[31] State Sponsors of Terrorism, http://www.state.gov/s/ct/c14151.htm (last visited Feb. 21, 2011).

In evaluating plaintiffs' proofs, a court may "accept as true plaintiffs' uncontroverted evidence, which may take the form of sworn affidavits or prior transcripts." Estate of Botvin v. Republic of Iran, 510 F. Supp. 2d 101, 103 (D.D.C. 2007).  Such evidence may also include judicial notice of findings and conclusions of related proceedings. Id.; see also Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 49 n.2 (D.D.C. 2003) ("Peterson I").

In light of defendants' failure to object or enter an appearance to contest the matters in this case, the Court accepts the uncontested evidence and sworn testimony submitted by plaintiffs as true.

## VI.   Liability

As noted above, there are five elements of liability under the FSIA's state-sponsored terrorism exception:  "(1) 'an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or provision of material support or resources for such an act' where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign state, and the act (3) 'caused' (4) 'personal injury or death' (5) 'for which the courts of the United States may maintain jurisdiction under this section for money damages.'" Bodoff v. Islamic Republic of Iran, ___ F. Supp. 2d. ___, 2012 WL 5995690, at *7 (D.D.C. Dec. 3, 2012) (quoting 18 U.S.C. § 1605A(1), (c)).  In order to satisfy the third and fourth elements, plaintiffs must "prove a theory of liability under which defendants cause the requisite injury or death." Valore, 700 F. Supp. 2d at 73.  "In other words, plaintiffs in § 1605A actions—whether seeking solely punitive damages or pursuing compensatory relief as well—must articulate the justification for such recovery, generally through the lens of civil tort liability." Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 175-76 (D.D.C. 2010).

In this case, the Court's finding of Syrian liability is based on a theory of civil conspiracy, the elements of which are "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; [and] (4) which overt act was done pursuant to and in furtherance of the common scheme." <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983).[32]

An agreement may be inferred from conduct. <u>Bodoff v. Islamic Republic of Iran</u>, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (citations omitted).  As this Court has noted on a number of occasions, "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." <u>Id.</u> (quoting <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1, 27 (D.D.C. 1998)).  It has been established, with evidence satisfactory to the Court, that Syria, through its officials acting in their official capacity, provided funding, training, safe havens, access, and a variety of other supports to the ANO.  Former State Department officials and expert witnesses testified that the ANO would have been unable to accomplish the EgyptAir hijacking and the Rome and Vienna Airport attacks without Syrian aid.[33]  The elements of a civil conspiracy between Syria and the ANO are therefore satisfied.  As a result, the Court may now award both compensatory damages (for economic loss, solatium, and pain and suffering) as well as punitive damages.  <u>See</u> 28 U.S.C. § 1605A(c)(4).

**VII.    <u>Damages</u>**

      **A.    <u>Compensatory Damages</u>**

            **1.    <u>Economic Damages</u>**

---

[32] When seeking to define a federal cause of action under 28 U.S.C. § 1605A(c), the Court looks to common law as illustrated by the Restatement (Second) Torts.  <u>See</u> <u>Terrorism Litig.</u>, 659 F. Supp. 2d at 60; <u>see also</u> <u>Bettis v. Islamic Republic of Iran</u>, 315 F.3d 325, 333 (D.C. Cir. 2003).

[33] In cases involving the state sponsor of terrorism exception to the FSIA, courts rely extensively on expert testimony. <u>Gates I</u>, 580 F. Supp. 2d at 68 n.13.

Evidence of the lost earning capacity for 1) Don Maland; 2) John Buonocore, III; 3) Frederick Gage; and 4) Natasha Simpson was presented by Dr. Markham, an economist accepted by the Court as an expert in the field of forensic economics. First, Dr. Markham reviewed the methodology of calculating economic loss, and then calculated lost earnings and pension for each of the shooting victims who died. Having reviewed the evidence and testimony of the plaintiffs, either personally or through the administrators of their estates, and having considered the testimony and expert reports of Dr. Markham, the Court makes the following findings.

### a.    **Don Maland**[35]

Dr. Markham calculated that, were it not for the shooting, Don would have had a life expectancy of 77.3 years. When he was killed, he was 30 years old and working as a Financial Supervisor for Ford Aerospace on a USAID project in Egypt. He was single, and had a B.S. in Business Administration and an M.B.A. His brother, Mark Maland, has a J.D. and practices law. His sister, Ellen Maland, has a J.D. and practiced law for a period of time, but now teaches. His sister, Jane Maland, has a B.A. and is a nurse.

First, Dr. Markham calculated Don's future earnings, taking into account past and future growth figures, and discounting those earnings to their present value, to account for the fact that the damages would be awarded in the present year and that the principal could be invested. Next, Dr. Markham reduced his lost future earnings to reflect his personal maintenance expenditures, which Dr. Markham calculated to be between 43.9% and 50.7%. Finally, Dr. Markham projected that he would have received retirement or pension benefits equal to 5% of annual earnings.

---

[35] All of the information and analysis in this section was taken from Ex. 86 – Economic Loss Calculation for D. Maland.

Ultimately, Dr. Markham derived two estimates of economic loss for Don, based on his assumption that he would have progressed to the 75th percentile level of earnings for financial managers within 10 years and two estimates based on his assumption that he would have progressed to the 75th percentile level within 15 years.  The first estimate is based on a worklife expectancy of 63.73 years, based on his age and level of education at his death.  The second is based on a worklife expectancy of 66.17 years, based on an assumption that he would work fulltime until age 66.17, his full Social Security retirement age.[36]

|  | Estimate #1 | | Estimate #2 | |
|---|---|---|---|---|
| Attains 75th Percentile Earnings | In 10 years | | In 15 years | |
| Worklife Expectancy | 63.73 years | 66.17 years | 63.73 years | 66.17 years |
| Lost Earning Capacity | $1,986,629 | $2,159,855 | $1,978,251 | $2,151,477 |
| Lost Pension Benefits | $178,623 | $194,062 | $178,043 | $193,482 |
| Total Economic Loss | $2,165,252 | $2,353,917 | $2,156,294 | $2,344,959 |

The estate of Don Maland is therefore entitled to receive compensatory damages for the total amount of economic loss damages sustained as a result of his murder.  Based on Dr. Markham's calculations, I assume that Don would have progressed to the 75th percentile level of earnings for financial managers within 15 years, and would have worked fulltime until age 66.17, and award economic damages to his estate in the amount of $2,151,477 in lost earnings and $193,482 in lost pension, for a total of $2,344,959.

### b.      John Buonocore, III[37]

Dr. Markham calculated that, were it not for the shooting, John III would have had a life expectancy of 76.6 years of age.  When he was killed, he was 20 years old and a junior in college.

---

[36] Dr. Markham based his calculation of Social Security retirement ages for all the decedents on a Social Security Administration finding that "beginning with people born in 1938, normal retirement age gradually increases [from 65] until it reaches 67 for people born after 1959." (Ex. 86 – D. Maland, Economic Loss Calculation at pg. 2, n1)
[37] All of the information and analysis in this section was taken from Ex. 84 – J. Buonocore, III, Economic Loss Calculation.

First, Dr. Markham calculated John III's future earnings, taking into account past and future growth figures, and discounting those earnings to their present value, to account for the fact that the damages would be awarded in the present year and that the principal could be invested.  Next, Dr. Markham reduced John III's lost future earnings to reflect his personal maintenance expenditures, which Dr. Markham calculated to be between 46.4% and 70%. Finally, Dr. Markham projected that John III's would have received retirement or pension benefits equal to 5% of annual earnings.

Ultimately, Dr. Markham derived four estimates of economic loss for John III.  The first and second estimates are based on an assumption that he would have completed his bachelor's degree.  The third and fourth estimates are based on an assumption that he would have obtained a graduate degree.  Estimates #1 and #3 are based on a worklife expectancy of 60.44 years, for work with a bachelor's degree, and 63.17, for work with a graduate degree.  Estimates #2 and #4 are both based on a worklife expectancy of 67 years, based on an assumption that he would work fulltime until age 67, his full Social Security retirement age.

|  | Bachelor's Degree | | Graduate Degree | |
|---|---|---|---|---|
|  | Estimate #1 | Estimate #2 | Estimate #3 | Estimate #4 |
| Worklife Expectancy | 60.44 years | 67 years | 63.17 years | 67 years |
| Lost Earning Capacity | $1,235,415 | $1,475,176 | $1,981,995 | $2,182,163 |
| Lost Pension Benefits | $134,614 | $159,641 | $187,289 | $205,962 |
| Total Economic Loss | $1,370,029 | $1,634,817 | $2,169,285 | $2,388,125 |

The estate of John Buonocore, III is therefore entitled to receive compensatory damages for the total amount of economic loss damages sustained as a result of his murder.  Based on Dr. Markham's calculations, I assume that John III would have obtained a graduate degree and would have worked fulltime until age 67, and hereby award economic damages to his estate in the amount of $2,182,163 in lost earnings and $205,962 in lost pension, for a total of $2,388,125.

50

c.      **Frederick Gage**[38]

Dr. Markham calculated that, were it not for the shooting, Frederick would have had a

life expectancy of 77.2 years of age.  When he was killed, he was 29 years old, had a high school

diploma, and had started his own business.

First, Dr. Markham calculated Frederick's future earnings, taking into account past and

future growth figures, and discounting those earnings to their present value, to account for the

fact that the damages would be awarded in the present year and that the principal could be

invested.  Next, Dr. Markham reduced Frederick's lost future earnings to reflect his personal

maintenance expenditures, which Dr. Markham calculated to be between 36.4% and 47%.

Finally, Dr. Markham projected that Frederick would have received retirement or pension

benefits equal to 5% of annual earnings.  Ultimately, Dr. Markham derived two estimates of

economic loss for Frederick.  The first estimate is based on a worklife expectancy of 58.16 years,

based on work as a high school graduate.  The second is based on a worklife expectancy of 66.33

years, based on an assumption that he would work fulltime until age 66.33, his full Social

Security retirement age.

|  | Estimate #1 | Estimate #2 |
|---|---|---|
| Worklife Expectancy | 58.16 years | 66.33 years |
| Lost Earning Capacity | $3,146,218 | $3,348,119 |
| Lost Pension Benefits | $52,970 | $71,950 |
| Total Economic Loss | $3,199,188 | $3,420,069 |

The estate of Frederick Gage is therefore entitled to receive compensatory damages for

the total amount of economic loss damages sustained as a result of his murder.  Based on Dr.

Markham's calculations, I assume that Frederick would have continued to work fulltime until

---

[38] All of the information and analysis in this section was taken from Ex. 85 – F. Gage, Economic Loss Calculation.

age 66.33, and hereby award economic damages to his estate in the amount of $3,348,119 in lost earnings and $71,950 in lost pension, for a total of $3,420,069.

### d.   Natasha Simpson[39]

Dr. Markham calculated that, were it not for the shooting, Natasha would have had a life expectancy of 77.2 years of age.  When she was killed, she was 11 years old.

First, Dr. Markham calculated Natasha's future earnings, taking into account past and future growth figures, and discounting those earnings to their present value, to account for the fact that the damages would be awarded in the present year and that the principal could be invested.  Next, Dr. Markham reduced Natasha's lost future earnings to reflect her personal maintenance expenditures, which Dr. Markham calculated to be between 36.4% and 47%.  Finally, Dr. Markham projected that Natasha would have received retirement or pension benefits equal to 5% of annual earnings.  Ultimately, Dr. Markham derived two estimates of economic loss for Natasha.  The first estimate is based on a worklife expectancy of 60.44 years, based on her attainment of a bachelor's degree.  The second is based on a worklife expectancy of 67.0 years, based on an assumption that she would work fulltime until age 67.0, her full Social Security retirement age.

|  | Estimate #1 | Estimate #2 |
|---|---|---|
| Worklife Expectancy | 60.44 years | 67.0 years |
| Lost Earning Capacity | $997,995 | $1,153,378 |
| Lost Pension Benefits | $120,009 | $137,747 |
| Total Economic Loss | $1,118,004 | $1,291,125 |

The estate of Natasha Simpson is therefore entitled to receive compensatory damages for the total amount of economic loss damages sustained as a result of her murder.  Based on Dr. Markham's calculations, I assume that Natasha would have attained a bachelor's degree and

---

[39] All of the information and analysis in this section was taken from Ex. 87 – N. Simpson, Economic Loss Calculation.

would have worked fulltime until age 67, and hereby award economic damages to her estate in the amount of $1,153,378 in lost earnings and $137,747 in lost pension, for a total of $1,291,125.

## 2.    <u>Pain and Suffering</u>

When the victim endured extreme pain and suffering for a period of several hours or less, courts have "rather uniformly" awarded the estate $1 million. <u>Baker v. Socialist People's Libyan Arab Jamahirya</u>, 775 F. Supp. 2d 48, 81 (D.D.C. 2011) (citing <u>Haim v. Islamic Republic of Iran</u>, 425 F. Supp. 2d 56, 71-72 (D.D.C. 2006)).  <u>See also</u> <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (awarding $1 million for pain and suffering endured in the several minutes between the suicide bombing of a passenger bus and the victim's death); <u>Flatow</u>, 999 F. Supp. at 28 (awarding $1 million for pain and suffering endured for three to five hours between the suicide bombing of a bus and the victim's death).  When the period of the victim's pain was longer than a few hours, the awards have increased. <u>Haim</u>, 425 F. Supp. 2d at 72 (citing <u>Stethem v. Islamic Republic of Iran</u>, 201 F. Supp. 2d 78, 91 (D.D.C. 2002) (awarding $1.5 million for pain and suffering endured over a 15-hour period in which the victim was repeatedly beaten before being shot)).  Courts have been influenced not only by the length of time that the victim endured physical suffering, but, in those cases where the victim did not survive, by the victim's mental anguish stemming from the knowledge that death was imminent.

From all the evidence presented to the Court, the Court finds that plaintiffs suffered greatly in the Rome Airport attack, and are therefore due the following compensatory damage awards for their pain and suffering whether they survived or died. The court, however, may not award damages for pain and suffering if the evidence indicates the murdered victim died instantly.

Additionally, a review of the evidence indicates to me that the injuries sustained by the victims were along a continuum from horrible suffering before dying, through serious and less serious injuries, to immediate death.  Using that continuum, I award damages for pain and suffering as follows:

|    | Plaintiff | Type of Victim | Award |
|----|-----------|----------------|-------|
| 1  | Don Maland (estate of) | Deceased victim | $1 M |
| 2  | Mark Maland | Injured victim | $1 M |
| 3  | John Buonocore, III (estate of) | Deceased victim | 0 |
| 4  | Frederick Gage (estate of) | Deceased victim | 0 |
| 5  | Charles Shinn (estate of) | Injured victim | $1 M |
| 6  | Jeanne Shinn (estate of) | Injured victim | $1 M |
| 7  | Michael Sweis (estate of) | Injured victim | $1 M |
| 8  | Jeannette Sweis | Injured victim | $1 M |
| 9  | Juliet Sweis | Injured victim | $1 M |
| 10 | Saied Sweis | Injured victim | $250 K |
| 11 | Natasha Simpson (estate of) | Deceased victim | 0 |
| 12 | Victor Simpson | Injured victim | $1 M |
| 13 | Michael Simpson | Injured victim | $1 M |
| 14 | Elena Tommarello (estate of) | Deceased victim | $1 M |

### 3.    **Solatium**

A claim of solatium seeks compensation for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing Dammarell, 281 F. Supp. 2d at 196-97).  "In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium." Acosta, 574 F. Supp. 2d at 29.

In recent cases, the framework used in Peterson II, 515 F. Supp. at 52, has been used to calculate solatium damages.  See Valore, 700 F. Supp. 2d at 85; Belkin, 667 F. Supp. 2d at 23. In Valore, the appropriate amount of solatium damages for the families of deceased victims was

calculated as follows:  $8 million to spouses of deceased victims, $5 million to parents of deceased victims, and $2.5 million to siblings of deceased victims.[40] <u>Valore</u>, 700 F. Supp. 2d 85. The appropriate amount of damages for family members of injured victims was calculated as follows:  $4 million to spouses of injured victims, $2.5 million to parents of injured victims, and $1.25 million to siblings of injured victims. <u>Id.</u>  The court in <u>Valore</u> also noted, however, that the amounts are a guide, and not set in stone. <u>Id.</u> at 86.  There may be upward departures where there are "aggravating circumstances," as may be indicated by testimony that "describes a general feeling of permanent loss or change caused by decedent's absence" or "medical treatment for depression and related affective disorders." <u>Id.</u> (citations omitted).   Self-destructive behavior or a need for psychiatric treatment starting after the incident, may also indicate a particularly powerful feeling of loss. <u>Id.</u>  On the other hand, there may be circumstances where a downward departure is appropriate, as when the relationship between the decedent and claimant is more attenuated.

Additionally, as a finder of fact, guided by my own experience, I find that the distinctions the <u>Valore </u>court made among family members to be responsible and reasonable.  Spouses can and do remain together for a lifetime.  While children grow up and leave their parents' home, both seem to incur the same kind of loss when the other dies.  Finally, siblings most often draw apart when they leave their parents' home. Without pretending that any judgment can be lapidary, the <u>Valore</u> court's assessment is most reasonable and I will accept it.

The Court adopts these amounts as guidelines for making its determinations with regards to solatium damages.

---

[40] While it did not come up in <u>Valore</u>, the court in <u>Peterson</u> determined that parents and children of victims were entitled to the same award. <u>Peterson</u>, 515 F. Supp. 2d at 52.

|    | Plaintiff | Relationship to other victims | Award |
|----|-----------|-------------------------------|-------|
| 1  | Einar Maland (estate of) | Parent of deceased victim (Don Maland) | $5 M |
| 2  | Jane Maland | Sibling of deceased victim (Don Maland) | $2.5 M |
| 3  | Mark Maland | Sibling of deceased victim (Don Maland) | $2.5 M |
| 4  | Ellen Maland | Sibling of deceased victim (Don Maland) | $2.5 M |
| 5  | Tim Maland | Sibling of deceased victim (Don Maland) | $2.5 M |
| 6  | Grace Maland (estate of) | Parent of deceased victim (Don Maland) | $5 M |
| 7  | John Buonocore, Jr. | Parent of deceased victim (John Buonocore III) | $5 M |
| 8  | Cecile Buonocore | Parent of deceased victim (John Buonocore III) | $5 M |
| 9  | Todd Buonocore | Sibling of deceased victim (John Buonocore III) | $2.5 M |
| 10 | Nancy Gage | Sibling of deceased victim (Frederick Gage) | $2.5 M |
| 11 | Charles Shinn (estate of) | Spouse of injured victim (Jeanne Shinn) | $4 M |
| 12 | Jeanne Shinn (estate of) | Spouse of injured victim (Charles Shinn) | $4 M |
| 13 | Michael Sweis (estate of) | Parent of injured victims (Jeanette Sweis, Juliet Sweis, Said Sweis) | $2.5 M |
| 14 | Aida Sweis (estate of) | Spouse of injured victim (Michael Sweis) Parent of injured victims (Jeanette Sweis, Juliet Sweis, Said Sweis) | $4 M |
| 15 | Jeannette Sweis | Child of injured victim (Michael Sweis) Sibling of injured victims (Jeanette Sweis, Juliet Sweis, Said Sweis) | $1.25 M |
| 16 | Juliet Sweis | Child of injured victim (Michael Sweis) Sibling of injured victims (Jeanette Sweis, Juliet Sweis, Said Sweis) | $1.25 M |
| 17 | Sayel Sweis | Child of injured victim (Michael Sweis) Sibling of injured victims (Jeanette Sweis, Juliet Sweis, Said Sweis) | $1.25 M |
| 18 | Saied Sweis | Child of injured victim (Michael Sweis) Sibling of injured victims (Jeanette Sweis, Juliet Sweis, Said Sweis) | $1.25 M |
| 19 | Daniela Simpson | Parent of deceased victim (Natasha Simpson) Spouse of injured victim (Victor Simpson) Parent of injured victim (Michael Simpson) | $5 M |
| 20 | Victor Simpson | Parent of deceased victim (Natasha Simpson) Parent of injured victim (Michael Simpson) | $5 M |
| 21 | Michael Simpson | Sibling of deceased victim (Natasha Simpson) Child of injured victim (Michael Simpson) | $2.5 M |

## B.    Punitive Damages

Punitive damages against the state were not available until the 2008 revisions to the

FSIA. Valore, 700 F. Supp. 2d at 87.  According to the Restatement (Second) of Torts, the

purpose of punitive damages is "to punish" a defendant for "outrageous conduct," and "to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1977); see also Acosta, 574 F. Supp. 2d at 30.  Courts evaluate four factors in determining a proper punitive damages award: "(1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." Acosta, 574 F. Supp. 2d at 30 (quoting Flatow, 999 F. Supp. at 32).

In this case, the evidence shows defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose *modus operandi* included the targeting, brutalization, and murder of American citizens and others.  The character of these acts merits an award of punitive damages.  See, e.g., Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 235 (D.D.C. 2002) (finding the character of the defendant's act—where the defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture—supported a punitive damage award of $300,000,000).  As noted by Dr. Marius Deeb in his testimony, Syria, as a state sponsor of terrorism, spends between U.S. $500,000,000 (at a minimum) and U.S. $700,000,000 annually on terrorism-related expenditures. (M. Deeb, T-24-6)  Thus, not only is there a need for deterrence, but there is evidence that the defendant has substantial wealth.

Recent cases have taken different approaches in determining the appropriate amount of punitive damages in terrorism cases.  In Valore, Heiser, and Acosta, the Court held that an appropriate measure of punitive damages was the state's annual expenditures on terrorism multiplied by a number from three to five. Valore, 700 F. Supp. 2d at 88-90; Heiser, 659 F. Supp. 2d at 30-31; Acosta, 574 F. Supp. 2d at 31.  In Gates I, on the other hand, the Court

awarded each of the families $150 million in punitive damages, for a total of $300 million. Gates
I, 580 F. Supp. 2d at 75.

Examining these cases helps determine which method is most appropriate.  In Valore,
where the Court multiplied the amount expended each year by five, the court pointed out that
Iran had begun to participate more actively in litigation in the United States. Valore, 700 F.
Supp. 2d at 89.  The court hypothesized that, in light of Iran's "paying more attention to the
cases that have been brought against it," it might be more likely that the punitive damages would
have the desired effect of "send[ing] the strongest possible message" to Iran that its support of
terrorism would not be tolerated. Id.  Furthermore, the terrorist act underlying the case was the
1983 bombing of a Marine barracks in Beirut, which was the most deadly state-sponsored
terrorist attack on Americans until September 11, 2001, killing 241 American military
servicemen. Id. at 57.  The punitive award in that case was $1 billion. Id. at 89.  In Heiser, the
estimated terrorism expenditures by Iran were between $50 million and $150 million per year;
based on that range, the Court took the mean, $100 million, and multiplied it by three, noting that
this Court had, with one exception, never awarded an amount higher than $300 million in
punitive damages against Iran. Heiser, 659 F. Supp. 2d at 30-31.  In Acosta, the Court had the
same numbers, and came to the same conclusion, awarding $300 million dollars in punitive
damages against Iran. Acosta, 574 F. Supp. 2d at 31.

As the Court in Gates I noted, the punitive damage finding must still comport with the
requirements of due process, and should be commensurate with awards in other FSIA cases.
Gates I, 580 F. Supp. 2d at 75 n.19 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575
(1996)).  Were this Court to adopt the mean-terrorism-expenditures-times-three formula, the total
punitive damages would be $1.8 billion.  While this shooting incident was very tragic and

serious, and lives were destroyed by it, it would not be appropriate for this Court to award plaintiffs $8 million more than the families and victims of the Beirut bombing in <u>Valore</u> received.  Thus, I find that the per-victim standard in <u>Gates I</u>, where the defendant was also Syria, is the more appropriate measure in this case.

The acts in <u>Gates</u> were particularly atrocious; two men were beheaded, while conscious, on camera.  While I might otherwise reduce the award in this case, however, Syria's active involvement in litigation in this Circuit[41] indicates that there may be some chance, as in <u>Valore</u>, that punitive damages could have the desired effect.  Thus, I recommend and award of $150 million in punitive damages to each of the victims of the shooting and their families.

## C.   <u>Prejudgment Interest</u>

It is within the Court's discretion to award plaintiffs prejudgment interest from the date of the attack on December 27, 1985, until the date of final judgment. <u>Pugh v. Socialist People's Libyan Arab Jamahiriya</u>, 530 F. Supp. 2d 216, 263 (D.D.C. 2008).  The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations. <u>Id.</u> (citations omitted).  "Courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." <u>Id.</u>  Prejudgment interest is entirely appropriate in this case, and necessary to fully compensate the victims for the injuries they sustained as a result of Syria's material support of the ANO.  Such awards compensate the victims for any delay due to litigation, and prevent Syria from profiting from its terrorist attacks.  <u>See</u> <u>id.</u>

---

[41] Syria appealed the judgment in the <u>Gates I</u> case and filed a motion for relief from judgment in the district court. <u>Gates v. Syrian Arab Republic</u>, 646 F. Supp. 2d 79, 81-82 (D.D.C. 2009) ("<u>Gates II</u>").

An appropriate measure of what rate to use when calculating prejudgment interest is the prime rate, *i.e.*, the rate banks charge for short-term unsecured loans to credit-worthy customers. Oldham v. Korean Air Lines Co., 127 F.3d 43, 54 (D.C. Cir. 1997) (citing Forman v. Korean Air Lines Co., Ltd., 84 F.3d 446, 450 (D.C. Cir. 1996), cert. denied, 519 U.S. 1028 (1996)).  In Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48, 87, I stated:  "The Court accepted testimony from Dr. Markham regarding his economic analysis and the applicable prime rate of interest for each year from 1985 through 2010. Markham, T-4, 175-177; Pltf's Exh.93, Table 1.  Using his report and the current prime rate,[42] the Court averages the prime rate from 1985 through 2011, with a result of 7.03%."  I shall use the same analysis here.

Plaintiffs sustained injuries in the form of pain and suffering for the victims of the attack and emotional distress for their immediate families, as addressed by the solatium claims.  Thus, the Court recommends awarding plaintiffs prejudgment interest on their damages for solatium and pain and suffering, again computed at a rate of 7.03% per annum from December 27, 1985 to the present.

## VIII.  Conclusion

For the foregoing reasons, final judgments will be entered against the defendant by way of a separate Judgment Order in the amounts set forth in the summary chart below.

| Plaintiff | Compensatory Damages | | | Punitive Damages | Total Award (Total damages x 7.03% per annum) |
|---|---|---|---|---|---|
| | Economic | Pain & Suffering | Solatium | | |
| Don Maland (estate of) | $2,344,959 | $1 M | | $150 M | $1,027,600,284 |
| Einar Maland | | | $5 M | $150 M | $1,038,691,099 |

---

[42] The prime rate as of October 2012 is 3.25%; it has not changed since 2009. Economic Data – FRED® of the Federal Reserve Bank of St. Louis, http://research.stlouisfed.org/fred2/series/MPRIME (last visited Oct. 23, 2012).

| | | | | | |
|---|---|---|---|---|---|
| (estate of) | | | | | |
| Jane Maland | | | $2.5 M | $150 M | $1,021,938,017 |
| Mark Maland | | | $2.5 M | $150 M | $1,021,938,017 |
| Ellen Maland | | | $2.5 M | $150 M | $1,021,938,017 |
| Tim Maland | | | $2.5 M | $150 M | $1,021,938,017 |
| Grace Maland (estate of) | | | $5 M | $150 M | $1,038,691,099 |
| John Buonocore, III (estate of) | $2,388,125 | | | $150 M | $1,021,188,317 |
| John Buonocore, Jr. | | | $5 M | $150 M | $1,038,691,099 |
| Cecile Buonocore | | | $5 M | $150 M | $1,038,691,099 |
| Todd Buonocore | | | $2.5 M | $150 M | $1,021,938,017 |
| Frederick Gage (estate of) | $3,420,069 | | | $150 M | $1,028,103,614 |
| Nancy Gage | | | $2.5 M | $150 M | $1,021,938,017 |
| Charles Shinn (estate of) | | $1 M | $4 M | $150 M | $1,038,691,099 |
| Jeanne Shinn (estate of) | | $1 M | $4 M | $150 M | $1,038,691,099 |
| Michael Sweis (estate of) | | $1 M | $2.5 M | $150 M | $1,028,639,250 |
| Aida Sweis (estate of) | | | $4 M | $150 M | $1,031,989,866 |
| Jeanette Sweis | | $1 M | $1.25 M | $150 M | $1,020,262,709 |
| Juliet Sweis | | $1 M | $1.25 M | $150 M | $1,020,262,709 |
| Sayel Sweis | | | $1.25 M | $150 M | $1,013,561,476 |
| Saied Sweis | | $250 K | $1.25 M | $150 M | $1,015,236,784 |
| Natasha Simpson (estate of) | $1,291,125 | | | $150 M | $1,013,837,064 |
| Antonia Daniela | | | $5 M | $150 M | $1,038,691,099 |

| | | | | | |
|---|---|---|---|---|---|
| Simpson | | | | | |
| Victor Simpson | | $1 M | $5 M | $150 M | $1,045,392,332 |
| Michael Simpson | | $1 M | $2.5 M | $150 M | $1,028,639,250 |
| Elena Tommarello (estate of) | | $1 M | | $150 M | $1,011,886,168 |


_____
JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE